## BACHNER & ASSOCIATES, P.C.
ATTORNEYS AT LAW
26 BROADWAY
SUITE 2310
NEW YORK, NEW YORK 10004

TELEPHONE: (212) 344-7778
FACSIMILE: (212) 344-7774

www.bhlawfirm.com

MICHAEL F. BACHNER*

DANIELLE L. ATTIAS
KEVIN T. O'BRIEN

*ALSO ADMITTED IN NJ

NEW JERSEY OFFICE
175 FAIRFIELD AVENUE
SUITE 3D
WEST CALDWELL, N.J. 07006
TEL: (973) 403-9550

November 13, 2007

**VIA FACSIMILE**
**And ECF**
Hon. Richard M. Berman
United States District Court Judge
Southern District of New York
US Courthouse
500 Pearl Street
New York, NY 10007

Re:   *United States of America v. Hafiz Muhammad Zubair Naseem, et. al.* /07 Cr. 610 (RMB)

Dear Judge Berman:

I am counsel for the defendant, Hafiz Naseem. This letter sets forth for the court various issues to be addressed *in limine*.

1.   **Wire Transfers to the Defendant.**

According to the discovery, the defendant received a total of ten wire transfers beginning in June 2006 and ending in March 2007. The wires, ranging in value from $856.00 to $89,250.00, originated in Pakistan through the accounts of a.) Ateeq Ahmed/ Arjumand Ateeq/ Haaris Ahmed;  b.) Anis Uddin Sheikh;  c.) Melissa Ikram;  and d.) Syed Irshad Shah. The sum of the ten wires was approximately $198,504.00. We expect the government will seek to argue that information about these wire transfers is admissible to show that the defendant was compensated by his alleged co-conspirator, Ajaz Rahim, for allegedly tipping him with inside information. It is the defense's position, for the reasons set forth below, that information regarding these wire transfers should be deemed inadmissible as rank speculation.

Initially, there is **absolutely no proof** connecting the money being sent or the persons whose accounts were used to send the wires to the alleged tippee, Rahim or his trading

BACHNER & ASSOCIATES, P.C.

activity. There is also no proof that any of the above mentioned persons engaged in any trading activity in the stocks charged in the indictment or received any financial gain or benefit from Ajaz Rahim, the alleged tippee. Moreover, in all the Rahim account statements, provided in discovery, there are no corresponding wire transfers or cash withdrawals that could have been linked to these wires. This alone makes the evidence inadmissible under F.R.E. 104 and 403. But there is more. The government has alleged that the profits generated by Rahim as a result of the alleged insider trading scheme was over $7,000,000. It is ridiculous to claim that $198,000, paid over nine months was Naseem's compensation for allegedly misappropriating and divulging confidential information. Also, the timing of the wires bears no correlation at all to the timing of Rahim's trading activities. Finally, according to the discovery, the account of Ateeq Ahmed was used to wire money to Naseem as far back as 2005 – long before Naseem even joined CSFB. In fact, the defendant received money from the account of Ateeq Ahmed in his student checking account going back to 2003, a time when the defendant was a graduate student at NYU (the account has since been closed). As attested to in the attached affidavit from the defendant's father (Ex A), all this money was, in fact, sent to the defendant by his father, and was raised through legitimate sources. Clearly then, the fact that money was transferred by him to Naseem cannot be evidence of criminality. Therefore, in the absence of proof tying each of these wire transfers to Rahim or Rahim's trading, jury will be required to indulge in rank speculation in order to arrive at a conclusion that Naseem was compensated through these wires for tipping Rahim.

Therefore, all testimony and documentation regarding these wires must be excluded from evidence.

2.  **Access to a CSFB Printer**

The government has supplied counsel with documents that the government claims the defendant actually accessed from the CSFB database (defendant did not work on any of the alleged deals). However, in order to fill in the holes in their proof, the government will also seek to ask the jury to speculate that the defendant must have misappropriated other information from CSFB simply because he (and hundreds of others) had access to it by virtue of his desk's proximity to a printer and to other desks in his group. In the absence of proof that Mr. Naseem actually misappropriated information, and identification of specific information allegedly taken from the printer or from other group member desks, this type of rank speculation is improper under FRE 104 and 403.

"Although the [Government] may prove that a defendant possessed material nonpublic information through the use of circumstantial evidence (beyond alleged 'suspicious' trading), the [Government] may not rest on evidence that would require a jury to speculate that the defendant possessed that information." *SEC v. Truong*, 98 F. Supp. 2d 1086, 1097-98 (N.D.Ca. 2000). In *Truong*, the Government alleged that Hahn Truong came into possession of material non-public information of his employer, Molecular Dynamics, Inc. ("MDI"), and misappropriated that information by trading in his own accounts and tipping the information to his brothers and a friend. The central issue was "whether the SEC has offered sufficient evidence on which a reasonable jury can infer

BACHNER & ASSOCIATES, P.C.

that [Mr. Truong] was in possession of material non-public information at the time he sold the stock." *Truong*, at 1097.

The Court held that Hahn's mere *access to* documents was not sufficient to establish liability:

> The SEC contends that Hahn "had access" to these documents, but does not deny that his access was the same as any other MDI employee. As Hahn pointed out in oral argument, "access to documents" means essentially that Hahn worked in an office with open cubicles and had routine interactions with senior management. With reference to the draft of the Form 10-K, the SEC notes that Hahn was working late the same evening that the company controller was working late. But the SEC failed to adduce evidence that Hahn was seen lurking around the controller's office or was engaged in any other behavior which would raise some questions about whether he overheard some discussions of confidential financial information. A reasonable jury cannot conclude that the mere open-cubicle environment of a corporation could give rise to an inference of possession, otherwise, as argued by Hahn at oral argument, "anyone who works in an office with open cubicles, like virtually everyone in Silicon Valley, and who has merely normal professional relationships with senior management must be considered to have 'access to confidential information' for insider trading purposes."
>
> \* \* \*
>
> The evidence of possession is so tenuous that it would require a jury to speculate, for example, that Hahn rifled through papers hidden in senior staff members' offices or to speculate about the contents written on the white board in manufacturing.

*Hahn*, at 1098-99.

Several Southern District Courts have cited to *Truong* when faced with circumstantial evidence of possession of material non-public information by a tipper. In *SEC v. Gonzalez de Castilla*, 184 F. Supp. 2d 365 (S.D.N.Y. 2002), the Court cited the *Truong* decision favorably as an example of a case where "other courts have granted summary judgment in defendants' favor under similar gaps in proof." *Gonzalez de Castilla*, at 378. Similarly, in *SEC v. Euro Sec. Fund*, 2000 U.S. Dist. LEXIS 13847 (S.D.N.Y. Sept. 25, 2000), an unreported decision, the Court agreed with the holding of *Truong* but distinguished that case on its facts. Notably, the tipper in *Euro Sec. Fund* (1) lied to investigators, (2) concealed his personal trading in an account away from the firm, in violation of firm policy, (30 deliberately destroyed telephone records, and (4) made potentially incriminating statements on recorded telephone calls. *Euro Sec. Fund* at \*3-\*4.

Paragraph 12 of the Government's complaint against Mr. Naseem alleges that he had access to some of the confidential information forming the basis of the charges because

BACHNER & ASSOCIATES, P.C.

his "desk was situated near a printer that was used in connection with certain of the Subject Transactions" although neither he nor his group worked on those transactions. The Government further alleges that Mr. Naseem had access to other confidential information relating to deals being worked on by his group (Global Energy Group) since his desk was "situated in close proximity to other members" of the group. The government has also failed to identify the specific printer, establish its proximity to defendant's desk, identify the documents that were printed and the timing of the alleged printing and provide the name of a single corroborating witness (on an open floor of open cubicles with almost 100 bankers). The Government has, however, since acknowledged that they have no proof that the defendant actually misappropriated or attempted to misappropriate any specific information either from the printer near his desk or from the desk(s) belonging to any member of the Global Energy Group. This is precisely the type of speculation that the Court found impermissible in *Truong*. Indeed, the instant case arguably calls for greater speculation on the part of the jury because, unlike Mr. Truong, Mr. Naseem did not personally trade during the time period in which he allegedly was in possession of material non-public information. Further, none of the factors present in *Euro Sec. Fund* are present here. Nevertheless, the government still intends to argue that the jury should infer actual access of information from the mere opportunity to access information. This argument, like the wire transfer argument above, improperly calls on the jury to engage in rank speculation and should not be permitted.

### 3. Documents Related to Ajaz Rahim's accounts at Merrill Lynch and at Julius Bear are Inadmissible.

The government intends to introduce against Naseem as business records, documents regarding Ajaz Rahim's alleged trading accounts at Merrill Lynch located in Bahrain, and at Julius Bear located in the Channel Islands. These documents purport to include Rahim's account statements, opening account documents (containing, among other things, his address, date of birth, telephone number, and investment objectives), and, in the case of the Merrill Lynch account, alleged summaries of conversations between Rahim and his alleged broker.[1]

### The Foreign Documents are Non-Self-Authenticating Hearsay[2]

The law is clear that unless the Government provides evidence that Merrill Lynch and/or Julius Bear either verified the information contained in the documents, including phone number or had a regular practice of verifying customer information, the documents would not be admissible for the purpose of establishing that the information contained in the documents, including address, telephone number, and other pedigree information is in

---

[1] I have attached copies of these documents as Exhibit B.
[2] FRE 902 (12) sets for the process to authenticate certified foreign records of regularly conducted activity otherwise admissible pursuant to the business record hearsay exception of FRE 803(6). FRE 902(12), however, explicitly limits its provisions to "civil cases." Accordingly, the Julius Bear documents, including the monthly statements, may not be authenticated merely by certification.

BACHNER & ASSOCIATES, P.C.

fact Rahim's.[3] In *United States v. Reyes,* 157 F.3d 949 (2d Cir. 1998), the District Court admitted a log book maintained by Cape Vincent Correctional Facility ("Cape Vincent") to corroborate testimony that the witness, Raul Vargas, and other members of Mr. Reyes's gang visited him at Cape Vincent on days close in time to several murders:

> Before admitting the logbook into evidence, the district court heard testimony outside the presence of the jury from Susan McLear, the Inmate Records Coordinator at Cape Vincent, who was responsible for maintaining and storing prison visitor logbooks, and who testified on the basis of what she observed when people came to see her at the prison. The procedure, according to McLear, is that visitors are required to show identification to the lobby officer and to sign their names and record their addresses in the logbook, and that the lobby officer is required to check the visitor's identification against the entry in the book. McLear, who had been employed by the Department of Corrections for eight years, testified that this was "normal procedure at a correctional facility."

*Reyes,* at 951. The District Court admitted the log book into evidence, and Mr. Reyes was subsequently convicted. The Second Circuit affirmed, finding that, *inter alia,* "The person making the record need not have a duty to report so long as someone has a duty to verify the information reported . . . So long as the regular practice of verification is established, the cases allow the names into evidence under the business records exception." *Reyes* at 952. The *Reyes* Court cited to *United States v. Lieberman,* 637 F.2d 95 (2d Cir. 1980). There, in the context of information obtained from a hotel guest, the Court provided the following analysis:

> Lieberman's objection to the admission of the hotel guest card was that the lines showing the guest's name and address had been filled in by the guest, not the hotel's employee. This objection missed the mark. We do not view the applicability of the business records exception as depending on the purely formal matter of whether the guest supplies the information by writing it on the card, or by stating it so that it may be written on the card by the employee. ***The latter process would not suffice to make the business records exception applicable to prove the identity of the guest unless the employee were able in some way to verify the information provided for example, by examining a credit card, driver's license or other form of identification.*** See Note, Revised Business Entry Statutes: Theory and Practice, 48 Colum.L.Rev. 920, 927 (1948) ("The mere fact that recordation of third party statements is routine, taken apart from the source of the information recorded, imports no guaranty of the truth of the statements themselves.") By the same token, however, if such verification is obtained by the employee, we see no reason why the guest card that has

---

[3] Since Rahim purportedly opened his Merrill Lynch account in February 2006, before the April 2006 date the conspiracy with Naseem is alleged to have started, the statements could not be admissible as coconspirator's statements made in furtherance of the conspiracy. FRE 801(d)(2) 12 and 13.

BACHNER & ASSOCIATES, P.C.

been filled in by the guest himself would not qualify as a business record and thus be admissible for the truth of its statements.

*Lieberman* at 100-101.

Therefore, we argue that all the documentation regarding Rahim's account is inadmissible hearsay and must be excluded.

### 4. Naseem's Efforts to Open a Brokerage Account in Pakistan

In May 2006, Naseem sent various emails to a brokerage firm, Arif Habib, located in Pakistan, asking to open an account. In one of his emails to the broker, Sajid Bhanji, Naseem authorized Rahim to manage the account. He ended the email with the words, "Let the fun start." The documents were never signed by Rahim as the ostensible manager of the account. The Government may seek to introduce this and other communications with Bhanji as admissions by Naseem or a business records of Credit Suisse. We object. under FRE Sections 104 and 403.

There is no dispute between the defense and the government that the Arif Habib account was never opened, nonetheless funded.[4] Moreover, I am informed that in May 2006 (up till the present) the Arif Habib firm dealt only in securitites which traded on the Pakistani Exchnage. Thus, none of the securities in issue at this trial could have been bought or sold by Rahim or Naseem at Arif Habib. Given the fact that the account was never opened or funded, the records of the account and Naseem's emails surrounding it are simply irrelevant to proving an issue in dispute in the case.

The defendant respectfully requests that the relief sought be granted and that counsel be afforded the opportunity to orally argue the issues.

Respectfully submitted,

Michael F. Bachner

MFB/jl

Cc: AUSA Josh Klein (via ECF and e-mail))
    AUSA Reed Brodsky (via ECF)

---

[4] I have attached a certification from Arif Habib attesting to that fact (Ex C). The government initially agreed to stipulate to this fact but withdrew its stipulation after the defense refused to stipulate to other matters with the government.