UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA,

                Plaintiff,                NOTICE OF MOTION
                                                    Indictment # 07 Cr. 610 (RMB)

           -against-

HAFIZ NASEEM,

                Defendant,
-------------------------------------------------------X

**PLEASE TAKE NOTICE** that, upon the annexed affidavit of Michael F. Bachner, Esq., duly sworn to the 20th day of December 2007, the Indictment, exhibits, and upon all proceedings heretofore had herein, the undersigned, on behalf of the defendant, HAFIZ NASEEM, will move this court, before the Honorable Richard M. Berman, United States District Court Judge, Southern District of New York, at the United States Courthouse, 500 Pearl Street, New York, New York, on an adjourn date to be set by the Court, for an Order dismissing the Indictment on the grounds that the retrial of the defendant would violate the Double Jeopardy Clause of the United Constitution.

Dated:       December 20, 2007
               New York, New York

                                                              Respectfully submitted,

                                                             BACHNER & ASSOCIATES, P.C.
                                                             *Attorney for the Defendant*
                                                              *HAFIZ NASEEM*
                                                             26 Broadway, Suite 2310
                                                             New York, NY 10004
                                                             (212) 344-7778

To:    Hon. Richard M. Berman
        AUSA Joshua Klein, Esq.
        AUSA Reed Brodsky, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA,

                Plaintiff,                      AFFIRMATION
                                                                Indictment # 07 Cr. 610 (RMB)
      -against-

HAFIZ NASEEM,

                Defendant,
------------------------------------------------------X

      MICHAEL F. BACHNER, ESQ., an attorney duly admitted to the practice of law in the state of New York and before the federal court in the Southern District of New York, hereby swears under the penalties of perjury as follows:

      1.    I am the attorney for the defendant, Hafiz Naseem. As such, I am fully familiar with the fact s and circumstances of this case.

      2.    I submit this affirmation in support of the defense motion to dismiss the indictment against the defendant on the grounds that his retrial would violate the Double Jeopardy Clause of the United States Constitution.

## STATEMENT OF FACTS

      3.    Jury selection commenced in this action on Monday, December 10, 2007. The jury was impaneled and sworn on that day. After opening statements, the jury was excused and ordered to return the following day for the beginning of testimony.

      4.    Before the trial began on the morning of December 11, 2007, the Government informed the Court that an attorney for Credit Suisse who was present in the courtroom during the jury selection process the previous day observed an acquaintance of the defendant (the "Third Party") speaking with three members of the venire pool. Tr.

187.[1] One of these venire members was ultimately selected for the jury, Tr. 187, and was subsequently identified as juror #8 ("Juror #8"). Tr. 189, 194-97.[2]

5. According to the Government, the Credit Suisse attorney informed prosecutors that the Third Party spoke to Juror #8 for approximately 30 seconds, but that the contents of this conversation were unknown. Tr. 187. The Government further represented to the Court that when Juror #8 was selected to the jury, the Third Party "made a gesture and a smile" to another acquaintance of the defendant. Tr. 188

6. After a brief recess, defense counsel returned and told the Court that he believed the appropriate first step was to question Juror #8 about what had occurred. Tr. 191. The defense's position was stated as follows:

> [MR. BACHNER:] So all I can say, your Honor, is that our suggestion is as follows: I certainly have been involved in cases, and probably your Honor has as well, in which there have been questions about whether a juror spoke with somebody or did someone speak to a juror in the elevator, things of that nature. And the Court's general process is to ask the juror what happened in a very innocuous fashion. If the juror says: "Nothing, I was speaking with some woman who said, 'isn't this fun' or 'how is the weather'" or something like that, I don't know that if your Honor believes the juror, that it would have to really go any further. If your Honor for some reason disbelieves the juror and thinks that the juror is holding something back, we don't have any problem with your Honor speaking to whoever she says spoke with her. She may say no one did.
> THE COURT: Right.
> MR. BACHNER: That all being said, your Honor, you should know that to the extent that your Honor believes that that will cause an undue delay, etc., we don't have any problem replacing the juror, but we do want your Honor to know that for your own comfort, if you believe that you want to conduct and speak to the people here, that's fine with us.

Tr. 190-91.

---

[1] The letters "Tr." Followed by a page number refer to the court transcripts of December 11.
[2] No reason was given to explain why the Credit Suisse attorney waited to communicate her observations to the government until after the jury was sworn.

3

7.  Thereafter, the Court and counsel for both parties agreed that the Court should question Juror #8 *ex parte*, and that steps be taken to ensure that she did not attach the inquiry or any potential contact to the Government or the defense. Tr. 192-93.

8.  The following conversation then occurred between the Court and Juror #8, outside of the presence of counsel:

> THE COURT: I just wanted to ask you a question or two.
> A JUROR: Sure.
> THE COURT: One of the observers thought they might have seen you talking or someone talking to you yesterday who is from the audience, who is not part of the jury pool. So I just wanted to ask you if you know what they're talking about?
> A JUROR: Yes, I do, and I -- I didn't know whether that would be an issue or not. It just so happens that the young lady who had a scarf, she sat next to me.
> THE COURT: In the audience?
> A JUROR: Yes.
> THE COURT: OK.
> A JUROR: And I guess one of your assistants asked her whether she was going to be, you know, selected, and then she said, no, I'm part of the audience.
> THE COURT: I see.
> A JUROR: Then she just made a comment to me about that something about I guess my appearance looked like I would make a good juror.
> THE COURT: Yours or hers?
> A JUROR: Yes, mine because I guess I said something like, you know, this is a little nerve racking or something, and then she says, oh, but you -- your type of person would make a good juror.
> THE COURT: I see.
> A JUROR: Then I said, OK. I didn't think anything of it, and then I did go to the pizza shop, and I did see her with the defendant.
> THE COURT: Right.
> A JUROR: And then I just said, oh, I don't know if that makes a big deal, and then I made a comment to one of the jurors that she had spoken to me, but I don't know if that's an issue, so --
> THE COURT: All right. So, does it --
> A JUROR: Sway me either way?
> THE COURT: Yes.

4

      A JUROR: I don't think so at all, but I have to say I was a little nervous because I know that now she's in the audience, and I guess I'm sure she's with him.

      THE COURT: It's my understanding that --

      A JUROR: I don't know the relationship though.

      THE COURT: OK. My understanding is that she is a friend of his or something like that.

      A JUROR: OK.

      THE COURT: But the bottom line, how do you feel about it? Do you feel you can go forward fairly and impartially as a juror?

      A JUROR: Yes.

      THE COURT: That's all I wanted to know.

      A JUROR: That's not an issue, and I'm sorry.

      THE COURT: No. No.

      A JUROR: I feel like -- I told -- I know we're not supposed to talk about this. I spoke to my husband. I didn't tell him about the case other than that this lady talked to me, and I don't know if I should say something or would that influence or --

      THE COURT: Right. What about the other juror? Do I need to talk to the other juror who you talked to to see if she has any -- is it a she or a he?

      A JUROR: Yes, it's a she.

      THE COURT: What number?

      A JUROR: She's right next to me. I'm 8, so she's 7.

      THE COURT: 7. Maybe I should talk to her for a minute as well. Let me decide that. You're doing a great job.

      A JUROR: Sorry.

      THE COURT: Not to be sorry at all. These things happen, incidentally.

      A JUROR: It was one of those weird things. She just sat next to me, and I said, oh, gosh, who is she, and later on I saw her and I said, oh, God. But it doesn't -- it doesn't impede in any way. I'm impartial. It's about the facts.

      THE COURT: Great.

Tr. 194-97.

      9.    The Court then called counsel for both parties into the robing room and summarized his conversation with Juror #8.. Tr. 197-98. Defense counsel voiced his concern to the Court about whether Juror #8 believed that the Third Party was connected to the defendant. In response, the Court informed counsel that Juror #8 had seen the Third Party and the Defendant together out of court. Tr 198. The Court, however, did not

inform defense counsel that it was the juror, and not the Third Party, who had initiated the conversation.

10.   In response to the information he was supplied with, defense counsel, fearing that Juror #8 might "bend over backwards" to the detriment of the defense, requested that Juror #8 be removed. On the other hand, the Government opined that Juror #8 had expressed an ability to be "completely fair." Tr. 198-99. Counsel for the parties then left the robing room and the Court spoke with Juror #7:

> THE COURT: Hi. How are you? Nice to see you.
> A JUROR: Nice to see you too.
> THE COURT: Grab a seat for a minute. I just wanted to mention, I was talking to one of your other juror colleagues, Juror No. 8, and she had mentioned that somebody said something to her yesterday who was not a member of the jury pool, and she was a little nervous that that had happened. She relayed it to me and she also said it would not impact her ability to be fair and impartial as a juror, but she did mention that she also mentioned it to you. I think she said it was to you. She said the woman to her right; that would be you.
> A JUROR: Mmm-hmm.
> THE COURT: So I just wondered if you were aware of it, and if it would have any impact on you at all as a juror?
> A JUROR: No.
> THE COURT: Did she say something to you, Juror No. 8, that she was concerned that she had -- that's what she said to me she voiced a concern.
> A JUROR: I think she said maybe she was a little nervous, this was her first time, yeah.
> THE COURT: So whatever occurred and whatever she said, you would still be fair?
> A JUROR: Oh, absolutely. Absolutely.
> THE COURT: All right. Thanks very much.
> A JUROR: You're quite welcome.
> THE COURT: We're going to start in a minute. I just wanted to clear this all up. Thanks again.
> A JUROR: You're quite welcome.

Tr. 199-201.

6

11.     After speaking with Juror #7, the Court addressed counsel for both parties in open court without the jury present. The Court stated that Juror #7 acknowledged that Juror #8 told her about the incident and also said that it would not impact her ability to be fair. Tr. 201. That said, the Court expressed concern that "both jurors were at some whatever level involved in some extra courtroom proceeding, as it were, however minor, and didn't follow my instructions, which are that if something like that happens, you need to report it to the Court." Tr. 201. As a result, the Court concluded that "the safest thing to do is to not excuse one but to excuse two jurors and then where that, I think, leaves us is in the unfortunate position of having two [sic] few jurors." Tr. 201. In explaining that this would result in a mistrial, the Court provided the following rationale:

> THE COURT: Yes. Ultimately, what I think I'm suggesting is a mistrial might be declared, and we would start afresh and impanel a new jury. And just so you know, my thinking is actually two reasons: One is something happened. Mr. Bachner thinks it wouldn't be helpful to his client. I think that the jurors both assured me that they would be fair and impartial. It wasn't anything that would impact them. But something did happen and didn't get reported, and I also think that there could be some implication but -- not implication, but some effect on the remaining jurors if all of a sudden, for example, you all agree that two jurors would be excused and we have 13 and go forward with 13. That is two issues. One is I think 13 is too small a number, but it also has an issue about whether the other jurors might wonder, speculate what happened to Jurors No. 7 and 8, which I think would be unfortunate also.

Tr. 202.

12.     Counsel thereafter asked for time to consider the situation, which the Court granted. After an approximately 30 minute break, counsel returned to the courtroom. The Government stated that its preference was to go forward with the jury as impaneled because the jurors stated that they could be impartial and an immediate retrial could make it difficult for the Government to schedule all of its witnesses. Tr. 204.

However, after learning that the earliest the retrial would commence was January 7, 2008, the Government stated that it thought that it would be "amenable to starting over on January 7." Tr. 206.

13.   Thereafter, defense counsel suggested that the trial resume with thirteen jurors. Tr. 206. The Government did not consent to this alternative and again expressed its preference "to go forward with the jury as selected." Tr. 206. The Court acknowledged the Government's position and asked defense counsel for a response. Defense counsel responded as follows: "Your Honor, after having had extensive conversations with Mr. Naseem, he's decided to proceed with the jury as maintained at this time." Tr. 207.

14.   The Court then asked counsel for both parties whether it was "legally appropriate to declare a mistrial in a circumstance like this and start over again." Tr. 208. The Government stated that it was in the Court's discretion. Tr. 208. Defense counsel stated that the Court "would have to find just cause to declare a mistrial." Tr. 209. Defense counsel then stated that his "only bit of discomfort is [he] didn't have a chance to hear the jurors' words and see their faces." Tr. 208. Nevertheless, defense counsel opted to proceed with the trial::

> [MR. BACHNER:] Mr. Naseem is comfortable that in their answers that they said that they can be fair and that they weren't swayed and they weren't bothered by any of this.
> In some ways, your Honor, I'm taking the fact that they didn't say anything to the Court because they probably -- they may have felt it was such an insignificant event, they didn't think it was something that had to get reported.
> I think at this point, Mr. Naseem's preference is that we proceed with the jury as impaneled, and we're ready to go forward if your Honor so rules.

8

Tr. 208-09. The Court then asked for some time to consider the situation to "make sure that expediency is not the driving force." Tr. 209.

15. Upon returning, the Government, in an about-face, stated that it had spoken with its Appeals Bureau regarding the option of going forward with the fifteen original jurors, and decided that they now had concerns about the ability of the two jurors to be fair and impartial. Tr. 210. The Court indicated that it shared the Government's concerns about the two jurors. Tr. 210. The Court then asked defense counsel if he had a position and counsel stated that his position had been stated. Tr. 210. Counsel then stated that "[w]e've indicated the one alternative would have been to 13, and we've indicated what our preferences were other than that." Transcript, p. 211.

16. The Court then took a short break and rendered its decision. While acknowledging that each juror would be "fair and impartial as jurors going forward," Tr. 212, the Court nevertheless declared a mistrial:

> [THE COURT:] The reason I'm declaring a mistrial is to safeguard the integrity of the jury that we have selected, and more broadly the jury system. The appearance of impropriety in this instance may be as important as any actual impropriety.
> Mr. Bachner has earlier stated today and, again, I believe on the record, that he was concerned that the juror in question might not be impartial, might bend over backwards, as it were, in favor presumably of the government to show impartiality. He didn't -- he expressed that as a possible concern.
> There must be no doubt in this and in every other case that each juror is fair and impartial. That no external events or persons approach or influence the jurors.
> And that I specifically, as I had specifically instructed this jury, and as I instruct every jury, if there is such contact, that they report it to me immediately. Which they did not do in this case. Neither the juror who was first approached nor the second juror who spoke to the first juror, even though this did happen yesterday and there was ample time to either call or speak to me or Christine or bring it to our attention so they clearly had the opportunity.

Tr. 212-13.

17. Later the Court further clarified his position that he found no misconduct by the defense:

> I trust incidentally that you all understand that I'm not suggesting that venality occurred here. What I know is what you now know, and my comments I think speak for themselves. But I think that there is this manifest necessity to insure the integrity of the jury system. And this jury in particular. And I think this is the best way that I can think of as to how to do that.

Tr. 216.

### LEGAL ARGUMENT

#### I. Jeopardy Attached When the Jury Was Impaneled and Sworn

18. The Double Jeopardy Clause is designed to protect "not against being twice punished, but against being twice put in jeopardy." *United States v. Dixon*, 509 U.S. 688, 746 (1993), *citing United States v. Ball*, 163 U.S. 662, 669 (1896). As such, jeopardy attaches "when the jury is empanelled and sworn." *Corey v. District Court of Vermont, Unit #1, Rutland Circuit*, 917 F.2d 88, 90 (2d Cir. 1990), *citing United States v. Martin Linen Supply Co.*, 430 U.S. 564, 569, 51 L. Ed. 2d 642, 97 S. Ct. 1349 (1977). As the Second Circuit held in *Corey*:

> The Double Jeopardy Clause of the Fifth Amendment provides that no person shall be put in jeopardy twice for the same offense. This prohibition not only includes an unequivocal bar against a second trial after a judgment of acquittal, ***but also protects a defendant's "'valued right to have his trial completed by a particular tribunal.'"***

*Corey*, 917 F.2d at 90 (emphasis added), *citing Arizona v. Washington*, 434 U.S. 497, 503, n.11(1978). "Because jeopardy attaches when the jury is empanelled and sworn, the Double Jeopardy Clause may preclude a second trial even if the first trial is terminated

before the jury reaches a verdict." *Corey,* 917 F.2d at 90. The record is clear that the jury was impaneled and sworn in this case and that jeopardy attached.

## II.    The Jury Should Not Have Been Discharged

19.    As the Supreme Court recognized in *Washington, supra,* a second trial "increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted." *Washington,* 434 U.S. at 503-04 (footnotes omitted).

20.    Moreover, the Supreme Court has long held that one of the evils to be avoided in declaring a mistrial is permitting the government time to bolster its case. Here, "a mistrial entailed not only a delay for the defendant, but also operated as a post-jeopardy continuance to allow the prosecution an opportunity to strengthen its case." *Illinois v. Somerville,* 410 U.S. 458, 469 (1973). The defendant was indicted in July 2007 and insisted on a speedy trial with a December 10 trial date. Even as of the start of the trial, the Government was still gathering essential information by issuing document subpoenas, and conducting searches. For example, the Government was still trying to tie the $200,000 wire transfers to the Rahim. Moreover, A majority of its witnesses had only recently been interviewed. The additional time resulting from the mistrial will indisputably inure to the Government's benefit and to the defendant's detriment. For these reasons, while the decision to grant a mistrial is within the discretion of the trial judge, "the discretion to discharge the jury before it has reached a verdict is to be exercised only in very extraordinary and striking circumstances." *Downum v. United States,* 372 U.S. 734, 736 (1963).

21.     In this regard, where the trial court declares a mistrial without the consent of the defendant, a retrial is barred unless there was "manifest necessity" for the mistrial. *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824); *See also Washington*, 434 U.S. at 505 (same); *Corey*, 917 F.2d at 90 (same). The test for determining "manifest necessity" was first set forth by Justice Story in *Perez*:

> The law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes.

*Perez*, 22 U.S. (9 Wheat.) at 580. "The test of manifest necessity thus is, by its nature, an elusive one, incapable of any mechanical formulation and dependent on the specific factual and procedural context of each case." *Corey*, 917 F.2d at 90, *citing Illinois v. Somerville*, 410 U.S. 458, 462 (1973).

22.     While a trial judge's determination will be accorded deference, the judge "must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *United States v. Jorn*, 400 U.S. 470, 486 (1971). "An appellate court must therefore satisfy itself that the trial court exercised 'sound discretion' in declaring the mistrial." *Corey*, 917 F.2d at 90, *citing Perez*, 22 U.S. (9 Wheat.) at 580. *See also Washington*, 434 U.S. at 514; *United States v. Grasso*, 600 F.2d 342, 343-44 (2d Cir. 1979). The Supreme Court has held that a "trial judge properly exercises his discretion to

declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial." *Somerville,* 410 U.S. at 464. Certainly, where the defense agreed to keep the jurors, no appellate error existed by forging ahead with the trial.

### A. The Trial Should have Continued with Thirteen Jurors.

23. A major factor in assessing the wisdom of a trial court's decision granting a mistrial is whether alternatives were ignored. Thus, where "obvious and adequate alternatives to aborting the trial were disregarded, this suggests the trial judge acted unjustifiably." *States v. Razmilovic,* 498 F.3d 136 (2d Cir. 2007), quoting *Harris v. Young,* 607 F. 2d 1081, 1085 n.4 (4th Cir. 1979). In this analysis, the court must look to alternatives that the court chose not to pursue. *Id.* Here, defense counsel repeatedly told the Court that the trial should continue with thirteen jurors. Tr. 206-09; 211. This alternative was procedurally appropriate and preserved the impartiality of the jury.

#### 1. The Trial Should Have Proceeded With One Alternate Juror.

24. As an initial matter, Federal Rule of Criminal Procedure 24(c)(1) provides that "the court *may* impanel *up to* 6 alternate jurors to replace any jurors who are unable to perform or who are disqualified from performing their duties." (emphasis added). Further, "the Constitution does not require twelve jurors for conviction," *United States v. Stratton,* 779 F.2d 820, 831 (2d Cir. 1985), and Federal Rule of Criminal Procedure 23(2)(A) provides, in relevant part, that "at any time before the verdict, the parties may, with the court's approval, stipulate in writing that the jury may consist of fewer than 12 persons."

13

25.     While the Government expressed an initial reluctance to proceed with thirteen jurors, Tr. 206, the Court conducted no investigation into the reasons for that reluctance. If the Government's refusal to consent was based upon the possibility that there could be too few jurors to render a verdict, this possibility was sufficiently unlikely to order a mistrial. First, the trial was relatively short, expected to last no more than ten trial days. Second, even if the problem ever arose, it could have been addressed by a stipulation pursuant to Fed. R. Crim. Proc. 23(2)(A). If a stipulation was not forthcoming when the need arose, a mistrial could have been granted at that time when the problem was real rather than as here, when it was merely hypothetical. In any event, solutions to preserve the defendant's constitutional right to obtain a verdict from the jury that was impaneled were not pursued or rejected.

> **2.     The possibility of bias to the remaining jury members was too remote to constitute a manifest necessity.**

26.     Courts have consistently held that the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). *See also Rushen v. Spain*, 464 U.S. 114, 118 (1982) (same); *United States v. Blume*, 967 F.2d 45, 47-48 (2d Cir. 1992) (same). The Supreme Court in *Smith* explained its reasoning as follows:

> It is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Smith*, 455 U.S. at 217. As a result, while "the district court has wide discretion to address the effects of unauthorized third party contact on a jury," *Blume*, 967 F.2d at 48,

14

the analysis focuses on "whether the impact of such contact denied an accused his fundamental right to a fair trial." *Id.*

27. In *United States v. Blume,* 967 F.2d 45 (2d Cir. 1992), the Court was confronted with an issue of jury tampering. During the trial, one of the jurors, Tenner, informed the judge "that he had received a telephone call from an unidentified man, offering him $5,000 to secure a mistrial." *Blume,* 967 F.2d at 48. Tenner remained on the jury while the F.B.I. conducted an investigation. Several days later, Tenner received a note threatening his life. At that point, he reported to the judge that he could no longer remain impartial and he was dismissed from the jury. *Id.* Thereafter, the judge conducted a voir dire of the jury panel and determined that two jurors had spoken to Tenner about the case. Despite this contact, the jurors were permitted to remain on the jury as "neither juror … appeared to know anything about the attempted bribe, and both assured the judge that they could remain impartial." *Id.* The defendant was convicted and appealed on the ground "that the events involving Tenner denied him the right to trial by an impartial jury." In denying defendant's appeal, the Second Circuit held:

> There is no reason to believe that Tenner's dismissal before the jury began to deliberate prejudiced the verdict ***or that the third-party conduct affected the other jurors***. Judge Billings' conduct of the proceedings ensured [the defendant's] right to an impartial jury.

*Blume,* 967 F.2d at 48 (emphasis added).

28. The facts underlying the Fifth Circuit's decision in *United States v. Smith,* 550 F.2d 277 (5th Cir. 1977) are particularly analogous to this action. In *Smith,* the trial court discharged four regular jurors and replaced them with four alternates. While two jurors were discharged for being inattentive during trial, two others were discharged because of "the possibility that [the defendant] had attempted to tamper with the jury"

*Smith* 550 F.2d at 284. The trial continued with the alternate jurors. On appeal, the Fifth Circuit held "that the trial judge was justified in removing these two jurors." *Smith* 550 F.2d at 286. *See also United States v. Domenech,* 476 F.2d 1229, 1232 (2d Cir. 1973) (finding no abuse of discretion where trial judge dismissed juror who was ten minutes late).

29.   Further, the Court in *Smith* specifically rejected the defendant's argument that the circumstances surrounding the dismissal of four jurors resulted in prejudice to the defendant. After recounting the statement made by the trial judge, the Court held "this statement can hardly be said to have been calculated to intimidate or prejudice the jury and the trial court committed no error in this regard." *Smith* at 286.

30.   As indicated by the law cited above, continuing Mr. Naseem's trial with thirteen jurors was clearly within the Court's discretion. Further, there is no indication in the record that this alternative would have resulted in an impartial jury or a procedural error subject to reversal on appeal. Courts are free to dismiss multiple jurors if the circumstances dictate it and such a removal is not likely to taint the remaining members of the jury. For these reasons, continuing the trial with thirteen jurors was a particularly appropriate option that was not explored adequately by the Court and rejected.

### C.   Continuing the Trial with Fifteen Jurors Would not Have Resulted in Procedural Error or a Biased Jury.

31.   Alternatively, defense counsel expressed to the Court the defendant's desire to continue the trial without removing any of the jurors. Tr. 207-09. This alternative also would have resulted in a trial free of obvious procedural error and would not have resulted in a situation that would have necessitated a reversal on appeal.

32.     As stated above, the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). *See also Rushen v. Spain,* 464 U.S. 114, 118 (1982) (same); *United States v. Blume,* 967 F.2d 45, 47-48 (2d Cir. 1992) (same). If the impartiality of a juror is in question, the Court may order a hearing to determine the issue. *See Remmer v. United States,* 347 U.S. 227, 230 (1954) (instructing the trial judge to "determine the circumstances, the impact thereof upon the juror, and whether or not [they were] prejudicial, in a hearing with all interested parties permitted to participate").

33.     Additionally, the Supreme Court has long held that it is well within the discretion of the trial court to rely upon the opinion of the juror herself that she can remain impartial. For example, the Court in *Phillips* noted that while "determinations made in Remmer-type hearings will frequently turn upon testimony of the juror in question," such evidence is not "inherently suspect." *Smith,* 455 U.S. at 217, n. 7. "[One] may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter." *Smith* 455 U.S. at 217, n 7, *citing Dennis v. United States*, 339 U.S. 162, 171 (1950).

34.     Where jurors declare that they can remain impartial, it is not reversible error to allow them to remain on the jury, even where they have had discussions with other jurors regarding potential jury tampering. While defense counsel was initially troubled by the Court's account of its conversation with Juror #8, Tr. 198-99, and ultimately agreed with the Court that "the safest thing to do is to not excuse one but to

17

excuse two jurors," Tr. 201, the defendant did not agree that the declaration of a mistrial was a manifest necessity on these facts. Rather, after reflecting on the situation, defendant agreed that continuing with the fifteen jurors was its alternative to Courts' refusal to proceed with thirteen jurors, particularly given that both jurors had communicated to the Court that they could remain impartial. Tr. 198, 199, 201.

35.     Defendant respectfully asserts that this position is further supported by a review of the transcript of Juror #8's conversation with the Court. In this conversation, Juror #8 states that the contact was ***not initiated by the Third Party*** but rather was made in response to a statement by Juror #8 that the selection process was "a little nerve racking or something", Tr. 195, and that the Third Party had a conversation with the Court's assistant disclosing that she was not a member of the venire but rather part of "the audience." Tr. 194-97. These facts, which were not known to the defense at any time prior to the dismissal of the jury, further supported a finding that Juror #8 could remain impartial and the appropriateness of continuing the trial with the impaneled jury.[3]

---

[3]     Indeed, had the defense been aware that the juror instigated the contact with the Third Party, he would never have even sought to remove her. Thus, defense counsel would have had no concern that the juror might have erroneously believed that someone connected to the defense had initiated an effort to influence her.

## **CONCLUSION**

36.  For all of these reasons, adequate consideration of the alternatives proposed by the defendant would have resulted in the Court deciding to continue the trial with either thirteen or fifteen jurors. A finding of manifest necessity to declare a mistrial was not supported by this record.

---------------------------------------------
MICHAEL F. BACHNER. ESQ. MFB-7719

Respectfully submitted,

Bachner & Associates, PC
By: Michael F. Bachner, Esq.,
Kevin T. O'Brien, Esq.
Attorneys for the Defendant
HAFIZ NASEEM
26 Broadway, Suite 2310
New York, New York 10004
Tel: (212) 344-7778
Fax: (212(344-7774)

To: Hon Richard M. Berman
 AUSA Joshua Klein
 AUSA Reed Brodsky