UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                |
UNITED STATES OF AMERICA                        |
                                                |
        -v.-                                    |
                                                |
HAFIZ MUHAMMAD ZUBAIR NASEEM,                   |          07 Cr. 610 (RMB)
                                                |
                Defendant.                      |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x


GOVERNMENT'S MEMORANDUM IN
OPPOSITION TO DEFENDANT'S DOUBLE JEOPARDY MOTION



MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York,
<u>Attorney for the United States of America</u>



JOSHUA KLEIN
REED MICHAEL BRODSKY
Assistant United States Attorneys,

        <u>Of Counsel</u>



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  |
UNITED STATES OF AMERICA                          |
                                                  |
            -v.-                                  |
                                                  |
HAFIZ MUHAMMAD ZUBAIR NASEEM,                     |        07 Cr. 610 (RMB)
                                                  |
                    Defendant.                    |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S MEMORANDUM IN
## OPPOSITION TO DEFENDANT'S DOUBLE JEOPARDY MOTION

### Preliminary Statement

The Government respectfully submits this memorandum in opposition to
the defendant's motion, dated December 20, 2007, to dismiss the Indictment in this case
on grounds that a retrial would violate the Double Jeopardy Clause of the United States
Constitution.  For the reasons stated below, a retrial would not violate the Double
Jeopardy Clause and the Court should deny the defendant's motion to dismiss the
Indictment.

### Relevant Facts

Trial commenced in this case on December 10, 2007.  After the jury was
impaneled and sworn, the Court gave its preliminary instructions to the jury.  (Tr. 71).[1]
Thereafter, counsel for the Government and counsel for the defense delivered their
opening statements.  (Tr. 71).  Following the conclusion of opening statements, the Court

---

[1]  "Tr." refers to the trial transcript in this case; "Br." refers to the defense
affirmation in support of the defendant's double jeopardy motion.

provided additional instructions to the jury.  The Court instructed the jurors, in relevant

part, as follows:

> First, do not talk to each other about the case or about
> anyone who has anything to do with it until the end of the
> case when you go to the jury room to deliberate on your
> verdict.  And additionally, don't remain in the presence of
> others who may be discussing the case.

(Tr. 183).  The Court then instructed that:

> Second, do not talk with anyone else about the case or
> about anyone who has anything to do with it, until the trial
> has ended and you have been discharged by me as jurors.
> Anyone else includes members of your family and your
> friends.  You may tell them that you are a juror in a case.
> But don't tell them anything else about the case until after
> you have been discharged by me.

(Tr. 183).  The Court further instructed the jury that:

> Third, don't let anyone talk to you about the case or about
> anyone who has anything to do with it.  If someone should
> try and talk to you about the case, please report that to me
> or to Christine immediately.

(Tr. 183-84).

The next morning, before the jury entered the courtroom, the Government

informed the Court that it had learned, at the end of the first trial day, from an attorney

for Credit Suisse who was in the courtroom during the voire dire, that a friend or relative

of the defendant's was observed speaking with three members of the venire pool, one of

whom was selected to serve on the jury as Juror No. 8.  (Tr. 187; 189).  The Government

relayed to the Court that, according to the Credit Suisse attorney, the defendant's friend

spoke to the juror for approximately 30 seconds, but the Credit Suisse attorney was

unable to hear their conversation.  (Tr. 187).  According to the Credit Suisse attorney,

when Juror No. 8 was selected to serve on the jury, the defendant's friend "made a gesture and a smile" to a gentleman (Tr. 188) whom the defense later reported was the defendant's father-in-law. (Tr. 190).

After listening to the Government, the Court ordered a short recess to allow the parties to confer in an attempt to reach a joint proposal for addressing the situation. (Tr. 189). The Court also indicated, prior to the recess, that its "gut reaction" was that the incident was "disturbing." (Tr. 189). After the recess, the Government informed the Court that the parties were unable to reach a joint proposal concerning how to address the situation. (Tr. 189). Defense counsel then stated that "it's important initially for the disturbing feeling your Honor had to be respectfully put out of your mind or to be removed from your mind because there really, in my opinion was nothing here." (Tr. 190). Defense counsel then proceeded to explain that: "The woman who spoke with one or two or three of the venire people is a lawyer in New York. She's a friend of the defendant's. She just passed the bar." (Tr. 190).

When the Court expressed surprise that the woman was there "on behalf of the defendant" and "wasn't a member of the juror pool" defense counsel responded that this was correct. (Tr. 190). According to defense counsel, the defendant's friend "came in late after the jury pool had started" and "sat down and started schmoozing with people. That's what I believe occurred." (Tr. 190). When pressed by the Court as to how he knew what had occurred, defense counsel explained that he did not, in fact, know what had occurred but that his belief was based upon the fact that "the only people here on behalf of defendant were that woman and the defendant's father-in-law, who was a judge in Pakistan." (Tr. 190).

3

The Court then suggested questioning Juror No. 8 and inquired as to whether the parties wished to be present. (Tr. 192). Defense counsel stated that he "would like to do it in the least intimidating fashion possible" and that "we don't have any problem [with] Your Honor doing it on your own ex parte." (Tr. 192). The Government agreed that the Court should question the juror outside of the parties' presence. (Tr. 192). The Government requested that the Court conduct the questioning in a manner so as not to suggest that the Government had requested that the Court undertake the inquiry. (Tr. 192). Defense counsel indicated he didn't want the juror to "believe there was any improper contact with anyone from the defense side." (Tr. 193).

The parties then left the courtroom and the Court invited Juror No. 8 into the robing room where it conducted the following inquiry:

The Court:    I just wanted to ask you a question or two.

Juror No. 8:    Sure.

The Court:    One of the observers thought they might have seen you talking or someone talking to you yesterday who is from the audience, who is not part of the jury pool. So I just wanted to ask you if you know what they're talking about?

Juror No. 8:    Yes, I do, and I – I didn't know whether that would be an issue or not. It just so happens that the young lady who had a scarf, she sat next to me.

The Court:    In the audience?

Juror No. 8:    Yes.

The Court:    Ok.

Juror No. 8:    And I guess one of your assistants asked her whether she was going to be, you know, selected, and then she said, no, I'm part of the audience.

4

The Court:    I see.

Juror No. 8:    Then she just made a comment to me about that something about I guess my appearance looked like I would make a good juror.

The Court:    Yours or hers.

Juror No. 8:    Yes, mine because I guess I said something like, you know, this is a little nerve racking or something, and then she says, oh, but you – your type of person would make a good juror.

The Court:    I see.

Juror No. 8:    Then I said, Ok. I didnt' think anything of it, and then I did go to the pizza shop, and I did see her with the defendant.

The Court:    Right.

Juror No. 8:    And then I just said, oh, I don't know if that makes a big deal, and then I made a comment to one of the jurors that she had spoken to me, but I don't know if that's an issue, so –

The Court:    All right. So, does it –

Juror No. 8:    Sway me either way?

The Court:    Yes.

Juror No. 8:    I don't think so at all, but I have to say I was a little nervous because I know that now she's in the audience and I guess I'm sure she's with him.

The Court:    It's my understanding that –

Juror No. 8:    I don't know the relationship though.

The Court:    Ok. My understanding is that she is a friend of his or something like that.

Juror No. 8:    Ok.

5

| | |
|---|---|
| The Court: | But the bottom line, how do you feel about it?  Do you feel you can go forward fairly and impartially as a juror? |
| Juror No. 8: | Yes. |
| The Court: | That's all I wanted to know. |
| Juror No. 8: | That's not an issue, and I'm sorry. |
| The Court: | No. No. |
| Juror No. 8: | I feel like – I told – I know we're not supposed to talk about this.  I spoke to my husband.  I didn't tell him about the case other than that this lady talked to me, and I don't know if I should say something or would that influence or – |
| The Court: | Right.  What about the other juror?  Do I need to talk to the other juror who you talked to to see if she has any – is it a she or a he? |
| Juror No. 8: | Yes, it's a she. |
| The Court: | What number? |
| Juror No. 8: | She's right next to me.  I'm 8 so she's 7. |
| The Court: | 7.  Maybe I should talk to her for a minute as well.  Let me decide that.  You're doing a grat job. |
| Juror No. 8: | Sorry. |
| The Court: | Not to be sorry at all. These things happen, incidentally. |
| Juror No. 8: | It was one of those weird things.  She just sat next to me, and I said, oh, gosh, who is she, and later on I saw her and I said, oh, God.  But it doesn't – it doesn't impede in any way.  I'm impartial. It's about the facts. |

(Tr. 194-97).

Following this inquiry, the Court relayed to the parties the substance of

what Juror No. 8 had said.  Specifically, the Court informed the parties that Juror No. 8

6

had stated that a person who is a friend of the defendant's complimented her by stating she would make an excellent juror, that it caused Juror No. 8 to take note because she realized this person was not in the jury pool, and that it would not impact her ability to be fair and impartial as a juror. The Court noted that it was relating to the parties what had occurred "in sum and substance" and that the Court did not "exactly remember the words." (Tr. 198). Defense counsel then asked whether the juror was "attaching this conversation with the defense." (Tr. 198). The Court replied that she was because "at some other point during the day she saw this person with Mr. Naseem." (Tr. 198).

Defense counsel then requested that the Court speak to Juror No. 7 and remove Juror No. 8 from the jury. Defense counsel explained that he was concerned that Juror No. 8 "feels there was some effort to sway her, and I'm concerned that she will be bending over backwards to show that she can't be swayed, and I'm uncomfortable with it . . . ." (Tr. 199). The Court then spoke to Juror No. 7 who confirmed that Juror No. 8 had mentioned the incident to her, but also indicated she could still be fair. (Tr. 200).

After speaking to Juror No. 7, the Court addressed the parties, stating that it wished to discuss the available options. (Tr. 201). The Court stated its view that both jurors were inolved in "an extra courtroom proceeding" and that neither had heeded the Court's instructions to report the incident to the Court. (Tr. 201). Consequently, the Court stated its inclination to declare a mistrial. (Tr. 201). The Court explained that the safest course would be to remove both jurors, notwithstanding their "well meaning" statements that they could be fair and impartial, but that this would create the unfortunate situation of reducing the jury by two jurors, and would further risk affecting the remaining jurors, creating a distraction that would cause speculation about what had

7

occurred. (Tr. 201-02). At the Government's request, the Court then ordered a short recess to permit the parties to consider how to proceed. (Tr. 202).

Following a half hour recess, the parties reconvened in Court, at which time the Government stated its preference to proceed without removing any juror. (Tr. 204). The Government explained that Jurors 7 and 8 had both indicated they could be fair and impartial and that if a misrial were declared and the proceedings were to recommence immediately thereafter, the Government was concerned about its ability to present its witnesses before the Christmas holiday. (Tr. 204). The Court indicated that if it were to declare a mistrial the proceedings would not recommence until early January 2008. The Court further stated that it was aware of its obligation under Fed.R.CrimP. 26.3 to "give each defendant and the government an opportunity to comment on the propriety of the order to state whether that party consents or objects and to suggest alternatives" before ordering a mistrial and that it wanted to insure that the parties had the opportunity to provide such input in accordance with the requirements of Rule 26.3. (Tr. 205).

The Government stated that it would be amenable to starting over in January, but that its preference was to proceed with the jury as selected. The Government explained that its principal concern with removing two jurors was that, as the Court had stated, this would create an internal inquiry within the jury as to why the jurors were removed, and could possibly taint the proceedings. (Tr. 204, 206-07). Defense counsel expressed a preference to remove Jurors 7 and 8 and proceed with a jury of 13. (Tr. 206). The Court then expressed the additional concern that, given the anticipated length of the trial, removing two jurors may not leave a sufficient number of

jurors that would allow for the completion of the trial.  (Tr. 207).

Following the above colloquy, defense counsel stated that he had further consulted with his client and that his client wished to proceed with the selected jury of 15.  (Tr. 207).  The Court then asked the parties whether it was "legally appropriate to declare a mistrial in the circumstance like this and to start over again" notwithstanding the particular "preference" of the parties about whether or not the Court should do so. (Tr. 208).  The Government responded that, under the circumstances, the decision to declare a mistrial fell within the Court's discretion.  (Tr. 208).  Defense counsel responded that the Court would have to find just cause, and that the circumstances involving Jurors 7 and 8 "could give rise to that level if your Honor were to so find." (Tr. 208).  Defense counsel further stated that the Court "could find to the contrary as well."  (Tr. 208).  Defense counsel then mentioned that his "only bit of discomfort is that I didn't have a chance to hear the jurors' words and see their faces."  (Tr. 208).  When the Court responded that the parties had consented to having the Court conduct the inquiry outside the presence of the parties, defense counsel confirmed that he did, in fact, provide such consent and explained that he did so because of the defense's desire not to intimidate the jurors.  (Tr. 208-09).  Defense counsel then stated that the defendant's "preference" was to "proceed with the jury as impaneled, and we're ready to go forward if Your Honor so rules."  (Tr. 209).

The Court then advised the parties that it wanted to give the matter additional thought and that it wished to "make sure expediency is not the driving force" underpinning the resolution of this matter.  (Tr. 209).  Before adjourning, the Court addressed defense counsel and stated that "you mentioned earlier you thought the

9

incident could impact negatively upon Mr. Naseem and the defense, which is what precipitated a lot of this conversation." (Tr. 209).

Following a second short recess, the parties reconvened in Court at which time the Government mentioned that it had conferred with the Appeals Unit of the United States Attorney's Office and that an appellate attorney had raised concerns about whether jurors seven and eight could be fair and impartial, which concerns she advised the AUSAs to raise with the Court. (Tr. 210). When the Court asked the parties whether they had any thoughts about how the Court was proceeding under F.R.Crim.P. 26.3, the Government reiterated its view was that the matter fell within the Court's discretion. (Tr. 210). The defense replied that "we've stated our position." (Tr. 210).

The Court then stated its view that it had complied with F.R.Crim.P. 26.3, which requires the Court to provide the parties with an opportunity to comment on the propriety of an order for a mistrial before entering such an order, and to indicate whether the parties consent, object or propose alternatives. (Tr. 211). The Court then gave the parties another opportunity to add to their previous statements. (Tr. 211). The Government declined to add anything. (Tr. 211). Defense counsel reiterated its prior preferences to proceed with 13 jurors or, in the alternative, 15 jurors. (Tr. 211). The Court then ordered a mistrial. (Tr. 211).

### The Court's Order Directing A Mistrial

In explaining the basis for its order the Court noted that a juror had acknowledged that a friend or associate of the defendant made some "out-of-court comments" to her "during the voire dire process which appeared to make the juror uncomfortable." (Tr.211-12). The Court noted that the juror was aware that the person

10

was associated with the defendant and that the comment was "to the effect that the friend

or associate of Mr. Naseem's believed that the juror in question would make a good juror

in this case." (Tr. 212). The Court reiterated that it had spoken to "both jurors with the

consent of counsel independently and not in their presence, as they had requested taht

they not be present, and confirmed that inappropriate contact in fact occurred yesterday."

(Tr. 212). The Court then acknowledged that both Jurors 7 and 8 had indicated they

could be fair and impartial. Nevertheless, the Court stated it was declaring a mistrial "to

safeguard the integrity of the jury that we have selected, and more broadly the jury

system." (Tr. 212). The Court then stated the following:

> The appearance of impropriety in this instance may be as important as any
> actual impropriety. Mr. Bachner has earlier stated today and, again, I
> believe on the record, that he was concerned that the juror in question
> might not be impartial, might bend over backwards, as it were, in favor
> presumably of the Government to show impartiality. He didn't - he
> expressed that as a possible concern. There must be no doubt in this and
> in every other case that each juror is fair and impartial. That no external
> events or persons approach or influence the jurors.

(Tr. 212-13).

The Court then explained that, in addition to the foregoing, it was

concerned that both Juror No. 7 and Juror No. 8 had failed to heed its instructions. (Tr.

213). In this regard, the Court stated the following:

> I had specifically instructed this jury, and as I instruct every jury, if there
> is such contact, that they report it to me immediately. Which they did not
> do in this case. Neither the juror who was first approached nor the second
> juror who spoke to the first juror, even though this did happen yesterday
> and there was ample time to either call or speak to me or Christine or
> bring it to our attention so they clearly had the opportunity.
>
> The instruction in particular, although I think there are other instructions
> that cover this situation, is one of the so-called preliminary instruction
> about conduct of the jury. And it is the third one which says do not let

11

anyone talk to you about the case or about anyone who has anything to do with it, and if someone should try to talk to you about the case, please report it to me immediately. In this regard, 'the attorneys and the defendants are not supposed to talk to jurors. I'm not suggesting incidentally that they did. Even to offer a friendly greeting. So if you happen to see any of them outside the courtroom they will and should ignore you. Please do not take offense. They will only be acting properly by doing so.'

I gave that instruction, and there are three or four other instructions. The second instruction says do not talk with anyone else about this case or about anyone who has anything to do with it until the trial has ended and you have been discharged as jurors. And anyone else includes members of your family and your friends. You may tell them that you are a juror in a case but don't tell them anything about the case until after you have been discharged by me.

(Tr. 213-14).

The Court then concluded "that there is a manifest necessity to declare a mistrial in this case in order to ensure an impartial trial and a fair trial." (Tr. 214). The Court cited United States v. Razmilovic, 2007 WL 3011042 (2d Cir. 2007) and United States v. Ruggiero, 846 F.2d 117 (2d Cir. 1988) in support of its ruling, which it indicated it came to reluctantly. (Tr. 214). The Court stated that its reluctance was due, in part, to the effort exerted by the parties to get the trial underway and because of its belief that Jurors 7 and 8 were sincere when they advised the Court they could be fair and impartial. (Tr. 214). However, the Court emphasized that, under the circumstances, it had "no doubt and no hesitation whatsoever in my mind that a mistrial is appropriate and that the jury should be dismissed and we should start again." (Tr. 214).

The next day, the parties reconvened in Court to pick a new trial date at which time the Court accepted the parties' joint proposal to commence the new trial on January 14, 2008. (December 12, 2007 Tr. 2). Defense counsel then advised the Court

12

that he was "looking into the issue as to whether or not there is a potential double

jeopardy issue here."  (December 12, 2007 Tr. 2).  Defense counsel did not challenge the

Court's response that "for whatever it is worth, I think we achieved what we achieved

yesterday consensually."  (December 12, 2007 Tr. 2).

## Applicable Legal Principles

A.    Double Jeopardy and the "Manifest Necessity" Standard

   "The Double Jeopardy Clause of the Fifth Amendment protects a criminal

defendant from successive prosecutions for the same offense." United States v. Huang,

960 F.2d 1128, 1133 (2d Cir. 1992).  "[J]eopardy attaches when the jury is empaneled

and sworn," which serves to "protect the interest of an accused in retaining a chosen

jury" and having "his trial completed by a particular tribunal." Crist v. Bretz, 437 U.S.

28, 35-36 (1978); United States v. Razmilovic, 507 F.3d 130, 136 (2d Cir.  2007).  This

right, however, must be balanced against "the public interest in insuring that the

prosecutor be accorded one full opportunity to present his case against the accused and

that *both sides* receive a fundamentally fair trial."  United States v. Ruggiero, No. 83 Cr.

412 (S), 1988 WL 23546, *7 (E.D.N.Y.  March 2, 1988) (quoting Dunkerley v. Hogan,

579 F.2d 141, 145 (2d Cir. 1978) (emphasis in original)).

   "Where a defendant either objects or fails to consent to a trial court's

declaration of a mistrial, double jeopardy will bar a second prosecution unless there was

a manifest necessity for the mistrial."  Maula v. Freckleton 972 F.2d 27, 29 (2d Cir.

1992).  "Virtually all double jeopardy cases turn on their particular facts and thus escape

categorical classification."  United States v. White, 524 F.2d 1249, 1252 (2d Cir. 1975)

(citing Illinois v. Somerville, 410 U.S. 458, 464); Gori v. United States, 367 U.S. 364

13

(1961), United States v. Kin Ping Cheung, 485 F.2d 689, 690 (5th Cir. 1973)).

Accordingly, it is well settled that:

> the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere.

United States v. Perez, 22 U.S. 579 (1824).

In determining whether there is a "manifest necessity" to declare a mistrial, "the key word 'necessity' cannot be interpreted literally." Arizona v. Washington, 434 U.S. 497, 505 (1978). "There are degrees of necessity and we require a 'high degree'" before concluding that a mistrial is appropriate." Id. at 506. "The question whether that 'high degree' has been reached is answered more easily in some kinds of cases than in others. Id. at 507. Thus, "at one extreme are cases in which a prosecutor requests a mistrial in order to buttress weaknesses in his evidence," Id., or in an attempt "to achieve a tactical advantage over the accused." Id. at 508. In such circumstances, "the strictest scrutiny is appropriate." Id. "At the other extreme is the mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict, long considered the classic basis for a proper mistrial." Id. at 510.

"Along the spectrum of trial problems which may warrant a mistrial and which vary in their amenability to appellate scrutiny," those involving potential jury bias "falls in an area where the trial judge's determination is entitled to special respect." Id. at 510-12. As the Supreme Court has stated:

> There are compelling institutional considerations militating in favor of appellate deference to the trial judge's evaluation of the significance of

14

possible juror bias.  He has seen and heard the jurors during the voire dire examination.  He is the judge most familiar with the evidence and the background of the case on trial.  He has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors.  In short, he is far more conversant with the factors relevant to the determination than any reviewing court can possibly be."

Id. at 513-14;  Mikel v. Zon, No. 04 Civ. 6448 (CJS)(VEB) 2007 WL 3076975, *3 (W.D.N.Y.  Oct. 19, 2007) ("where the decision to declare a mistrial involved an issue related to possible juror bias, the trial court's ruling is entitled to *special* deference") (emphasis added) (citing Arizona v. Washington, 434 U.S. at 513-14)).  Special deference is also accorded where "there is a distinct possibility that" the defendant was "responsible for the events triggering the mistrial."  United States v. Ruggiero, 846 F.2d at 123.

"The manifest necessity standard reflects a recognition that a criminal trial is even in the best of times, a complicated affair to manage, and that a rule that barred retrial whenever an appellate court saw the need to declare a mistrial differently would create undesirable pressures on trial judges to see each trial through to completion." United States v. Razmilovic, 507 F.3d at 136.  Accordingly, "a trial court's denial of a motion for a mistrial" is reviewed "for abuse of discretion."  United States v. Kaid, 241 Fed.Appx. 747, 751 (2d Cir. 2007); Razmilovic, 507 F.3d at 137.  "The trial court's mistrial ruling is entitled to great deference irrespective of any statement of reasons by the trial court."  United States v. Ruggiero, 846 F.2d at 123;  United States v. Mastrangelo, 662 F.2d 946, 950 (2d Cir. 1981).

Finally, Fed.R.Crim.P. Rule 26.3 requires that before ordering a mistrial, the Court give "each defendant and the government an opportunity to comment on the

15

propriety of the order, to state whether that party consents or objects, and to suggest alternatives."

B.    Waiver of Double Jeopardy

"A motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution even if the defendant's motion is necessitated by prosecutorial or judicial error," United States v. Huang, 960 F.2d at 1133, "unless the government or the court acts in a manner intended to provoke a defendant to move for a mistrial." Maula v. Freckleton 972 F.2d at 29.  Similarly, "the defendant's . . . consent to a mistrial removes any double jeopardy bar to reprosecution."  Oregon v. Kennedy 456 U.S. 667, 684 (1982).  Thus, absent such provocation, "no manifest necessity analysis is required when a defendant requests a mistrial, or consents to one."  Maula v. Freckleton 972 F.2d at 29.

"The reason for allowing a retrial in such circumstances is that when the defendant requests a mistrial, he is deemed to have deliberately elected to forgo his valued right to have his guilt or innocence determined before the first trier of fact." United States v. Huang, 960 F.2d at 1133.  "Thus, the Double Jeopardy Clause guards against government oppression; it does not relieve a defendant of the consequences of his voluntary choice to accept a mistrial."  Id.

"Consent [to a mistrial] need not be express, but may be implied from the totality of circumstances attendant on a declaration of mistrial."  United States v. Rodriguez, 114 Fed.Appx. 23, *2 (2d Cir.  2004).  However, consent is not presumed from the mere "absence of an express objection to discharging the jury."  Id.  In assessing whether or not the defense has consented to a mistrial, the fact that the judge was

16

unaware of the double jeopardy problem "contributes to" the "inference that defense counsel consented" to the mistrial.  Id. (citing United States v. Gentile, 525 F.2d 252, 255 (2d Cir. 1975)).

## Discussion

A.    The Defendant Has Waived His Double Jeopardy Claim

At the time the Court was alerted to the incident involving Juror No. 8, defense counsel conceded that ordering a mistrial in this case constituted a valid exercise of the Court's discretion.  By making this concession, the defendant has extinguished his right to assert a double jeopardy claim.  Consequently, his motion to dismiss the indictment on double jeopardy grounds is waived and therefore foreclosed.  United States v. Yu-Leung, 51 F.3d 1116, 1122 (2d Cir. 1995) ("If [a] party consciously refrains from objecting as a tactical matter, then that action constitutes a true 'waiver,' which will negate even plain error review."); United States v. Quinones, --- F.3d ---, 2007 WL 4571412, *29 (2d Cir.  Dec. 28, 2007) (same); United States v. Olano, 507 U.S. 725, 733 (1993) (A "true waiver" is different from a forfeiture.  "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.").

As discussed above, before ordering the mistrial, the Court painstakingly followed the strictures of Fed.R.Crim.P. 26.3 by allowing the parties ample time to propose various alternatives to a mistrial. (Tr. 205-10).  When asked for his view, defense counsel suggested the possibility of removing Jurors 7 and 8 and proceeding with 13 jurors (consisting of only one alternate instead of 3).  (Tr. 206).  The Government on the other hand, had proposed that the parties proceed with the jury intact, given the

17

assurances provided by Jurors 7 and 8 that they could be fair and impartial and the Government's concern, shared by the Court, that removing two jurors could taint the remaining jurors.  (Tr. 204, 206-07).

The Court then specifically solicited the parties' views as to whether it was "legally appropriate to declare a mistrial in the circumstance like this and to start over again" notwithstanding the particular "preference" of the parties about whether or not the Court should do so.  (Tr. 208).  The Government responded that the Court, "having reviewed the jurors" had the discretion to order a mistrial.  (Tr. 208).  Defense counsel responded that the Court "would have to find just cause" and that, as to the incident involving Jurors 7 and 8 "if the defense wanted to push that issue, I think that it could give rise to that level if your Honor were to so find.  And I think, frankly, given the jurors' answers, your Honor could find to the contrary as well."  (Tr. 208).

Although defense counsel did not move for a mistrial, his concession that the Court could find just cause to order a mistrial, or, in the alternative, find to the contrary, plainly conveyed to the Court that the defense viewed the matter of whether it was "legally appropriate to declare a mistrial in the circumstance like this" as falling within the Court's discretion.  Defense counsel, paraphrasing the legal standard of "manifest necessity," stated the Court would have to find "just cause" and confirmed that the circumstances "could give rise to that level if your Honor were to so find."  Counsel's comment that the Court "could find to the contrary as well" only underscored that, in the defendant's view, the Court possessed broad discretion, under the circumstances, to decide the matter of whether to declare a mistrial.  Defense counsel's comments that "the only bit of discomfort is I didn't have a chance to hear the jurors' words and see their

18

faces" (Tr. 208) further confirmed the defendant's view that the Court was best situated to make such an assessment in the exercise of its discretion. In light of the foregoing, defense counsel cannot reasonably claim now that it was an abuse of the Court's discretion to order the mistrial.

Defense counsel also stated that "I think at this point, Mr. Naseem's preference is that we proceed with the jury as impaneled, and we're ready to go forward if Your Honor so rules." (Tr. 209). Counsel's stated preference to proceed with the trial was entirely consistent with his expressed view that the Court possessed the discretion to order the mistrial. In fact, the Court asked for the parties' views about the legal propriety of ordering a mistrial *notwithstanding* their particular preferences. Consequently, counsel's statement that "I think at this point, Mr. Naseem's *preference* is that we proceed with the jury as impaneled, and we're ready to go forward if Your Honor so rules" (emphasis added) simply confirmed that, in the defendant's view, the ultimate decision of whether to order a mistrial fell to the Court's discretion.[2]

Although the defense expressed a "preference" to proceed with the trial, at no time prior to the mistrial did the defendant object or challenge the Court's authority to

---

[2] Although at some point defense counsel stated that "if the defense wanted to push that issue" the Court could find just cause (Tr. 208), this could not have been reasonably construed by the Court as an indication that the defense believed just cause would exist *only* if the defense wanted to push that issue. First, the very context of the discussion was one in which the Court had solicited the parties' views *notwithstanding* their preferences. Moreover, "the defendant's . . . consent to a mistrial" would have "remove[d] any double jeopardy bar to reprosecution," Oregon v. Kennedy, 456 U.S. at 684, and "no manifest necessity analysis" would have been "required" in such circumstances. Maula v. Freckleton 972 F.2d at 29. Consequently, the very analysis about which defense counsel was opining, in response to the Court's question, is implicated only in those circumstances where the defense does not "push" the issue by moving for the mistrial.

19

declare a mistrial, under the circumstances, nor did he claim a mistrial would implicate double jeopardy.  Based on the foregoing, it is hardly surprising that the Court, upon learning, the next day, that defense counsel was considering filing a double jeopardy motion, commented that "for whatever it is worth, I think we achieved what we achieved yesterday consensually."  (December 12, 2007 Tr. 3).  At that time, only one day after the mistrial was declared, the defense did not disagree with the Court that the result was achieved consensually.

    In sum, the defendant not only failed to object to a mistrial, but he expressly conceded that it was legally appropriate for the Court to declare a mistrial in this case, notwithstanding the defendant's "preference" that the trial proceed.  The defendant further underscored this view by admitting that the Court, having questioned the two jurors outside the presence of the parties, was best positioned to determine whether to order a mistrial.  Consequently, the defendant's motion to dismiss the Indictment on double jeopardy grounds has been extinguished and his motion is foreclosed.  See Ayala v. Ercole, No. 06 Civ. 1747 (JFB), 2007 WL 1135560, *11, fn.8 (E.D.N.Y.  April 17, 2007) (where prosecution notified defense that several prosecution witnesses had pending criminal records and would likely assert their Fifth Amendment privilege on cross-examination, "one could conclude " the defendant "waived in a knowing and intelligent way" and "therefore, extinguished" any objection where no objection was lodged by defense counsel regarding the jury instructions pertaining to witnesses taking the Fifth Amendment and counsel affirmatively agreed with the jury charge regarding the witnesses who took the Fifth Amendment).

B.    The Court Exercised Sound Discretion In Determining There Was A "Manifest Necessity" To Declare A Mistrial

      1.    The Court Possessed Broad Discretion Under The Circumstances

As a threshold matter, under the circumstances of this case the Court's discretion to assess whether there was a manifest necessity to declare a mistrial was especially broad.  The fundamental issue related to whether or not Jurors 7 and 8 were biased and, concomitantly, whether removing these jurors from the jury would taint the remaining jurors.  (See e.g., Tr. 206-07).  In this context, "the trial judge's determination is entitled to special respect."  Arizona v. Washington, 434 U.S. 497, 512 (1978).

Indeed, "deference [to] the trial judge's evaluation of the significance of possible juror bias" is appropriate because the trial judge, having "seen and heard the jurors during the voire dire examination," and being "most familiar with the evidence and background of the case on trial" "is far more conversant with the factors relevant to the determination than any reviewing court can possibly be."  Id. at 513-14. Moreover, having questioned Jurors 7 and 8, the Court was in the best position to assess whether or not they could continue to serve on the jury in an unbiased manner. Oddly, although the defendant now claims double jeopardy on grounds that the Court abused its discretion in declaring a mistrial, as discussed above, at the time of the incident, when asked to comment on the legal propriety of declaring a mistrial, defense counsel conceded that, having observed the jurors, the Court was better situated than counsel to assess any possible bias on the part of Jurors 7 and 8.

      2.    The Court Exercised Sound Discretion In Considering And Rejecting The Option Of Proceeding With The Impaneled Jury

Not only did the Court possess broad discretion to act in this case, but "the

trial judge did not act precipitately" in ordering a mistrial.  <u>Arizona</u> v. <u>Washington</u>, 434

U.S. at 515.  "On the contrary, evincing a concern for the double jeopardy consequences

of an erroneous ruling, he gave both defense counsel and the prosecutor full opportunity

to explain their positions on the propriety of a mistrial."  <u>Id</u>. at 515.  The Court thereby

"acted responsibly and deliberately, and accorded careful consideration" to the

defendant's "interest in having the trial concluded in a single proceeding." <u>Id</u>. at 515.

Furthermore, considering the facts here, the Court unquestionably exercised sound

discretion in finding a "manifest necessity" to declare a mistrial.  First, a "friend of the

defendant's" (the "Defendant's Friend") who "is a lawyer in New York," had recently

"passed the bar," and was in the courtroom "on behalf of the defendant" was

"schmoozing" with the venire pool.  (Tr. 190).  After speaking to Juror No. 8, the

Defendant's Friend "made a gesture and a comment" to the defendant's father-in-law, "a

judge in Pakistan" (Tr. 188, 190) clearly suggesting the Defendant's Friend was pleased

that Juror No. 8 had been chosen to serve on the jury.

       The Defendant's Friend was also observed speaking to two other members

of the venire pool besides Juror No. 8.  Moreover, there is no assurance that the

Defendant's Friend did not speak with additional members of the venire pool as well,

some of whom may have been chosen, like Juror No. 8, to serve on the jury, or may have

had communications with other members of the venire pool concerning possible contacts

with the Defendant's Friend.  At a minimum, these circumstances were, as the Court put

it, "disturbing."  (Tr. 189).  Furthermore, it was certainly within the Court's discretion to

consider the possibility -- or, even, plausibility -- that the actions of the Defendant's

Friend infected the entire jury pool and caused sufficient risk of tainting the jury to

necessitate a mistrial.  <u>See</u> <u>Remmer</u> v. <u>United States</u>, 347 U.S. 227, 229 (1954).  ("In a criminal case, any private communication . . . with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with the full knowledge of the parties.").  In any event, at the time the Government alerted the Court to the issue involving the improper juror contacts there was no dispute that the actions of the Defendant's Friend created at least the possibility of juror bias and thereby necessitated further exploration by the Court.

The Court's inquiry revealed circumstances that justified its decision to declare a mistrial.  As discussed above, the Court learned from Juror No. 8 that an improper contact had, in fact, occurred between the Defendant's Friend and Juror No. 8, that Juror No. 8 subsequently observed the Defendant together with the Defendant's Friend, and that the incident was sufficiently disturbing to Juror No. 8 to prompt her to discuss it with her husband, as well as with Juror No. 7, despite the fact that she knew she was not supposed to do so.  (Tr. 196).  Juror No. 7 confirmed that Juror No. 8 had relayed the incident to her.  Indeed, when Juror No. 8 observed the Defendant's Friend together with the Defendant she described her reaction by exclaiming "I saw her and I said, oh, God."  (Tr. 197).  Juror No. 8 further commented that "I have to say I was a little nervous because I know that now she's in the audience and I guess I'm sure she's with him."  (Tr. 196).

After the Court relayed its conversation with Juror No. 8 to the parties, including Juror No. 8's comment that she could be fair and impartial, defense counsel requested that she be removed from the jury and that the Court question Juror No. 7.  (Tr.

23

198).  Defense counsel articulated a "concern" that Juror No. 8 "feels there was some

effort to sway her, and I'm concerned that she will be bending over backwards to show

that she can't be swayed, and I'm uncomfortable with it."  (Tr. 199).[3]

        The Court then questioned Juror No. 7 who confirmed that Juror No. 8 had

relayed the incident involving the Defendant's Friend to her.  The Court was justifiably

disturbed not only by the improper contacts made by the Defendant's Friend, but also by

the fact that both Juror No. 7 and Juror No. 8 had failed to abide by the Court's

instructions to report any attempt by anyone to discuss the case with them, and not to

discuss the case with anyone.  (Tr. 212-13).  Although both jurors professed they could

---

[3]  Defense counsel now contends that the transcript of the Court's inquiry of Juror
No. 8 demonstrates the contact was "not initiated by the Third Party" and that, these
facts, which were unknown to the defense prior to dismissal of the jury further supported
a finding that Juror No. 8 could remain fair and impartial.  Indeed, counsel states that had
he known this fact he would not have sought to remove this juror.  (Br. 18).  This claim is
baseless and disingenuous.  First, the conversation between Juror No. 8 and the
Defendant's Friend that Juror No. 8 related to the Court consisted of just a snippet of the
30 seconds of conversation observed by the Credit Suisse attorney.  Consequently,
counsel's inference, from the transcript, that it was the juror who instigated the
conversation is not supported.  Moreover, other comments by Juror No. 8 reflect that it
was the Defendant's Friend who approached her.  For example Juror No. 8 relayed to the
Court that she expressed concern to Juror No. 7 that the Defendant's Friend "*had spoken
to me.*" (Tr. 195) (emphasis added).  In addition, counsel's reasoning for why he wished
to remove the juror -- that he was concerned that the juror would "bend over backwards"
to show she was not biased in favor of the defense -- would have applied even if the juror
had spoken to the Defendant's Friend first.  In fact, when defense counsel asked the
Court whether the juror was "attaching this conversation with the defense" (Tr. 198) the
Court responded that she was because "at some other point during the day she saw this
person with Mr. Naseem." (Tr. 198).  Thus, defense counsel's contention that he was
ignorant of the relevant facts is vacuous.  Moreover, not only did counsel consent that the
inquiry should occur outside the presence of the parties, but he neglected to request that
the court reporter read back the transcript involving the colloquy between the Court and
Juror No. 8, *even though the Court had stated that it was relating the conversation with
Juror No. 8 "in sum and substance" and that the Court did not "exactly remember the
words."* (Tr. 198).  Finally, as discussed above, counsel conceded that, having observed
the juror, the Court was best positioned to assess whether removal was appropriate.

be fair and impartial, the Court was nevertheless concerned that they had failed to abide by the Court's instructions. (Tr. 201, 214).

Under these circumstances, the Court acted well within its discretion in rejecting the alternative of proceeding with the jury as impaneled. "The court's broad discretion . . . clearly includes the right -- indeed the duty -- not to blithely accept all jurors' disclaimers at face value." United States v. Ruggiero, No. 83 Cr. 412 (S), 1988 WL 23546, *7 (E.D.N.Y. March 2, 1988). In addition, it is appropriate for the Court to consider whether jurors "felt fee to disregard the court's instructions." Mikel v. Zon, No. 04 Civ. 6448 (CJS)(VEB), 2007 WL 3076975 (W.D.N.Y. Oct. 19, 2007). Moreover, here, the defense had moved to have Juror No. 8 removed, and indicated its concern that Juror No. 8 could be biased notwithstanding the fact that the Court had reported to the parties that Juror No. 8 professed she could be fair and impartial.

Although defense counsel ultimately reversed his position and indicated that the defendant preferred to proceed with the jury as impaneled, defense counsel expressed this preference immediately after reporting to the Court that notwithstanding the defense's preferences, the defense believed the incident involving Jurors No. 7 and 8 could justify an order for a mistrial. (Tr. 208-09). This course of events caused the Court to remark that it wanted "to make sure expediency is not the driving force" in light of defense counsel's prior mention that "the incident could impact negatively upon Mr. Naseem and the defense, which is what precipitated a lot of this conversation." (Tr. 209). Even if the defense preferred to proceed with a potentially tainted jury, "neither party has a right to have his case decided by a jury which may be tainted by bias; in these circumstances, the public's interest in fair trials designed to end in just judgements must

25

prevail over the defendant's 'valued right' to have his trial concluded before the first jury impaneled."  Arizona v. Washington, 434 U.S. at 516.  Consequently, under these facts, there is no question the Court exercised sound discretion in rejecting the alternative of proceeding with the jury as impaneled.

The defense argues that "where jurors declare that they can remain impartial, it is not reversible error to allow them to remain on the jury, even where they have had discussions with other jurors regarding potential jury tampering."  (Br. 17). This argument misses the point.  Even if the Court possessed the discretion to find that Jurors 7 and 8 could continue to serve impartially, this does not mean the Court's declaration of a mistrial constituted an abuse of discretion.  Moreover, when the Court questions jurors in the context of potential jury tampering "the jurors' responses to these questions must be evaluated in the context of the heavy burden that falls upon the government when jury tampering in any form occurs."  United States v. Shapiro, 669 F.2d 593, 600 (9th Cir.  1982) (citing Remmer v. United States, 347 U.S. 227, 229 (1954)).

Accordingly, in light of the Court's broad discretion in assessing issues of bias, the fact that the Court alone questioned and observed Jurors 7 and 8, the initial defense motion to remove Jurors 7 and 8, the failure of Jurors 7 and 8 to follow the Court's instructions, and the other factors discussed above, the Court did not abuse its discretion in declining to proceed with the jury as impaneled despite the fact that Jurors 7 and 8 had remarked that they could be fair and impartial.  See e.g.,  United States v. Shapiro, 669 F.2d at 600 (where district court removed a juror in connection with possible jury tampering, the appellate court reversed the conviction finding that the

district court should have ordered a mistrial despite the fact that the district court had

conducted a voire dire of the remaining jurors and found that they could, as they claimed,

remain fair and impartial).

    3.    <u>The Court Exercised Sound Discretion In Considering And Rejecting The Option Of Proceeding With 13 Jurors</u>

        In similar vein, the Court exercised sound discretion in considering and

rejecting the alternative of removing Jurors 7 and 8 and proceeding with 13 jurors. As the

Court stated, it was concerned that removing two jurors would create an internal inquiry

about why they were removed and would thereby taint the jury. (Tr. 207). As an initial

matter, the defendant's claim that "the Court conducted no investigation into the reasons"

for the Government's "reluctance" to proceed with 13 jurors is simply false. It was the

Court itself, not the Government, that first articulated a concern that removing two jurors

would taint the jury when it commented that not only is 13 jurors "too small a number,

but it also has an issue about whether the other jurors might wonder, speculate what

happened to Jurors No. 7 and 8, which I think would be unfortunate also." (Tr. 202).

The Government reiterated this concern when it mentioned the possible taint that may

inure to the jury if Jurors 7 and 8 were removed, namely that it might "create . . . among

this jury an internal inquiry among themselves as to why two jurors were removed." (Tr.

207).

        Furthermore, the Court was within its discretion to conclude that

removing two jurors, on the second day of trial, under the circumstances of this case, in

which the venire pool potentially had been infected, and where the two jurors who were

questioned had not followed the Court's instructions, fell within its discretion. The

defendant's claim is that the possibility of bias to the remaining jurors was too remote to constitute a manifest necessity and therefore the Court abused its discretion in declaring a mistrial. (Br. 15). The defense relies upon United States v. Blume, 967 F.2d 45 (2d Cir. 1992) and United States v. Smith, 550 F.2d 277 (5th Cir. 1977) (Br. 15) in support of its claim that the removal of jurors in jury tampering cases does not necessarily result in reversible error on grounds that it taints the remaining jurors. This claim, however, misses the mark. The issue facing the Court is not whether the removal of jurors in every jury tampering case would result in reversible error. Rather, the issue facing the Court is whether, *in this case*, under the totality of the circumstances, the Court abused its discretion by finding there to be a "high degree" of necessity to declare a mistrial to insure against "the ends of public justice . . . otherwise be[ing] defeated." United States v. Perez, 22 U.S. at 579. In some circumstances involving jury tampering, the removal of a juror does not constitute reversible error. In other circumstances, it may constitute reversible error. See Shapiro 669 F.2d at 603. What is required is a fact intensive inquiry.

Moreover, the Blume case not only fails to support the defense's claim, it actually supports the Government's position. The Blume Court, in upholding the lower court's ruling to allow the jurors to remain on the jury (in part, on grounds that the defendant had, in any event, waived his right to challenge the Court's handling of the jury), noted that "the district court has wide discretion to address the effects of unauthorized third party contact on a jury." Id. at 49. The Blume Court further held that "whether the impact of such contact denied an accused his fundamental right to a fair trial turns on the special facts of each case, *facts best left to the judgment of the district*

28

*court.*"  Id (emphasis added).  Accordingly, Blume supports the Government's position that the district court's discretion in these matters is controls.[4]

Notably, the defense also ignores the longstanding authority, discussed above, that "in a criminal case, any private communication . . . with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial."  Remmer v. United States, 347 U.S. at 229; See United States v. Shapiro, 669 F.2d at 600 (removal of a "tainted juror" from the jury does not mean "there should no longer be a presumption of prejudice," particularly in cases where it is possible that, before removal, a juror "attempted to influence other jurors" or where the possibility exists that a juror's "unexplained removal, coupled with the unusual questioning by the court immediately thereafter, planted in the minds of the jurors the possibility that one of the defendants had engaged in misconduct.").

Indeed, United States v. Shapiro provides an instructive example of the concerns that exist regarding the taint that can inure to the remaining jurors when jurors are removed in circumstances involving jury tampering. The Shapiro Court examined whether the district court's refusal to declare a mistrial, after questioning jurors concerning possible jury tampering, constituted error where the jurors who were questioned by the court indicated they could remain fair and impartial.  The district court removed a juror in connection with the jury tampering incident and questioned the remaining jurors about their ability to remain fair and impartial.  Id. at 599.  The Ninth

---

[4]  United States v. Smith 550 F.2d at 286, did not implicate the issue of a mistrial or double jeopardy concerns and simply stands for the unremarkable proposition that the removal of jurors does not necessarily taint the remaining jurors.  (Br. 16).

Circuit held that the lower court committed error in failing to declare a mistrial, notwithstanding the fact that the remaining jurors stated they could be fair and impartial. Although the juror who had the improper contact was removed, the Court noted that "*a showing that the contacted juror was removed from the jury before he had the opportunity to discuss the case with other members of the panel . . . would not so change the inquiry that there should no longer be a presumption of prejudice.*" Id. (emphasis added). The Court further noted there was a possibility that before the juror's removal, the juror "attempted to influence other jurors." Id. In addition, the Court expressed concern that "the unexplained removal [of the juror], coupled with the unusual questioning by the court immediately thereafter, planted in the minds of the jurors the possibility that one of the defendants had engaged in misconduct." Id. The district court had conducted a voire dire of the remaining jurors and determined they could be fair and impartial. Nevertheless, the Ninth Circuit, after examining the jurors responses, concluded that, under the circumstances, the presumption of prejudice that attached when outside contact with the juror occurred had not been rebutted, and reversed the conviction.

In light of the heavy presumption of prejudice that attaches in instances of jury tampering, the defendant's contention that the Court should have dismissed Jurors 7 and 8 and proceeded with a jury of 13 without first insuring that the presumption fo prejudice had been rebutted would have flouted longstanding legal authority and created a real probability that any verdict reached would be reversed on appeal. Under these circumstances the Court's declaration of a mistrial cannot be considered an abuse of the Court's wide discretion in such matters. It is true that the Court could have conducted a

30

voire dire of each of the remaining jurors. However, it was also within the Court's

discretion to determine that conducting such an inquiry, on the second day of trial, after

removing two jurors, neither of whom followed the Court's instructions, would have

created an unreasonably high risk of tainting the jury. See e.g., United States v. Shapiro,

669 F.2d at 603 (noting, where there was possible evidence of jury tampering, "the trial

judge found himself between the Scylla of no voir dire and the Charybdis of voir dire that

creates prejudice where none existed").

   The Court recognized the risks attendant to questioning jurors when it

conducted the voir dire of Jurors 7 and 8, noting that it "would like not to have to do it

at all." (Tr. 192). Counsel for both parties similarly recognized the pitfalls of conducting

such a voire dire by requesting that the questioning be done outside the presence of the

parties and cautioning the Court to take great care not to suggest that either party

instigated the questioning. It is thus no surprise that neither party requested that the

Court consider the alternative of questioning each juror and that defense counsel's

proposal that the Court proceed with 13 jurors omitted any suggestion that the Court

conduct a voir dire of each of the remaining jurors. See United States v. Shapiro, 669

F.2d at 600, 603 (discussing the fact that interrogating jurors constitutes an outside

influence that could create "suspicion in the minds of the jurors that something had

happened extraneously in the course of the trial to influence their deliberations" and

noting that despite the Court's assurance that there had been no misconduct "we think it

is obvious that a juror would more likely attribute misconduct to a criminal defendant

than to the United States Government.").

   This concern compounded the Court's additional worry about proceeding

31

with 13 jurors, namely that doing so would create a likelihood that the trial would not

reach verdict because it would not be completed prior to the Christmas holiday, during

which time certain jurors and witnesses would not be available to continue participating

in the trial. (Tr. 207). Given that the trial was anticipated to last two weeks, that the

incident involving the Defendant's Friend had already consumed the better part of the

morning of one of those days, and that the jury had to be released early on Fridays to

accommodate Juror No. 15's religious practices (Tr. 150), the Court's concern that 13

jurors might be too few to permit the trial to be completed was justified. Conducting a

voire dire of the remaining 13 jurors to insure their impartiality would only have

consumed additional time and made it far more likely that the trial could not be

completed prior to the holidays, not to mention that such an inquiry would have exposed

the entire jury to an outside influence. Based on the foregoing, the defendant's claim --

that the possibility that a jury of 13 would be too few to render a verdict was sufficiently

unlikely to order a mistrial (Br. 14) -- should be rejected as baseless.[5]

---

[5] Defense counsel, now, for the first time argues that a stipulation pursuant to Fed.R.Crim.Proc. 23(b)(2)(A) could have provided the Court with additional flexibility in proceeding to verdict, if necessary. The defense, however, never suggested this option at the time the parties conferred with the Court about whether to order a mistrial, despite the ample opportunity provided by the Court to suggest alternatives. The defense could have stipulated on the record that if the Court deemed 13 jurors to be too few to proceed it would agree to proceed with fewer than 12 jurors. Given that such a stipulation requires the consent of both parties, and is, in any event, highly unusual, the Court cannot be faulted for failing to proceed under this anomalous theory. This is particularly so in light of the fact that declaring a mistrial well into the proceeding, as opposed to doing so before any evidence is presented, creates a far more likely chance that prejudice will inure to the defendant. See United States v. Gentile, 525 F.2d at 255.

5.     The Fact That The Defendant Created The Circumstances That Caused
        The Mistrial Further Militates In Favor of Finding That the Court
        Exercised Sound Discretion

In addition, the very circumstances that gave rise to the mistrial were precipitated by the defense, who should not now be permitted to benefit as a result. As discussed above, it was the defense who raised concerns about the impartiality of Jurors 7 and 8, requested their removal, and agreed with the Government that the Court could, within its discretion, order a mistrial under the circumstances. "If counsel felt it to be his duty . . . to shed some light on the subject, the light should have included then, not later, an indication" that he "wanted his trial to proceed, *failing which he would claim double jeopardy.*" United States v. Gentile, 525 F.2d 252, 255 (1975) (emphasis added).

In addition, it was also the defense who was responsible for the very incident involving the Defendant's Friend that gave rise to those concerns. There is no dispute that the Defendant's Friend was, in fact, a friend of the defendant, who was in Court on the defendant's behalf. There is no dispute about the fact that the Defendant's Friend was "schmoozing" with members of the venire pool. And there is no dispute about the fact that the defendant's friend made some sort of celebratory gesture after Juror No. 8 was elected to serve on the jury. Under these circumstances, the Court should not allow the defendant to now claim double jeopardy and "profit from his own wrong." United States v. Harris, 2 F.3d 1452, 1455-56 (7th Cir. 1993) (holding that the district court did not abuse its discretion in denying the defendant's motion for a mistrial, on grounds that he would be prejudiced by his own outburst in a courtroom and noting that the defendant "should not profit from his outburst."); Vasta v. United States, 89 F.Supp.2d 424, 427 (S.D.N.Y. 1999) ("When successive trials are caused by the

33

defendant, he is not entitled to double jeopardy protection.") (citing, <u>Jeffers</u> v. <u>United States</u>, 432 U.S. 137 (1977)); <u>see also</u> <u>Williams</u> v. <u>Woodford</u>, 384 F.3d 567, 626 (9th Cir. 2004) ("The Sixth Amendment affords no relief when the defendant's own misconduct caused the alleged juror partiality and the trial judge employed reasonable means under the circumstances to preserve the trial's fairness."). <u>Arizona</u> v. <u>Washington</u>, 434 U.S. at 513 ("Unless unscrupulous defense counsel are to be allowed an unfair advantage, the trial judge must have the power to declare a mistrial in appropriate cases. The interest in orderly impartial procedure would be impaired if he were deterred from exercising that power by a concern that any time a reviewing court disagreed with his assessment of the trial situation a retrial would automatically be barred."); <u>United States</u> v. <u>McCormac</u>, 309 F.3d 623, 627 (9th Cir.  2002) (where the defendant had to be removed from the courtroom for defying the Court's order to sit quietly, *even though there was "no finding that McCormac's outburst was calculated with malign purpose to delay the trial, we must consider effect"*) (emphasis added).

   If the Court did not grant a mistrial under these particular circumstances, and proceeded with the trial the defendant would have benefitted from the Defendant's Friend's misconduct, and it would encourage other defendants to attempt to influence the venire during jury selection.  If the only consequence of being caught, after attempting to influence the venire pool, is the possible removal of certain jurors, there would be little downside for the defendant's friends and family to make such attempts.  Such serious and destructive acts that undermine the integrity of the judicial process should not be encouraged.  The Court, being charged with protecting the integrity of the judicial process from actual and perceived attempts to influence the jury inappropriately, acted

well within its discretion in doing everything in its judicial power to insure that the criminal justice system remained intact.  Indeed, if the defendant were found guilty by the impaneled jury, the defendant would surely argue on appeal that the proceedings were tainted and that the conviction must be reversed.

6.    The Defendant Did Not Suffer Unfair Prejudice As A Result Of The Mistrial

Finally, defense counsel's assertion that one of the evils sought to be avoided in declaring a mistrial is permitting the Government time to bolster its case (Br. 11) is well settled and does not alter the above-described "manifest necessity" analysis that courts must undertake in assessing whether a "high degree" of necessity to order a mistrial exists.  In any event, insofar as the defendant was prejudiced by the Court's declaration of a mistrial, the prejudice stemmed from his own doing as he was the one chiefly responsible for bringing about the course of events that led to the mistrial. Moreover, whatever "financial and emotional burden" and additional period of "stigmatiz[ation]" the defendant suffered, see Arizona v. Washington, 434 U.S. at 504, was minimal in light of the short delay of only one month, including the intervening holidays.

Furthermore, in a case like this, where the mistrial was declared before any evidence was presented, the Government cannot alter the presentation of evidence previously introduced during the first trial and, consequently, the risk of prejudice is far lower.  See United States v. Gentile, 525F.2d at 256 ("The declaration of a mistrial came before any testimony."  Thus, although the defendant was placed in jeopardy, "in weighing the harm to the defendant incident to a new trial against the desirability of the

court's protecting a defendant from prejudice (and retrial after a possibly successful appeal), even without an application on his part, the length of his exposure at the first trial is a relevant consideration.").

In addition, the mistrial caused only a short delay of one month, including the intervening holidays. While the defendant claims this permitted the Government additional time to prepare its case, it is the defense who was chiefly advantaged by the delay. The defendant has now been in possession of the Government's exhibits for a month (as opposed to a week) before trial. Similarly, the defendant has had possession of the Government's <u>Jencks</u> <u>Act</u> material for a month (instead of a week). Moreover, defense counsel has used the delay afforded by the mistrial to interview and attempt to interview various Government witnesses in advance of trial, with the benefit of the Government's exhibits and 3500 material. Thus, the defendant's claim that double jeopardy should attach, in part, because he was prejudiced by the delay resulting from the mistrial is also unavailing.

**<u>Conclusion</u>**

Based on the foregoing, the defendant's motion to dismiss the Indictment on double jeopardy grounds should be denied.

Dated:          January 7, 2008
                New York, New York

                                        Respectfully submitted,

                                        MICHAEL J. GARCIA,
                                        United States Attorney for the
                                        Southern District of New York,
                                        *Attorney for the United States of America*


                                By:    ___/s/_____
                                        JOSHUA KLEIN
                                        Assistant United States Attorney

                                        REED MICHAEL BRODSKY
                                        Assistant United States Attorney