UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

          -against-

HAFIZ NASEEM,
                            Defendant.
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/10/08

ORDER

07 Cr. 610 (RMB)

I.    **Background**

    On or about December 10, 2007 jury selection commenced. The jury was empaneled and sworn on the same day.[1] Opening statements were given also on December 10, 2007 and testimony was scheduled to begin on December 11, 2007. On December 11, 2007, counsel for the Government advised the Court as follows: "We were informed after the trial day [December 10, 2007] was over by someone who is an attorney for Credit Suisse, who was present during the jury selection process, and the attorney for Credit Suisse informed us that during the jury selection process, a friend or relative of Mr. Naseem [Defendant] was in the audience and spoke to three members of the ven[ire] pool, and one of the three people she spoke to . . . ended up on the jury . . . ." (Transcript of proceedings held on Dec. 11, 2007 ("Tr.") at 187.) The court responded: "[L]et me know after you've talked to Mr. Bachner [defense counsel] if there's a joint proposal." (Tr. at 189.)

    Following a short recess during which defense counsel spoke with Defendant, defense counsel described the incident as follows: "**The woman who spoke with one or two or three of**

---

[1] The Court incorporates the entire transcript of the trial proceedings by reference.

**the ven[ire] people is a lawyer in New York. She's a friend of the defendant's ... My belief is she sat down and started schmoozing with people."** (Tr. at 190.) After speaking with the parties and hearing their respective positions; interviewing two jurors [Jurors No. 8 and 7] in camera; and conferring with counsel, the Court concluded, in accordance with Federal Rule of Criminal Procedure 26.3, that a mistrial should be declared on several grounds.[2] (See Tr.) A mistrial was declared on December 11, 2007 at approximately 11:00 a.m. and the trial was adjourned to January 14, 2008. (See Tr. at 211.)

On or about December 20, 2007, Hafiz Naseem ("Defendant" or "Naseem") filed a motion to dismiss the Indictment ("Def. Mot.") on the grounds that "the retrial of the defendant would violate the Double Jeopardy Clause of the United Constitution." (Def. Mot. at 1.) Defendant argues that "continuing the trial with thirteen jurors was a particularly appropriate option that was not explored adequately by the court and rejected," (Def. Mot. at16), and, alternatively, the Court could have "continue[d] the trial without removing any of the jurors." (Def. Mot. at 16.) On or about January 7, 2008, the Government filed its Response in opposition to the Defendant's motion. ("Gov't Resp.") The Government argues that Defendant conceded that the court could declare a mistrial [on December 11, 2007] and Defendant "extinguished his

---

[2] The defense expressed **several** positions on December 11, 2007: Mr. Bachner stated: (i) "My concern, your Honor, is that she [Juror No. 8] feels there was some effort to sway her, and I'm concerned that she will be bending over backwards to show that she can't be swayed, and I'm **uncomfortable** with it ... " (Tr. at 199); (ii) "[R]emove two [jurors], and we proceed with 13." (Tr. at 206); (iii) "[M]r. Naseem's preference is that we proceed with the jury [15 jurors] as [e]mpaneled." (Tr. at 209.)
    The Government stated, initially: "Your Honor, our preference is to proceed with the jury as it stands now." (Tr. at 204.) Then, after conferring with appellate counsel, the Government argued: "[s]he [appellate counsel] raised concerns about whether jurors seven and eight could be fair and impartial, given the context, given the situation. She advised us to raise those concerns with your Honor."

right to assert a double jeopardy claim." (Gov't Resp. at 17; see, e.g., Tr. at 208 where the defense stated: "Well, I think your Honor would have to find just cause to declare a mistrial . . . well, your Honor, I think . . . that if the defense wanted to push that issue, I think that it could give rise to that level [mistrial] if your Honor were to so find.") Additionally, the Government argues that "under the circumstances of this case the Court's discretion to assess whether there was a manifest necessity to declare a mistrial was especially broad." (Gov't Resp. at 21.) On or about January 8, 2008, Defendant filed its Reply. ("Reply")

## II. Legal Standard

Federal Rule of Criminal Procedure 26.3 provides: "Before ordering a mistrial, the court must give each defendant and the government an opportunity to comment on the propriety of the order, to state whether that party consents or objects, and to suggest alternatives." "Where a defendant either objects or fails to consent to a trial court's declaration of a mistrial, double jeopardy will bar a second prosecution unless there as a manifest necessity for the mistrial." Maula v. Freckleton, 972 F. 2d 27, 28-29 (2d Cir. 1992) (internal quotations and citation omitted). "[C]onsent need not be express, but may be implied from the totality of the circumstances attendant on a declaration of mistrial." United States v. Beckerman, 516 F. 2d 905, 909 (2d Cir. 1975). "The discretion to discharge the jury before it has reached a verdict is to be exercised only in very extraordinary and striking circumstances." Downum v. United States, 372 U.S. 734, 736 (1963) (internal quotations and citation omitted); United States v. Razmilovic, 507 F.3d 130 (2d Cir. 2007). See United States v. Ruggiero, 846 F.2d 117, 122 (2d Cir. 1988) (where the district judge found, among other things, "a very high degree of likelihood that the panel sitting on this case has to some extent been compromised as a result of unlawful

conduct circumstantially attributable to the defendants.").

**III.    Analysis**

The determination of mistrial was made in compliance with Rule 26.3 and following full consultation with both the defense and the Government and was based, among other things, on the following totality of circumstances:

1- Someone associated with the defense caused the problem. Defense counsel acknowledged: "The woman who spoke with one or two or three of the ven[ire] people is a lawyer in New York. She's a friend of the defendant's . . . My belief is she sat down and started schmoozing with people." (Tr. at 190.)

2- The parties (Government and defense) requested that the Court speak to Jurors No. 8 and No. 7 outside their presence, i.e., in camera. (See, e.g., Tr. at 192 (Mr. Bachner: "We don't have any problem your Honor doing it on your own ex-parte." Mr. Brodsky: "Neither do we, your Honor.")).

3- Juror No. 8 revealed to the Court: "She [the Defendant's friend] made a comment to me about that something about I guess my appearance looked like I would make a good juror . . . I did go to the pizza shop, and I did see her with the defendant . . . then I made a comment to one of the jurors that she had spoken to me . . . I have to say I was a little nervous because I know that now she's [the Defendant's friend] in the audience, and I guess I'm sure she's with him . . . I know we're not supposed to talk about this. I [also] spoke to my husband." (Tr. at 195-96.)

4- Juror No. 7 stated to the Court: "I think she [Juror No. 8] said maybe she was a little nervous, this was her first time . . . ." (Tr. at 200.)

5- Jurors No. 8 and No. 7 expressed to the Court that they, despite the incident with the

Defendant's friend, could be fair. (See, e.g., Juror No. 8 stated: "It was one of those **weird** things. She just sat next to me, and I said, oh, gosh, who is she, and later on I saw her and I said, oh, God. But it doesn't -- impede in any way. I'm impartial. It's about the facts," (Tr. at 197), and Juror No. 7 stated she could "absolutely" be fair. (Tr. at 200.)

6- The Court conferred with counsel throughout its deliberations about how to proceed. For example, "[W]hat I'm leading to really is whether or not we should start over again with a new jury selection and what the legal ramifications, if any, are in doing that. So I'd like to hear from both of you on that subject." (Tr. at 201.)

7- The attorneys had varying and multiple positions as to how to proceed before a mistrial was declared by the Court. (See note 2 at 2.)

8- For example, after it was disclosed that Juror No. 8 had spoken to Juror No. 7, Mr. Bachner stated: "Our request, your Honor, and we believe you should speak to Juror No. 7, your Honor, is that this juror [presumably Juror No. 8] be removed . . . My concern, your Honor, is that she feels there was some effort to sway her, and I'm concerned that she will be bending over backwards to show that she can't be swayed, and **I'm uncomfortable with it** . . . ." (Tr. at 198-99.)

9- Thereafter, the defense argued: "[W]e remove two, and we proceed with 13." (Tr. at 206.)

10- And, thereafter, the defense reversed course and argued: "[A]fter having had extensive conversations with Mr. Naseem, he's decided to proceed with the jury as maintained [15] at this time." (Tr. at 207.)

11- The Government initially stated it wanted to go forward with the full jury (15 jurors).

(See e.g., Tr. at 204, Mr. Brodsky: "Your Honor, our preference is to proceed with the jury as it stands now."; Tr. at 207, "[I]f we can't do that, we're amenable to your Honor's suggestion of a postponement."). After a recess in the proceedings, the Government stated that it had spoken to the head of the United States Attorney's Office Appeals Division who expressed concerns "about whether jurors seven and eight could be fair and impartial, given the context, given the situation . . . ." (Tr. at 210.)

12- The Court advised the parties that it concluded that "something happened. Mr Bachner thinks it wouldn't be helpful to his client . . . something did happen and didn't get reported" and that there could be "some effect on the remaining jurors if all of a sudden, for example , you all agree that two jurors would be excused and we have 13 and go forward with 13." Tr. at 202. The Court further advised the parties: "[T]here was a reason in my own mind with going for 15, because it is a trial that's not a three-day trial particularly, and I purposely wanted to have 15 jurors just to be sure that we had enough to complete the trial." (Tr. at 207.) The Court also stated that: "I think they [Jurors No. 8 and No. 7] were sincere in their statements to me that they could be fair and impartial, but I have the same concerns that [the Government Appeals Bureau] has raised." (Tr. at 210.)

13- "The integrity of jury proceedings must not be jeopardized by unauthorized invasions. The trial court should not decide and take final action ex parte on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." United States v. Remmer, 347 U.S. 227, 229-30 (1954).

14- There is no dispute that Defendant's friend inappropriately spoke to Juror No. 8 and

that Jurors No. 7 and 8 violated the directives of the Court. That is, it is conceded that: Juror No. 8 had some contact (conversation) with a friend of the Defendant; that Juror No. 8 told her husband about the conversation and that Juror No. 8 told Juror No. 7 about the conversation as well because she was "nervous" and uncomfortable about the conversation. (See Tr. At 195-96 (Juror No. 8: "I made a comment to one of the jurors that she had spoken to me . . . I know we're not supposed to talk about this. I spoke to my husband.") Among other things, the jurors were instructed as follows: "First, do not talk to each other about the case or about anyone who has anything to do with it until the end of the case when you go to the jury room to deliberate on your verdict. And additionally, don't remain in the presence of others who may be discussing the case. Second, do not talk with anyone else about the case or about anyone who has anything to do with it, until the trial has ended and you have been discharged by me as jurors. Anyone else includes members of your family and your friends. You may tell them that you are a juror in a case. But don't tell them anything else about the case until after you have been discharged by me. Third, don't let anyone talk to you about the case or about anyone who has anything to do with it. If someone should try and talk to you about the case, please report that to me or to Christine immediately." (Transcript dated Dec. 9, 2007 at 183.)

15- "A juror is unlikely readily to admit to a judge that he has violated the express directive of the Court against discussing the case. Indeed, even a juror's good faith belief in his own impartiality is not dispositive." United States v. Shapiro, 669 F.2d 593, 601 (9th Cir. 1982).

16- This trial was scheduled to commence on December 10, 2007. In selecting the December 10, 2007 trial date, the Court considered, first and foremost, the Defendant's right to a fair and speedy trial. The Court also considered, among other things, the parties' respective

schedules, the complexity of the case and the anticipated length of the trial (given the lawyer's estimates). Commencing the trial on December 10, 2007, with three alternate jurors, was important, in the Court's view, taking into consideration, among other things, the proximity to the upcoming Christmas and New Years holidays. (See Tr. at 202 ("I think 13 [jurors] is too small a number"); and at 207 ("[T]here was a reason in my own mind with going for 15, because it is a trial that's not a three-day trial particularly, and I purposely wanted to have 15 jurors just to be sure that we had enough to complete the trial.")

17- The Court asked counsel, among other things, "[D]o you think that it is legally appropriate to declare a mistrial in the circumstance like this and to start over again?" (Tr. at 208.) Mr. Brodsky stated: "Your Honor, I think from a legal perspective, it is in your discretion. And the answer is yes, it could be in your discretion, your Honor, having reviewed the jurors, to declare a mistrial." (Tr. at 208.) Mr. Bachner stated: "Well, I think your Honor would have to find just cause to declare a mistrial . . . if the defense wanted to push that issue, I think that it could give rise to that level [mistrial] if your Honor were to so find." (Tr. at 208.)

18- In declaring a mistrial, the Court stated, among other things: "The reason I am declaring a mistrial is to safeguard the integrity of the jury that we have selected, and more broadly the jury system. The appearance of impropriety in this instance may be as important as any actual impropriety. . . There must be no doubt in this and in every other case that each juror is fair and impartial. **That no external events or persons approach or influence the jurors . . .** I had specifically instructed this jury, and as I instruct every jury, if there is such contact, that they report it to me immediately. Which they did not do in this case . . . I [also] conclude there is manifest necessity to declare a mistrial in this case in order to ensure an impartial trial and a fair

trial . . . So it is with reluctance . . . that a mistrial is appropriate and that the jury should be dismissed and we should start again." (Tr. at 212-14 (emphasis added).) See United States v. Gentile, 525 F.2d 252, 256 (2d Cir. 1975) ("Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment.") (internal quotations and citation omitted); see also Mikel v. Zon, No. 04 Civ. 6448, 2007 WL 3076975, at *3 (W.D.N.Y. Oct. 19, 2007) ("[W]here the decision to declare a mistrial involved an issue related to possible juror bias, the trial court's ruling is entitled to special deference . . . [The district judge] has seen and heard the jurors during their voir dire examination. He is the judge most familiar with the evidence and the background of the case on trial.") (internal citations omitted).

19- As noted, neither the Government nor the defense objected to the Court's declaration of a mistrial (although defense counsel now states: "it cannot be said that the Defendant consented to the mistrial"). (Reply at 3.) As acknowledged by the defense, "[t]he Defendant was left with a choice between continuing with a jury that was allowed to come into contract with a member of the audience or surrendering his right to receive a verdict from that jury. Certainly Mr. Naseem would have been in a far better position had the Third Party never come into contact with Juror #8." (Reply at 7-8.)

20- The Court does not find that either the Government or the Defendant suffered any prejudice in the mistrial declaration. In selecting the new trial date, the Court stated: "I want it to be convenient for everybody. I want it to be as soon as practicable, but understanding that

there are logistical arrangements you need to make and defense needs to make as well." (Tr. at 215.) On consent, a new trial date of January 14, 2008 was selected.

## IV.  Conclusion

Based upon the foregoing, Defendant's request for dismissal on the grounds of double jeopardy is denied.

Dated: New York, New York
       January 10, 2008

                                          _____/s/ RMB_____
                                          **Hon. Richard M. Berman, U.S.D.J.**