UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

vs.

HAFIZ NASEEM,

                Defendant.

Case No.: S1 07-CR-610-1

---

## SENTENCING MEMORANDUM OF HAFIZ NASEEM

HUGHES HUBBARD & REED LLP
Edward J.M. Little
Lisa A. Cahill
One Battery Park Plaza
New York, New York 10004-1482
Tel: (212) 837-6000

BACHNER & ASSOCIATES, P.C.
Michael Bachner
Kevin O'Brien
26 Broadway, Suite 2310
New York, New York 10004
Tel: (212) 344-7778

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................. 1

II.   PROCEDURAL BACKGROUND.......................................... 3

III.  MR. NASEEM'S HISTORY AND CHARACTERISTICS ................... 4

    A.   Family Circumstances Force Hafiz Naseem to Assume
        Heavy Responsibility at an Early Age ........................................5

    B.   Death of Mehnoor Naseem ...........................................8

    C.   Hafiz Overcomes These Early Tragedies To Become a
        Devoted Father and Successful Banker in Pakistan....................10

    D.   Maheen Naseem Is Diagnosed With Cerebral Palsy .................12

IV.   OBJECTION TO THE GUIDELINES CALCULATIONS ................. 14

V.    DOWNWARD DEPARTURE ARGUMENTS ................... 17

    A.   The Absence of Any Monetary Benefit to Mr. Naseem is a
        Mitigating Circumstance, and the Harsh Impact of Section
        2B1.4's Literal Application an Aggravating Circumstance,
        Of a Collective Kind and Degree Not Adequately Taken
        Into Consideration By the Sentencing Commission in
        Formulating the Guidelines.........................................................17

    B.   A Downward Departure for Extraordinary Family
        Circumstances and/or Because of the Prospective Loss of
        Caretaking and Financial Support is Justified in This Case ...............20

VI.   VARIANCE ARGUMENTS.......................................... 29

VII.  CONCLUSION............................................................. 31

i

## SENTENCING MEMORANDUM OF HAFIZ NASEEM

This memorandum is respectfully submitted on behalf of defendant Hafiz Naseem in connection with his sentencing, which is presently scheduled for May 30, 2008.

## I.

## INTRODUCTION

The Court is already familiar with this case, of course, having presided over the two-week trial attended by Mr. Naseem and multiple family members, and which ended in his conviction and subsequent remand to the Metropolitan Correction Center. It saw first hand Mr. Naseem's respect for the American judicial process and watched him absorb the verdicts returned by the jury in February with dignity.

In other respects, though, and we say this most respectfully, the Court has not yet had the chance to learn about Mr. Naseem as a person. Indeed, while the jury has spoken and we accept its verdicts for sentencing purposes, Mr. Naseem has had relationships, life experiences, joys and hardships far beyond this case that define him as a person and which we aim, through this memorandum, to bring to the Court's attention. He has lived his life in such a way and has touched the lives of so many that it would be unfair to characterize him based on the jury's verdicts alone.

While it is never easy to convey the essence of a person with words alone, we have been greatly helped by Mr. Naseem's family, friends and colleagues. Their letters to the Court are collected at Exhibit A to this brief; they attest to Mr. Naseem's dedication to family, the strength of his character and kind nature.

It is Mr. Naseem's "history and characteristics" over a lifetime, to quote Title 18's section 3553(a), that make the strongest case for leniency on May 30. The totality of this man is not expressed by the two years he spent at J.P. Morgan and Credit Suisse. It is the honorable way he's lived his life – *all his life* – and the good works he has done over a lifetime. The jury's verdicts can and should be balanced against that record, and we know that this Court will do so.

In the pages that follow, we discuss Mr. Naseem's personal history. We then explain our objection to the Probation Office's Guidelines calculation and argue for downward departures within the framework of the Guidelines that will allow the Court to impose a fairer sentence than the extremely severe one suggested by the Probation Office. Our position is based on circumstances present in this case of a kind and degree not contemplated by the Sentencing Commission (including the absence of a financial gain to this defendant), and Mr. Naseem's extraordinary family responsibilities, including to a young daughter with cerebral palsy. Most respectfully, a custodial sentence of the length called for by the Guidelines and recommended by Probation – 97 months or more than eight years – would be unduly harsh in a case where the defendant received no financial gain and where his prolonged absence would devastate a family. The application of a single 20-level enhancement, bringing Mr. Naseem's custodial exposure effectively from zero to ten years, is especially pernicious in this case, calling out for a downward departure that would blunt its severe impact. Lastly, we address various of the § 3553 factors, all combining, we respectfully submit, in favor of leniency in this case.

This is an individual, it bears emphasis, who has already lost his liberty, his young family, and the career he spent the entirety of his adult life building. While our

justice system requires that the jury's verdicts be respected and Mr. Naseem punished, we respectfully urge the Court in its consideration of an appropriate penalty to bear in mind all that Mr. Naseem and his family have lost already because of those verdicts and all that they stand to lose should he be sentenced to further prison time.

## II.

## PROCEDURAL BACKGROUND

On July 3, 2007, Mr. Naseem and his co-defendant, Ajaz Rahim, who actually made the trades that are the subject of this case but was never arrested, were charged in a 26-count indictment. The indictment was superseded on November 20, 2007, and Mr. Naseem ultimately went to trial alone on one count of conspiracy and 29 substantive counts of fraud. The first jury trial, which began on December 10, 2007, ended in a mistrial the following day. The second trial began on January 15, 2008 and ended with guilty verdicts on February 4, 2008.

The Probation Office submitted a Presentence Report ("PSR") to the Court on April 3, 2008 that calculates a total offense level of 30 for this case as follows:

| | |
|---|---|
| Base Offense Level | 8 |
| Amount of Gain Enhancement | +20 |
| Role in the Offense Adjustment | +2 |

PSR, at ¶¶ 67-78. That translates to a Guidelines custodial sentence range of 97 to 121 months – that is, more than 8 to 10 years.

Defense counsel submitted their objections to the PSR by letter on April 29, 2008, a copy of which is attached as Exhibit B. The Probation Office acknowledged

the objections in its May 7, 2008 addendum but did not revise its conclusions on the calculations of the Guidelines.

## III.

### MR. NASEEM'S HISTORY AND CHARACTERISTICS

Hafiz Naseem's life has been shaped by a series of tragic events – the onset of his mother's epilepsy 37 years ago; the sudden death of his sister in the prime of her life; and the diagnosis of his daughter, Maheen, with cerebral palsy. In his Mitigation Report (the "MR"), a copy of which is attached as Exhibit C, Dr. Mark S. Silver recognizes the cumulative effect that these and other traumas have had on Mr. Naseem:

> Hafiz has been deeply affected by the fact that when he was a child his mother suffered severe neurological problems, which greatly impacted the dynamic of his family. The tragic death of his sister from acute respiratory depressed syndrome at age 19 further set Hafiz's life course. It is also the case that his father has been ill for decades due to cardiac disease and endures serious depression. These combined issues made his family's life very tenuous. His daughter's heart-breaking illness of cerebral palsy and her related surgeries and systemic medical interventions at New York University Hospital, have also greatly influenced and informed Hafiz's life.

MR, at 9.

Mr. Naseem's remarkable ability to stay outwardly strong in the face of adversity has caused his wife, his children and, to varying degrees, his parents and other relatives, to rely on him for some or all of their emotional and financial well-being. As a result, at least three families – Mr. Naseem's own family, his wife Ayesha's own family, and the family they have made together – have suffered extreme financial and emotional damage since his arrest in May 2007, which has become only more acute with his incarceration in February 2008.

In particular, Mr. Naseem's handicapped daughter, Maheen, has suffered greatly and will continue to suffer so long as he is incarcerated. As the letters from her doctors (which are included in Exhibit A) attest, Maheen relied on her father's emotional and financial support for her well-being. Since the beginning of this ordeal, Maheen has suffered an interruption in her medical treatments that is almost certain to continue for as long as her father is unable to provide the support that he always has in the past.

Mr. Naseem's wife, Ayesha, who herself has health issues (we understand that she is at risk of developing diabetes and is currently on pre-diabetes medication), does not possess the professional skills necessary to support the family financially in her husband's absence. Thus, keeping Mr. Naseem incarcerated, particularly at this critical time and even for a short juncture, will place a great many lives in jeopardy.

We respectfully request that, after giving due consideration to the emotional damage done to Mr. Naseem by the many traumas he has faced, and the devastation that would result if the mainstay of the Naseem family stayed absent for any length of time, Your Honor consider reducing Mr. Naseem's sentence to reflect these realities.

A.  Family Circumstances Force Hafiz Naseem to
Assume Heavy Responsibility at an Early Age

Mr. Naseem was born in Pakistan on October 7, 1970 to Parveen Akhter and Muhammad Naseem. He was the oldest of three children. His brother, Usman, was born on September 27, 1973. His sister, Mehnoor, was born on January 22, 1976. Mr. Naseem informed Dr. Silver that "he was raised in a modern Muslim home . . . ." MR, at 10. It was "a loving and caring home . . . [and] his family lived a simple, content and modest life with most of the basic necessities that they required." *Id.*

While Mr. Naseem has fond memories of his childhood, it is clear from the many letters written on his behalf that he faced real difficulties as he grew up in Pakistan. Most significantly, Mr. Naseem's mother, Parveen Akhter, has suffered from uncontrolled seizure disorder, or epilepsy, for approximately 37 years. Dr. Javed Akram, who has treated Mrs. Akhter for the past 16 years, reports that she "is on heavy tranquilizer[s] and other medicines" for her condition. These medications evidently have numerous side effects, including joint swelling, limb edemas, weight gain, decreased sight and vision, frequent falls, and hearing loss.

Mr. Naseem's father, Muhammad Naseem, was educated as a civil engineer and was employed as a chief engineer for the Pakistani railroad system. While his job provided his family with financial security, it required him to work long hours and relocate his family repeatedly. The elder Naseem's heavy and stressful work schedule also aggravated a severe heart condition, which he has had to deal with for over 30 years and which has resulted in two heart attacks. According to Dr. Saqib Shafi Sheikh, Associate Professor of Cardiology at Punjab Institute of Cardiology in Lahore, Pakistan, Muhammad Naseem has a "history of longstanding hypertension and had acute coronary events in 1977 and 1985."

The combination of these factors left a caretaking and emotional void in the Naseem family. Hafiz Naseem filled that void by attending to many of the needs of his siblings and parents. As Muhammad Naseem told Dr. Silver:

> Hafiz has been an outstanding son in every manner and despite the current unfortunate situation has thanked God every day for the wonder of Hafiz's warm-hearted nature and giving disposition to Hafiz's mother without whom the family would have deteriorated long ago.

MR, at 11.

In addition to "attending to his siblings' health and safety while his father worked long hours almost every[]day and his mother seemed endlessly in need of daytime rest," *id.* at 13, Mr. Naseem cared for his paternal grandfather, paternal grandmother and uncle before their deaths, "literally sleeping in their hospital rooms to ensure that they had a family member present to advocate [on] their behalf when they could no longer speak for themselves." *Id.* Mr. Naseem's cousin, Aroona Hashmi, is forever grateful to him for helping her deal with the death of her father: "My father's death was devastating for me. He was a mere 10[th] grade[] student but supported me emotionally and helped me get over the great loss. I am thankful to him."

Mr. Naseem's role as caregiver was readily apparent to acquaintances and new members of the family. Saad Mushtaq Malik, a co-worker of Muhammad Naseem at Pakistan Railways who has known the family for 30 years, explained Mr. Naseem's childhood as follows:

> Hafiz Naseem had a very unusual and troubled childhood since his mother Mrs. Parveen Naseem is epileptic and he had to endure her condition when she would go into her epileptic fits. But the boy was always strong willed and from his early days he started looking after his mother, helping her out in her daily households and keeping track of her medications. I was very much impressed that such a young child can be so caring towards his mother. This nature carried forward in him through time and his care and love for his mother and father grew at the time when Hafiz Naseem's younger sister passed away in her teens. The way he supported his mother and father through these emotionally trying times was very impressive and mature for his age.

Taniya Malik speaks to Hafiz's role as caregiver as well:

> He always took good care of his epileptic mother with regards to her medical and emotional needs. He is always happy to help out anyone in need. He has always been with me and my husband through all of our highs and lows helping us out in times when we needed both financial and moral support. Hafiz Naseem is one of those people who cannot bear to see anyone in pain. He has been through a lot in his life and things just

seem to be getting very difficult for him with the passage of time. He grew up in a childhood filled with the added burden of taking care of his epileptic mother and she grew very much depend[e]nt upon him to will her on in her low times. He made sure he bore all the pressure since his father has a chronic heart condition.

Finally, Mr. Naseem's lifelong friend, Ahmer Malik, spoke of the care that Hafiz has provided for all those close to him in difficult times:

As mentioned earlier, we have been together since childhood; therefore, we have faced all ups and downs of our life together. When my father passed away while I had just left school and joined college, he was right beside[] me to will me on and stayed with me through our time in the University of Engineering and Technology in Lahore from where we both got our Engineering degrees. If it weren't for him, I would not have been able to resume my studies. The love and support he gave to me was nothing compared to the care he put towards his parents. His mother is epileptic and he was always with her through all her ill phases taking care of her every need. His father is a heart patient; therefore, he always tried his best to handle the pressures on his family himself and not put too much responsibility on his father. When his sister passed away in her teens around 12 years back, he stood by his father and didn't let him crumble from the loss of his only daughter. Hafiz Naseem put his own sorrow behind him to take care of his father and mother through these tough phases.

B.  <u>Death of Mehnoor Naseem</u>

By all accounts, Mr. Naseem's late sister, Mehnoor, was a smart and charming young woman who had taken on the role of caregiver for her mother and entire family. Much like Mr. Naseem, she was forced to grow up very quickly because of her mother's illness.

It came as a great shock to Mr. Naseem and his entire family when Mehnoor died suddenly on December 20, 1995. A bacterial lung infection caused her to fall into an irreversible coma. The family believed that Mehnoor suffered from an illness that could be treated by routine medical care and were astonished when she died a short time after she was hospitalized. Mr. Naseem told Dr. Silver that this experience caused

"shock, terror, and a sense of helplessness" from which he and his family members "have never fully recovered." MR, at 12. Mr. Naseem also told Dr. Silver that he believes that Mehnoor would be alive today if she were able to receive the level of healthcare available in the United States:

> Hafiz noted that the medical care in Pakistan has made great strides in the past several years, though it in no way begins to approach the healthcare available in the United States and he believes that his sister would likely still be alive if she had benefited from the level of professionalism that he has witnessed in American hospitals.

*Id.*

While himself suffering from the awful loss of a younger sister, Mr. Naseem recognized the needs of his family and increased his caregiving role after his sister's death. His mother, Parveen Akhter states:

> I am an epilepsy patient and Hafiz Naseem is one of my only two sons. I had only one daughter, who was younger than her brothers, who used to look after me all the time and who passed away when she was only 19. Our entire family went through the shock of our lives after her sudden and unexpected death. It was only because of the extra love and attention and 24 hours care that Hafiz Naseem gave me, that I was able to pick myself up and look at the prospect of living my life once again.

Taniya Malik believes that the role of caregiver that Mr. Naseem assumed as a result of his mother's illness and his father's work schedule and heart condition prepared him to lead his family through the tragic death of Mehnoor:

> From his childhood arose a strong, mature and confident man who handled his family's darkest hour, the death of his teenage sister, with confidence and maturity slowly but surely bringing his parents and his younger brother Usman out of misery. He vowed to give his children the perfect love and a happy childhood that he couldn't receive from his parents.

Fahad Malik, Hafiz's relative through marriage, states that upon joining the Naseem family he "found that Hafiz Naseem was the pillar to the fallen family and it

was mainly due to his efforts that his mother (who suffers from epilepsy) and his father (who has a severe heart condition) recovered from the shock of loosing [sic] a daughter. Amongst all this grief and sorrow arose a man with great respect for life and care for others."

> C.   Hafiz Overcomes These Early Tragedies To Become a
> Devoted Father and Successful Banker in Pakistan

Hafiz Naseem did not use his unfortunate circumstances as an excuse for leading an unproductive life.  Rather, Mr. Naseem was able not only to survive but thrive on the added responsibilities, consistently exceeding all personal and professional expectations.  His mother describes with pride the life that he made for himself in his native Pakistan:

> [My son was a] very hard working, honest and outstanding student.  He was also learning the Holy Quran by heart, as well as doing his normal school studies, only because I wanted him to.  He was always among the top students of the class, acquiring the highest grades and being among the toppers in all the major examinations in our country.
>
> It was this dedication and ambition that drove him first to get his Bachelors in engineering, then doing M.B.A. from one of the leading business institutes of the country and then starting his job as a banker, a profession he used to feel very passionate about.  Once he started his job with American Express Bank, he used to get the best employee of the month certificate[] frequently.  His friends, employers, colleagues and all our relatives have always been telling me how lucky I am to have such a brilliant, hard working and honest son.  Parents give his examples to their kids to make them work harder and to become better human beings.  He has always made me proud of having him as a son.

Mr. Naseem married his wife, Ayesha, on February 21, 1997.  They were blessed with their first child, a son, Danish, in December 1997.  In August 2000, the Naseems were blessed again, this time with a daughter, Maheen.

His father-in-law, Chaudhry Waheedudin Ahmad, praises Mr. Naseem as a husband and a father:

> Mr. Hafiz Naseem is a family man.  He was looking after his wife as a good husband [and to both of] his kids Danish Naseem and Maheen Naseem as a very good father.  His all efforts were to educate his two kids Danish and Maheen to the best possible standards of academics and morality.  He was always obedient to his old parents and was helping them to [the] best possible extent possible to him.  He also used to give me a lot of respect as a father in law.  He was very helpful to give me comfort as far as possible.

Despite the extraordinary amount of family turmoil Mr. Naseem experienced, and the seemingly ever-expanding role he played in caring for the many sick and suffering members of his family, he managed to find the time to play important supportive roles in the lives of others as well.  Mr. Naseem's classmates at the University of Engineering & Technology in Lahore, Pakistan ("UET") and at Lahore University of Management Sciences ("LUMS"), as well as his colleagues from his time at American Express Bank in Pakistan ("American Express"), all describe him as bright, compassionate and eager to help those less fortunate than himself.

Aqib Salam, a classmate of Mr. Naseem's both at UET and LUMS, speaks of him in glowing terms:

> During this friendship of over 20 years, I cannot recall even a single instance where I was even slightly disturbed by any act, oral or otherwise, of Zubair.  The only thing I can recall is his kindness, compassion and sympathy not only towards his friends but also towards the society in general.  I can recall his always motivating attitude towards us to do something more for the society.  I recall our collective participation in many social activities like working day and night for a flood relief camp and setting up the first blood donors' society of UET, Lahore.  Even considering specifically the circle of our friends, I recall his personal car and his other belongings being used by all of us friends like they were our own.  His house was extensively visited by those of us who were living in student hostels and at times needed the comfort of a home and his family was always beside him to welcome any or all of us together.  These may

be small acts of compassion and generosity but definitely reflect on the
personality of Zubair.

Similarly, Khurram Javed Maqbool writes:

Hafiz was not only a very intelligent and bright student but he was also a
very nice human being by heart. He always used to help other students
and I have never seen him turning down anybody seeking his help. . . .
Apart from studies and sports, Hafiz was very active in different type[s] of
social services. He was [a] member of Blood Donating Society in
engineering school and at many occasions I have also seen him collecting
money for poor and needy people.

Muhammad Akram Bilal, a classmate of Mr. Naseem's at UET,
recalls that he "was a great friend and always ready to help everybody who was in
need. . . . Everybody, whenever in any trouble went to him for help because he
never said No to anybody."

Remarkably, Mr. Naseem was able to overcome the many difficulties of
his childhood and early adult life to lead a successful personal, professional and spiritual
life in his native Pakistan. Unfortunately, the birth of his beautiful daughter, Maheen,
would result in even greater challenges.

D.  Maheen Naseem Is Diagnosed With Cerebral Palsy

Maheen Naseem was born on August 21, 2000 in Lahore, Pakistan. She
was three months premature and weighed approximately 3 lbs. at birth. After numerous
misdiagnoses, Maheen was correctly diagnosed with spastic diplegic cerebral palsy at the
age of two. According to Dr. Silver, cerebral palsy "is a neurological-muscular disorder
that appears in infancy or early childhood and permanently affects body movement and
muscle coordination." MR, at 17.

As would be expected, this was yet another devastating blow to Mr.
Naseem. According to Ayesha's brother, Amer, "[i]t was a great agony and torture for

him and the whole family to learn that their daughter could not walk and play with her cousins and friends."

After about a year of treatment, Mr. Naseem was informed that there was little more that could be done for Maheen in Pakistan. As Ayesha's sister, Lubna Sameer recalls, this caused further agony for the family:

> Further shock to the parents was the time when the doctors in Pakistan informed that there was no treatment for Maheen Naseem in Pakistan. It was further told that she will no longer be able to stand on her 2 legs for the rest of her life. This was a very crucial and emotional period for the parents as they used to weep day and night and would pray to God for the immediate recovery of their lovely daughter.

In her letter to the Court, Mr. Naseem's mother-in-law, Kishwer Ahmed, speaks of the despair felt by her daughter and son-in-law and their efforts to find the best treatment for Maheen:

> My son-in-law Hafiz Naseem and Daughter Ayesha Zubair continued to cry for weeks, months, and years as they were having the biggest shock of their life on account of their daughter being handicapped for the rest of her life. Hafiz Naseem and Ayesha Zubair ran from pillar to post to get treatment for their daughter Maheen Naseem, both of them are since then facing an extremely hard time and are always worried for their daughter.

Upon learning that the best medical care in the world for Maheen's condition was in New York at New York University Hospital and the Hospital for Joint Diseases, Hafiz Naseem, recognizing what needed to be done for the health and safety of his family, relocated them to New York and was accepted into the prestigious Stern School of Business at New York University. The resulting improvement in Maheen's condition has been nothing short of miraculous. After receiving medical treatment in the United States, Maheen, who a few short years ago had little chance of ever walking, is now able to walk where before she could not crawl or otherwise move freely. The

principal at Maheen's school, Kevin A. Fittinghoff, states that "in [his] twenty years as a professional educator [he has] never seen a child as determined and motivated as Maheen."

Sadly, many of the gains that Maheen has made over the past several years are now in jeopardy. If the Naseems are unable to provide suitable care and emotional and parental support for Maheen, whether it be in the United States or in a country with comparable resources, the risk of Maheen reversing course and losing the abilities she has fought so hard for are high.

In Sections V(B) and VI below, we rely on the above history and circumstances of Mr. Naseem's life in support of our argument for a downward departure or, in the alternative, a non-Guidelines sentence pursuant to 18 U.S.C. § 3553.

## IV.

## OBJECTION TO THE GUIDELINES CALCULATIONS

We appreciate that, while the United States Sentencing Guidelines are no longer mandatory or even presumptive after the Supreme Court's decision in *Booker*, they remain a factor the Court will consider in determining the appropriate sentence. *See United States v. Rutkoske*, 506 F.3d 170, 178 (2d Cir. 2007). Nonetheless, we respectfully submit that as applied to this case, the Guidelines and their range here of more than eight to ten years suggest far too severe a sentence given the facts of this case and Mr. Naseem's extraordinary family obligations. Indeed, the Probation Office's calculation of a total offense level of 30 is driven overwhelmingly by a single 20-level "gain" enhancement that effectively means the difference to Mr. Naseem of a possible

no-jail sentence *versus*, incredibly, a jail term of ten years, this though there is no evidence he received a financial gain in this case.

Fortunately, this Court is able to impose a more lenient and, we submit, fairer sentence for several reasons: (1) the Guidelines are held to be only one of a number of statutory factors the Court must consider, and they are entitled to no more weight than any other factor (18 U.S.C. § 3553(a); *see also United States v. Rattoballi*, 452 F.3d 127, 132 (2d Cir. 2006); *United States v. Crosby*, 397 F.3d 103, 107-08, 111, 113 (2d Cir. 2005)); indeed, this Court can impose a *non*-Guidelines sentence; (2) a two-level enhancement in the PSR is improper, as we discuss in this section, and the total offense level can therefore be reduced; and (3) the Court also has two bases for departing downwards from that reduced range, as we discuss in section V below, and to therefore mitigate the unduly harsh impact of the 20-level gain enhancement discussed above.

Mr. Naseem objects first of all to the PSR's two-level "role in the offense" adjustment for two reasons: (1) the PSR does not lay an adequate foundation for a "role in the offense" adjustment in this insider trading case; and (2) the circumstances of this case do not support such adjustment in any event.

The application note to section 2B1.4 limits such enhancement to those insider trading cases where the "defendant occupied and abused a position of *special trust*." U.S. Sentencing Guidelines Manual § 2B1.4 cmt. n.1 (2008) (emphasis added); *see also United States v. Pedersen*, 3 F.3d 1468, 1470 (11th Cir. 1993) ("enhancement of the base offense level for insider trading is permitted only in circumstances where a position of special trust is violated.") (footnote omitted). Neither the PSR nor its addendum makes such a finding, however. It is not sufficient to recite formulaically that

Mr. Naseem "was employed in the Investment Banking Division at Credit Suisse and had access to material, non-public information concerning Credit Suisse transactions. He provided such information to another for personal benefit." PSR, at ¶ 72. The abuse of a "special trust" enhancement necessarily depends on something above and beyond the duty breach inherent in any insider trading conviction.[1] Thus, the application note suggests that "[e]xamples might include a corporate president or an attorney who misused information regarding a planned but unannounced takeover attempt."

In fact, no breach of "special trust" above and beyond the breach of basic trust inherent in Mr. Naseem's conviction is present in this case. If Mr. Naseem had actually worked on any of the deals in question, we concede we would not have this argument. But he did not. He was a relatively junior investment banker at the firm. While he owed a duty to Credit Suisse not to misuse inside information, there is no evidence that he abused a position of special trust beyond that, such as to justify this two-level enhancement. The distinction was made by the Eighth Circuit in *United States v. O'Hagan*, 139 F.3d 641, 656 (8th Cir. 1998), where it held that the defendant senior partner in a law firm had abused a position of special trust in misappropriating inside information, but noted that it agreed "with the district court that a secretary or other employee at [the law firm] could have breached a duty to the firm and violated the securities laws under the misappropriation theory without abusing a position of special trust.")

---

[1] Mr. Naseem's conviction necessarily reflects the jury determination that he breached a duty, since the Court charged the jurors that they had to find that he "had a fiduciary or other relationship of trust and confidence with Credit Suisse and/or certain of its specified clients" and that that duty was breached. Jan. 31, 2008 Trial Transcript at 2354-55 (attached as an exhibit to Mr. Naseem's PSR objections, which is Exhibit B to this memorandum).

We submit, then, that the two-level "role in the offense" enhancement is inappropriate and that the total offense level should be 28, not 30. Even so reduced, we submit that the corresponding Guidelines sentencing range of 78 to 97 months is still too severe. Our downward departure arguments follow.

**V.**

**DOWNWARD DEPARTURE ARGUMENTS**

Mr. Naseem moves for a downward departure from the Guidelines on two bases: (1) the literal application of the "gain" enhancement in this case, where there was no evidence of any gain by the defendant, is so harsh as to justify a departure under U.S.S.G. § 5K2.0; and (2) Mr. Naseem's daughter's condition, the degree to which he was and would be involved in managing her care and the considerable expenses associated with her care going forward, all support a downward departure motion based on extraordinary family circumstances under U.S.S.G. §§ 5K2.0(a)(4) and 5H1.6, cmt. n.1(B) (discussing departures based on loss of caretaking or financial support).

A.   The Absence of Any Monetary Benefit to Mr. Naseem is a Mitigating Circumstance, and the Harsh Impact of Section 2B1.4's Literal Application an Aggravating Circumstance, Of a Collective Kind and Degree Not Adequately Taken Into Consideration By the Sentencing Commission in Formulating the Guidelines

The PSR has Mr. Naseem saddled with a "gain" under U.S.S.G. § 2B1.4(b) that adds 20 levels to the total offense level, taking his custodial exposure from a zero to six month range at base offense level 8 to a 78 to 97 month range at level 28. PSR, at ¶ 70. Put another way, his custodial exposure is multiplied *sixteen times* by virtue of the strict application of section 2B1.4's specific offense characteristic despite

the fact that there was no evidence offered at the trial that the "gain resulting from the offense," to quote section 2B1.4(b), was Mr. Naseem's own.

Nowhere in the Guidelines does the Sentencing Commission address the possibility of the unfair application of section 2B1.4's specific offense characteristic and its "gain" kicker in such circumstance – where the defendant himself enjoyed no financial gain. Nor, it logically follows, did the Commission consider the potentially harsh impact of the characteristic's application – in this case, resulting in an enormous 16-fold increase in the defendant's exposure – in a case where there was no showing of financial gain to the defendant.

We respectfully urge the Court to invoke Guidelines section 5K2.0 as a means of mitigating the harsh application of subsection (b) in this case. Both a mitigating circumstance, the absence of any evidence of financial gain to Mr. Naseem, and an aggravating circumstance, the 16-fold increase in custodial exposure, are present here to take the case out of the Guidelines' "heartland." *See generally United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) ("the guidelines are still generalizations that can point to outcomes that may appear unreasonable to sentencing judges in particular cases") (quotations and citation omitted). The first circumstance is of a "kind" and the second of a "degree" not adequately taken into consideration by the Sentencing Commission, thereby permitting the Court to exercise its discretion to depart under section 5K2.0(a). *See also Koon v. United States*, 518 U.S. 81, 92 (1996) ("Acknowledging the wisdom, even the necessity, of sentencing procedures that take into account individual circumstances, Congress allows district courts to depart from the applicable Guideline range if 'the court finds that there exists an aggravating or

mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'") (quoting 18 U.S.C. § 3553(b); other citation omitted).

We note that the Second Circuit recently remanded a case for resentencing so that the District Court might consider circumstances that potentially would reduce an otherwise crippling loss calculation. In *United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007), the Probation Office and District Court's amount of loss determination in a securities fraud case added an enormous 87 months to the defendant's minimum sentencing range, only slightly more than the 78 month increase faced by Mr. Naseem in this case. The Second Circuit remanded so that the District Court could consider other factors relevant to a decline in the subject company's share price that might reduce the loss calculation. *Id.* at 180. In doing so, the Court noted the potentially unduly harsh impact of a loss amount on a defendant's sentence and, we submit, tacitly encouraged an effort to mitigate that impact. It stated that "we see no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence." *Id.* at 179.[2]

---

[2] The Court might alternatively consider the absence of any monetary gain to Mr. Naseem as a "circumstance[] of the offense" justifying a non-Guidelines sentence under 18 U.S.C. § 3553(a)(1).

B.  A Downward Departure for Extraordinary Family Circumstances and/or
Because of the Prospective Loss of Caretaking and Financial Support is
Justified in This Case

While section 5H1.6 of the Guidelines provides that "family ties and

responsibilities are not ordinarily relevant in determining whether a departure may be

warranted," they may be relevant in an *extra*ordinary case.  Moreover, the Commentary

to section 5H1.6 explicitly permits the Court to entertain a downward departure "based

on the loss of caretaking or financial support of the defendant's family" if four

circumstances are present.  U.S. Sentencing Guidelines Manual § 5H1.6 cmt. n.1(B)

(2008).  Most respectfully, they are in this case.

1.  The defendant's service of a sentence within the applicable guideline
range will cause a substantial, direct and specific loss of essential
caretaking, or essential financial support, to the defendant's family

Mr. Naseem's remarkable ability to care for other members of his family

and achieve professional success in the face of real hardships makes his presence critical

to the future of his entire family.  Indeed, letter after letter submitted on Mr. Naseem's

behalf make clear that the entire family unit – his family, Ayesha's family, and the family

they have made together – will suffer dire and irreparable consequences if he is subjected

to a jail sentence.  As Mr. Naseem's brother-in-law, Amer, explains:

> It is very painful for Zubair and his family that for the last one year the
> treatment of his daughter has suffered due to the unlucky episode being
> faced by Zubair.  It is also a matter of great concern that Zubair's sick
> mother suffering from Epilepsy and father who is a heart patient are losing
> their heart and hopes. . . . Zubair's sentence can break and finish the three
> families.

His father, Muhammad, states that "[m]y family and my son[']s family is in extreme

distress, agony, mental torture and in fact had been completely shaken and is in shambles

for the last one year."

Asim Iftikhar Ahmad, Counselor to the Permanent Mission of Pakistan to the United Nations, who has known Hafiz and his family for 20 years, sums up the situation succinctly – "The future of an entire family is at stake." Indeed, the Probation Office has recommended a sentence of 97 months. If Mr. Naseem is sentenced to anywhere close to that, the resulting harm to his entire family, and particularly his handicapped daughter, Maheen, will be substantial, direct and specific.

While Maheen's condition has improved dramatically thanks to the care she has received in the United States, her treatment is ongoing and any disruption in that treatment will likely have serious long-term effects. Janet Weidinger, MS, PT, is a physical therapist who is working with Maheen. She describes the great improvement that Maheen has made and the significant challenges that lie ahead:

> Maheen came to the United States from her native Pakistan to receive adequate care. In Pakistan, there are no therapy services or availability of programs that focus on CP. She was not able to walk until she received spinal surgery in New York. Maheen has made tremendous gains since her surgery, but she has developed abnormalities in her hips due to her high tone and muscle tightness. Hip surgery has been recommended to correct her hip deformity.

Joan T. Gold, M.D., Clinical Director of Children's Rehabilitation Services at the Rusk Institute of Rehabilitation Medicine of New York University, describes Maheen's situation as follows:

> [Maheen] is a 7-year-old female with spastic diplegic cerebral palsy who has been under my care for the past 3-4 years. She has undergone a selective dorsal rhizotomy procedure, which is an extensive neurosurgical procedure on her back in order to modulate the abnormal tone in her lower extremities. She is still in need of extensive lower extremity release surgery and possibly boney intervention.
>
> She has been fully evaluated at this Medical Center and at the Hospital for Joint Diseases.

It would be imperative for her continuity of care purposes that her surgery be performed and that she receive post-operative rehabilitation at this facility.

She needs the input of her parents in order to emotionally cope with said interventions.

Kevin A. Fittinghoff is the principal of Danish and Maheen's school, Bruno M. Ponterio Ridge Street School in Rye Brook, New York. He wrote a letter to the Court on behalf of the children, explaining the serious detrimental effects of Mr. Naseem's incarceration on both Maheen and his son Danish:

Anything that would interrupt Maheen's current educational surroundings would be a travesty for an innocent child who only knows that she is loved and cared for with great affection at her current school.

Danish will also be deeply affected. Danish is a very conscientious and hard working student. His desire to succeed in school is unparalleled. Due to the publicity surrounding his father's legal issues, Danish has withdrawn from his peers. With his father away from the home it is my fear that Danish will continue to isolate himself and his self-esteem will be forever damaged. A son needs his father and Danish is no exception.

One need only look at the damage suffered by Maheen and Danish in the one year since their father's arrest to understand the devastation that potentially lies ahead. Maheen's doctors state that she requires additional surgery to correct her condition. She requires not only continued medical care but her continued determination and motivation to improve. As Mr. Naseem's brother notes, though, over the past year "she has stopped using her willpower which is vital for her recovery."

While Danish's situation is not as severe, he too has exhibited troubling symptoms that will only be exacerbated by his father's continued incarceration. His uncle states that the "[s]udden absence of his father is adding to the insecurity felt by him and is showing symptoms of psychological problem." As Dr. Silver notes in his report:

> Children who lose a parent risk a host of serious mental health problems, including sadness, depression, anxiety, loneliness, erratic behaviors, unstable moods, and interpersonal issues. Such mental health problems can cause irreparable harm to a child's emotional and psychological well-being and also prohibit the child from participating fully in his or her school programs and non-scholastic endeavors due to poor concentration and great personal distraction. Such mental health problems also tend to carry over into the child's adolescence and adulthood at which point repairing the deficits can be difficult if not impossible without significant interventions.

MR, at 20.

Mr. Naseem's wife, Ayesha, has been strong and supportive throughout this terrible ordeal. However, as she herself admits, she simply cannot support her family's unique emotional and financial needs alone and now has her own medical issues to deal with. While replacing the efforts of a spouse would be difficult for any individual, Ayesha's situation is seriously exacerbated by her upbringing in a culture that, to be frank, did not encourage women to be self-sufficient, Maheen's condition and her status as a non-U.S. citizen with none of the professional skills necessary to provide financial safety for a family. Ayesha states:

> I am a house wife with no work and absolutely have no income. I am not attuned to the system of this country. My husband was the earning hand, he could understand the system and he used to take care of the family issues including me, my son Danish, and especially my daughter Maheen. I exactly do not know as how to approach the doctors and I am daily handicapped to talk about the treatment and the further possibilities of being taken care of medical facilities. It was my husband who used to handle all these things. Some times I feel that if something happens to me, there will be no one to look after my kids.

Many letters submitted on behalf of Mr. Naseem and his family speak to this aspect of his sentencing. For example, Maheen's physical therapist recognized the role that her father played in Maheen's care: "[Hafiz was] involved in every aspect of [Maheen's] care. He coordinated arranging therapists to come to the home,

communicated with her doctors and therapists regarding appropriate care, and handled the finances." Lubna Sameer, Ayesha's sister, explains how, as a woman raised in Pakistan who traveled to the United States with complete faith in her husband's ability to provide for her family's needs, Ayesha is in an extremely difficult situation: "My sister Ayesha Zubair during her entire stay in the United States was always occupied as a housewife and had [to] look after her son Danish and handicapped daughter. She is absolutely unaware of the systems operative in the United States to carry the daily routine of life."

The financial burden on Ayesha, and her inability to meet it without her husband, is a recurring theme in the letters. Since Mr. Naseem's termination from Credit Suisse in May 2007, the family has relied on the continuing health coverage provided by COBRA but this coverage expires in or about October 2008. Given Ayesha's limited job skills, it is not clear how she will manage to obtain sufficient insurance. Maheen's physical therapist states that a disruption of medical coverage could have dire consequences:

> [T]he lifetime cost of CP is high. If her father is not able to work and provide insurance, Maheen will not be able to receive the proper care she needs. She may lose her ability to walk and be independent. She is at high risk of developing permanent deformity of her joints (and the resulting pain). Maheen is already suffering from deformity in her hips.

> Rizwan Yousaf, Ayesha's cousin, writes:

> In addition to the obvious consideration that the longer Mr. Naseem is incarcerated, the longer his wife and children do not have the love, comfort, companionship and guidance of their husband and father, there are financial considerations extant as well. The longer that Mr. Naseem is incarcerated, the longer the negative financial repercussions. As above mentioned, his wife, two children and (to a lesser extent, his parents) are financially dependent upon him. The longer he is incarcerated, the longer he is unable to financially produce and thus the longer and deeper the financial pall over his loved ones.

Their son's situation is taking a devastating toll on Mr. Naseem's parents, as well. They have been in poor health for many years. However, their doctors report that both of their conditions have dramatically deteriorated since the beginning of this ordeal. Mrs. Akhter's physician, Dr. Akram states:

> Ever since Hafiz Zubair Naseem, her eldest son left for United States for the treatment of his daughter who has cerebral Palsy, her condition could not improve, particularly in this past one year, her condition deteriorated further. It seems that she is under heavy mental pressure.

> This state of affairs is not only obstructing her recovery but also leading her to suspected hallucinations. If this persists for a long time, she may have to be admitted to an institution for mental health. Besides increase in epileptic problem, she also developed Ataxia and psychiatric ailments like disturbed mood lack of interest in routine work. With heav[y] medication, she has also lost hearing capabilities from both ears.

Similarly, in his letter to this Court, Dr. Sheikh makes clear that Muhammad Naseem has greatly suffered as a result of his son's situation as well:

> Since last one year he is under severe mental stress and is symptomatic despite maximum tolerable medication. In view of his clinical status and non invasive assessment, he was advised to undergo Coronary Angiogram and consider revascularization. While awaiting definite treatment he is advised to continue medicine along with dietary restriction and avoidance of mental/social stress which is well know to impair blood pressure control and exacerbate ischemic heart disease.

Mr. Naseem's brother, Usman, also recognizes the psychological toll this ordeal has taken on his parents:

> [Our father] lost not only his life earning (honor and respect in society) but his only and most valuable investment in the shape of Hafiz's education and to see him prosper in his career.

*  *  *

> [Our mother is] fearing to lose her elder son while still not recovered from the tragic death of her only daughter in teen age. The son that was no ordinary one but who took her every wish to heart, and comforted/cared for her in every way. Her only pride in life (moral training of her kids and

to see them being successful/useful to society) has been taken away from her. Her terrible condition due to old age, health which has gone worse from bad, stress and a feeling of helplessness that she might not be able to see her son in her life has brought her to the edge.

In short, a custodial sentence within the PSR Guidelines range will result in a substantial, direct and specific loss to Maheen and the rest of his family. This loss will increase dramatically over time. From a financial perspective, even if Maheen is able to have her surgery before her COBRA coverage expires, cerebral palsy requires a lifetime of care and any gains she has made or will make over the next several months will be seriously compromised without continuing care. Further, without Mr. Naseem's financial support, it is unlikely that the children will be able to remain in their current school district. This loss will further undermine Maheen's future.

2.   The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant

Mr. Naseem is a recent immigrant to the United States who shouldered the entire financial burden of supporting his family. His wife, Ayesha, has none of the education or technical skills necessary to find suitable employment in the United States. His daughter, Maheen, requires a lifetime of medical care. His parents and his in-laws also rely on him to varying degrees.

The loss of his caretaking and financial support is at least comparable to those cases where the Second Circuit has upheld a departure on the grounds of loss of caretaking or financial support. For example, in *United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992), the Second Circuit upheld Your Honor's 13-level downward departure, ten levels of which were attributed to a finding of extraordinary family circumstances, finding that:

Johnson was solely responsible for the upbringing of her three young children, including an infant, and of the young child of her institutionalized daughter. The number, age and circumstances of these children all support the finding that Johnson faced extraordinary parental responsibilities.

*Id.* at 129.  In affirming the sentence, the Second Circuit made clear that:

The rationale for a downward departure here is not that Johnson's family circumstances decrease her culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing. Judge Patterson made it clear that the departure was not on behalf of the defendant herself, but on behalf of her family:

In view of the special circumstances of the defendant – I shouldn't say "defendant," I should say of the "defendant's family," which, as the court sees it, is a family in which the mother is the sole link between the children, the six-month-old child . . . and having the father in Queens who does not contribute to the support of the five- and six-year-old children, . . . a 17-year-old boy having a father who does not contribute to his support, and a six-year-old grandchild whom the mother is unable to keep because of the circumstances of her having another child, at the age of 21, and living in an institution . . . I'm going to reduce the level.

*Id.* at 129-30.

Similarly, in *United States v. Galante,* 111 F.3d 1029 (2d Cir. 1997), the Second Circuit upheld a 13-level downward departure from a guideline range of 46 to 57 months to a sentence of five years supervised release based on findings at sentencing that:

[R]emoval of the father from this unit at this particular point in time would have a disastrous effect on the children in terms of possibilities of their education and upbringing.  That is, it would terminate present family responsibilities which Galante has effectively shouldered and continues to discharge.

Judge McKenna emphasized Galante's wife's limited earning capacity and her difficulty with English . . . [Galante] is the principal support of a family consisting of his wife and two children age eight and nine. While no older family member lives with them, defendant's father is hospitalized, and his mother is over 65 and although working at present, may require some assistance in the future.

*Id.* at 1035.  *See also United States v. Alba,* 933 F.2d 1117, 1122 (2d Cir. 1991) (finding that the district court did not abuse its discretion in downwardly departing where "incarceration in accordance with the Guidelines might well result in the destruction of an otherwise strong family unit").

As set forth in detail throughout this memorandum, the Naseems face a combination of factors that, standing alone, have been found to constitute extraordinary family circumstances warranting a significant downward departure.  As a result, we respectfully submit that the loss of caretaking and support to be suffered by the Naseem family is far greater than the loss that would be suffered by the family of a similarly situated defendant.

3.  The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family

Mr. Naseem's continued caretaking and financial support is essential to the future of Maheen and the rest of his family.  There is no reasonable alternative. Ayesha Zubair is a housewife who moved from her native Pakistan to the United States with the expectation, based on her upbringing in a male-dominated culture, that Mr. Naseem would provide for her financially and emotionally.  She does not have the skills necessary to find a job that could adequately support her family or the resources to obtain private insurance when the Naseem family's COBRA coverage terminates in a few short months.

Further, both his parents and his in-laws rely on Mr. Naseem for financial and emotional support.  They are simply unable to provide extended care for the Naseem family, particularly given Maheen's substantial needs.