March 9, 2008

The Honorable Robert P. Patterson
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007
New York.

Re:  United States vs. Hafiz Naseem 03, CR, 610 (RMB)

Your Honor,

It is with deep sorrow and grieve that I am writing to you for the well-being of my friend and his family Hafiz Zubair Naseem. To introduce myself, I am currently working as Secretary of Oil Companies Advisory Committee, a forum which consists of Nine Oil Marketing Companies and five Refineries operating in Pakistan. Prior to that, I have worked for Shell in different capacities for more than eight years.

I have known Zubair for thirteen years. In 1995, we joined Business School where Zubair spent two years with us and became known for his kindness and helpfulness. He was an active member of our class and positively contributed in all class activities. At the same time, he was an above average student. It was during the MBA, he suffered a tragedy in the death of his teenaged sister. Zubair faced that difficult time with patience and courage and was a continuous source of peace, love and hope for his parents.

Even after our graduation in 1997, we stayed connected. In 2000 when I moved to Karachi, Zubair was already there working for the American Express Bank. We were attending the same Gym, therefore meeting regularly in the evenings. He was passionate about going to US not only to excel in his work but also to provide top class medical facilities to his daughter who was undergoing long and tiring medical treatment.

With great sadness, I have learned of his problems in New York. Therefore, I seek for your kindness and understanding to act with compassion.

With Kind Regards,

Muhammad Ali Sheikh
Secretary
Oil Companies Advisory Committee
Ist. Floor, Federation House
Clifton, Karachi
Pakistan

# Punjab Institute of Cardiology

Ghaus-ul-Azam (Jail) Road, Lahore. Ph:92-42-9203051-60  Fax: 9200028

April 3, 2008

## TO WHOM IT MAY CONCERN

Ref:    Mr. Muhammad Naseem

Registration No. 2001022669

Age:   66 Years

This is to certify that Mr. Muhammad Naseem is a registered patient of Punjab Institute of Cardiology, Lahore. He has history of longstanding hypertension and had acute coronary events in 1977 and 1985. He has been under treatment of different cardiologists in Pakistan before getting registered at Punjab Institute of Cardiology.

Since last one year he is under severe mental stress and is symptomatic despite maximum tolerable medication. In view of his clinical status and non invasive assessment, he was advised to undergo Coronary Angiogram and consider revascularization. While awaiting definite treatment he is advised to continue medicine along with dietary restriction and avoidance of mental/ social stress which is well known to impair blood pressure control and exacerbate ischemic heart disease.

Dr. Saqib Shafi Sheikh
Associate Professor of Cardiology

The Honorable Robert P. Patterson
United States District Judge
United States Courthouse
500 Pearl Street
New York, New York 10007

March 14, 2008

Re: United States v. Hafiz Zubair Naseem, 03 CR 610 (RMB)

Honorable United States District Judge,

My name is Mr. Inam Siddiqi. Hafiz Zubair Naseem is married to Ayesha, daughter of Chaudhry Waheed-ud-din Ahmed, a very close friend and class fellow of mine from the last 45 years. I love Ayesha like my daughter and her husband Zubair has earned the same love and respect since they got married.

During past year due to unfortunate events, Zubair's family, particularly his daughter, Maheen, who has C.P since birth could not go under prescribed (medical) neurological surgery. Her whole life and future physical development is in complete jeopardy. His wife Ayesha, being totally a housewife could not provide the above mentioned medical services. Zubair's parent, his father, is an elderly man with a severe heart ailment and emotionally dependent for support form his son. His mother is also in the advance age and chronically suffering from severe epilepsy. She constantly needs medical and emotional care. Her ailment is increasing with the advancement of age.

All the above stated facts and circumstances motivated me to draw your kind and judicious attention on this humanitarian aspect to request you humbly to provide another chance to Zubair so that he could make the difference in the life of his parents and daughter.

Thank you for your kind considerations.

Sincerely,

Inam Siddiqi
35 Fillmore Ave
Staten Island
New York 10314

Janet Weidinger, PT
162 Duxbury Rd
Purchase, NY 10577

To Whom It May Concern:

Maheen Nasim is a delightful 7 year-old girl whom I have been treating in Physical Therapy for the past 2 years. Maheen suffers from Cerebral Palsy (CP). Cerebral Palsy refers to any one of a number of neurological disorders that appear in infancy or early childhood and permanently affect body movement and muscle coordination. Maheen must walk using crutches for balance in school. She is not able to independently climb ladders or other obstacles on the playground. She needs assistance with toileting and navigating her school. CP is a condition that she must manage for the rest of her life. Adults with CP often suffer from arthritis and osteoporrhosis as complications from abnormal movement patterns. As a result, intervention early in life is essential to maximize function and minimize complications. Intensive physical and occupational therapy is recommended to teach a child with CP how to move effectively and maximize function. A child with CP also may require specialized equipment (wheelchairs, walkers, crutches), custom braces and orthotic devices, medications, and surgeries (to correct anatomical abnormalities or release tight muscles). The cost of treating CP is high as well. According to the CDC, a person with CP will on average cost 921,000 dollars to manage and treat the disease over their lifetime.

Maheen came to the United States from her native Pakistan to receive adequate care. In Pakistan, there are no therapy services or availability of programs that focus on CP. She was not able to walk until she received spinal surgery in New York. Maheen has made tremendous gains since her surgery, but she has developed abnormalities in her hips due to her high tone and muscle tightness. Hip surgery has been recommended to correct her hip deformity.

Maheen's father is involved in every aspect of her care. He coordinated arranging therapists to come to the home, communicated with her doctors and therapists regarding appropriate care, and handled the finances. As stated above, the lifetime cost of CP is high. If her father is not able to work and provide insurance, Maheen will not be able to receive the proper care she needs. She may lose her ability to walk and be independent. She is at high risk of developing permanent deformity of her joints (and the resulting pain). Maheen is already suffering from deformity in her hips.

I hope that you can consider the hardship this family (and especially Maheen) will suffer if her father is incarcerated.

Regards,

Janet Weidinger, MS, PT

LAW OFFICES OF

# MANUEL B. QUINTAL

| | | |
|---|---|---|
| MANUEL B. QUINTAL<br>KENNETH C. SUWATSON<br>FRANCISCO O. RAQUEL-SANTOS | 291 BROADWAY, SUITE 1501<br>NEW YORK, N.Y. 10007<br>PHONE: (212) 732-0055<br>FAX: (212) 587-8933<br>QUINTALLAW@AOL.COM | RIZWAN YOUSAF, LL.M.<br>OFFICE ADMINISTRATOR |

March 22, 2008

The Honorable Robert P. Patterson
United States District Judge
United States Courthouse
500 Pearl Street
New York, New York 10007

Re: <u>United States v. Hafiz Zubair Naseem, 03 CR 610 (RMB)</u>

Honorable Judge,

Allow me the opportunity to introduce myself. My name is Rizwan Yousaf. I am an attorney duly admitted in the Lower and Higher Courts of Pakistan. I am hoping to be admitted in New York very soon. I am currently employed by the Law Offices of Manuel B. Quintal in New York, NY.

Mr. Hafiz Zubair Naseem married my cousin Ayesha Zubair in 1997. I have had personal contact with Mr. Naseem over these past 11 years approximately two to three times a month. As Your Honor may know, this union has been blessed with two children, Danish and Maheen. Unfortunately, Maheen was born with Cerebral Palsy which necessitated an operation and will necessitate future operations. The financing for same will have to be paid out of pocket by Mr. Naseem.

Please let me take this opportunity to put forward the educational achievements of Mr. Naseem. He received an engineering degree in Pakistan, a MBA from Pakistan and another MBA from New York University. Before his current unfortunate situation arose, Mr. Naseem was employed as a associate investment banker for Credit Suisse. As a benefit of his employment, both he and his family received full medical coverage. Additionally, his salary was approximately $100,000. per year. Needless to say, after his dismissal from Credit Suisse he receives no income from any other source.

His wife, Ayesha, never has worked throughout the marriage. I would also respectfully request that this Honorable Court take cognizance of the fact that since his gainful employment in the financial services industry, he has sent money back to his parents. Obviously, this has ceased since his incarceration. In addition to the obvious consideration that the longer Mr. Naseem is incarcerated, the longer his wife and children do not have the love, comfort, companionship and guidance of their husband and father, there are financial considerations extant as well. The longer that Mr. Naseem is incarcerated, the longer the negative financial repercussions. As above mentioned, his wife, two children and ( to a lesser extent, his parents) are financially dependent upon him. The longer he is incarcerated, the longer he is unable to financially produce and thus the longer and deeper the financial pall over his loved ones.

A period of incarceration would derailed completely Hafiz's future and his family. It would set his life on a different trail. Despite Danish's educational achievements he would permanently be affected due to depression, separation, anxiety the  need for the supervision of his father. Additionally, Maheen's medical and physical health care would likely to deteriorate due to sadness and fears. The presence of father is much needed to get proper treatment and care. His wife Ayesha would completely be overwhelmed devastated and she would be apart from love and affection with out any financial assistance. I am scared as to how without financial resources she would be able to survive with two children.

I, respectfully do not wish to have to hide Mr. Naseem behind the coattails of his family, but the plain fact is that he is not an island. His family still has their financial umbilical cord directly tied to him . I would respectfully request that the Court take this into consideration in deciding on the length of his sentence and temper the need for justice with the financial mercy that his family so desperately needs. I thank the Court in advance for the wisdom it will show in this case.

Respectfully,

Rizwan Yousaf

# EXHIBIT B

# Hughes
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com


Lisa A. Cahill
Direct Dial: 212-837-6155
cahill@hugheshubbard.com

April 29, 2008

<u>BY HAND DELIVERY</u>

Mr. Walter J. Quinn
United States Probation Officer
U.S. Probation Office for the
  Southern District of New York
Woolworth Building, 14th Floor
233 Broadway
New York, New York  10279-0001

Re:     <u>May 14, 2008 Sentencing of Hafiz Naseem</u>

Dear Mr. Quinn:

We are in receipt of the Presentence Report ("PSR") the Probation Office has prepared for our client, Hafiz Naseem.  On Mr. Naseem's behalf and in connection with his May 14, 2008 sentencing, we herewith submit objections, proposed amendments and suggested corrections to the PSR:

1.  <u>Page 1, Sentence Date, and Page 6, Paragraph 6</u> – the sentence is now scheduled for May 14, 2008.

2.  <u>Page 2, Dependents</u> – insofar as his wife is the sole caregiver of his two children, and otherwise unemployed, Mr. Naseem presently has three dependents, not two.

3.  <u>Page 5, Paragraph 4; Page 10, Paragraph 29; and Page 19, Paragraph 64</u> – the PSR indicates that the forfeitable "proceeds" from the charged activity are "not less than approximately $9 million." There is no indication where that figure derives from, though, and we believe it to be incorrect in any event. As discussed below at paragraph 11, Mr. Rahim's profits on *charged* trades (which we believe the Probation Office construed as "proceeds" for forfeiture purposes) were between $6 and $7 million.

We also object to paragraph 4 insofar as it indicates that counts 2 through 29 of the indictment give rise to forfeiture. They do not. Section

981(a)(1)(C) of Title 18 authorizes forfeiture only for certain enumerated predicate offenses, including "any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of [Title 18]), or a conspiracy to commit such offense." Section 1956(c)(7)(A) includes within its definition of "specified unlawful activity" "any act or activity constituting an offense listed in section 1961(1) of this title . . . ." Section 1961(1)(D) specifically enumerates "fraud in the *sale* of securities" (emphasis added). It does not cover fraud in the *purchase* of securities, and therefore does not support forfeiture under counts 2 through 29, which charges involve purchases not sales. *See In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 683-84 (S.D.N.Y. 1990) (Patterson, J.).

4.   Pages 6 to 19, Paragraphs 8 to 62 – we interpose a general objection on Mr. Naseem's behalf to all allegations of wrongdoing in the Offense Conduct section of the PSR. While the jury's verdicts must be respected for sentencing purposes, Mr. Naseem pled not guilty to the charges at his arraignment and intends to challenge his conviction on appeal. Our failure to independently address each and every charge of wrongdoing should not be interpreted as any admission.

We have an additional general objection to the Offense Conduct section of the PSR and that is that numerous of the referenced purchases covered therein were not the subject of any counts of the indictment and therefore should not have presumptively figured into the Guidelines' gain enhancement analysis (¶ 70). We request that the PSR be amended to specifically reflect that certain of the purchases were not the basis for any criminal charges. These are:

(a)   the J.P. Morgan trades (¶ 20);

(b)   1,000 shares of EPL purchased on July 21, 2006 (note that while ¶ 37 of the PSR references the purchase of 2,000 shares on this date, count 10 only charges based on a purchase of 1,000 shares);

(c)   8,000 shares of EPL purchased from August 2 to August 22, 2006 (¶ 38);

(d)   14,500 shares of Veritas purchased from August 11 to August 31, 2006 (note that while ¶ 40 of the PSR references the purchase of 20,500 shares between these dates, count 15 only charges based on a purchase of 6,000 shares on August 31);

(e)   25,000 shares of Trammell Crow purchased on October 19 and 25, 2006 (¶ 47);

(f)   21,000 shares of John Harland purchased on December 11, 12 and 13, 2006 (¶ 50);

(g)     37,000 shares of Caremark Rx purchased on December 13 and 14, 2006 (note that while ¶ 52 of the PSR references the purchase of 55,000 shares of Caremark on these dates, count 25 only charges based on a purchase of 18,000 shares on December 14);

(h)     120 February 85 HYDL call options and 480 March 85 HYDL call options purchased on February 5, 2007 (¶ 55);

(i)     6,447 shares of HYDL, 180 February 85 HYDL call options and 110 March 85 HYDL call options purchased on February 6, 2007 (¶ 55);

(j)     3,553 shares of HYDL purchased on February 7, 2007 (¶ 55);

(k)     60 March 85 HYDL call options purchased on February 8, 2007 (¶ 55);

(l)     5,000 shares of HYDL purchased on February 9, 2007 (¶ 55); and

(m)     15,000 shares of TXU purchased on February 23, 2007 (¶ 58).

        At paragraph 11 below, we lodge a corresponding objection to the Probation Office's gain calculation.

5.      Page 7, Paragraph 20 – while the PSR states that Mr. Naseem "stole confidential information from J.P. Morgan Chase and its clients," Mr. Naseem was not charged with any crimes relating to his tenure at J.P. Morgan and there was never any jury determination to this effect. *See* Jan. 25, 2008 Trial Transcript at 1525 ("Mr. Naseem has not been charged with committing any wrongdoing while he was at JP Morgan . . . I remind you that Mr. Naseem has not been charged with any wrongdoing while he was at JP Morgan.") (copy attached hereto). Because the PSR's Guidelines analysis does not apparently rely on any purported insider trading profits from J.P. Morgan, and respectful of the government, the Probation Office and the Court's time, we refrain from any further comment on this allegation.

6.      Page 7, Paragraph 21 – the PSR indicates that Mr. Naseem left J.P. Morgan Chase's employ on March 22, 2006. That is actually the date that he joined Credit Suisse; he left J.P. Morgan's employ roughly a week earlier.

7.      Page 9, Paragraph 26 – the PSR states that "[m]any of the Subject Transactions were staffed by members of the Global Energy Group" (emphasis added). Since virtually half of the deals – Jacuzzi Brands, Trammell Crow, Caremark and John H. Harland – were not staffed by Global Energy Group members, we challenge use of the word "many."

Mr. Walter J. Quinn
April 29, 2008
Page 4

Moreover, of the five remaining transactions that were staffed by that Group, numerous were run out of Credit Suisse's Houston office, including Veritas and Hydril. TXU Corp. was the only deal principally staffed by members of the Group *in New York*.

8.    Page 9, Paragraph 27 – the PSR observes that Mr. Naseem "was observed rummaging through papers on the desks of several analysts when the analysts were not present." The insinuation implicit in that bald statement is unfair. There was evidence at trial that at least three of these analysts were working on deals with Mr. Naseem at the time and that it was "common" for an associate working with an analyst on a project to go to the analyst's desk and retrieve documents. *See* Jan. 16, 2008 Trial Transcript at 458, 604-05 (attached). Also warranting mention is that the witness presumably behind this statement, Harris Ziskroit, could not identify the documents Mr. Naseem allegedly "flipped through" or what deals or projects they may have related to. *Id.* at 458-59 (attached).

9.    Page 10, Paragraph 28 – the PSR states that Mr. Naseem "provided the Credit Suisse Inside Information to Rahim for personal benefit." We appreciate that "personal benefit" is a legal term of art and that the Probation Office did not mean to suggest necessarily that such benefit included receipt by Mr. Naseem of a tangible monetary benefit from Mr. Rahim's trading. To be clear, though, there was no proof at trial that Mr. Naseem shared in Mr. Rahim's profits.

10.    Page 16, Paragraph 48 – we believe that the $48.55 per share average sale price figure is incorrect. According to Government Exhibit 1800 (copy attached), a summary chart of the trading records, the figure should be $48.65.

11.    Page 20, Paragraph 70 – we disagree with the Probation Office's gain analysis insofar as it includes profits Rahim made on *uncharged* trades (see paragraph 4 above for an enumeration of the same). Uncharged conduct should not be included in the gain analysis absent a "relevant conduct" determination by the Court under U.S.S.G. § 1B1.3. No such determination has been made here.

The PSR profit figures on all the trades total, by our accounting, $7,693,088.50. Deduction from that figure of the profits realized by Rahim on uncharged trades (which we submit are not properly considered at this juncture) leaves a profit figure on charged trades of $5,738,719 or $5,743,419 (depending on the date of certain Veritas sales). Thus, assuming *arguendo* that the enhancement is appropriate at all in this case, the enhancement should be 18, not 20. *See* U.S.S.G. § 2B1.1 (b)(1)(J) (providing for an 18-level enhancement between $2,500,001 and $7 million).

While not appropriately the subject of this letter response to the PSR, we do intend to argue to the Court that even an 18-level enhancement is inappropriate given the peculiar circumstances of this case. To wit, where there is no evidence Mr. Naseem made any money at all from Mr. Rahim's trading activity, there is a perversity in seeing his sentencing exposure effectively multiplied *ten times* under a "gain" enhancement analysis. We submit that this circumstance is sufficiently unusual to take the case out of the Guidelines' "heartland" and to justify a downward departure under *Koon v. United States*, 518 U.S. 81 (1996) and U.S.S.G. § 5K2.0. In the alternative, we will argue to the Court that, as literally applied, the Guidelines' gain enhancement works such an unjust result in this case that it should be merely considered in the section 3553 calculus and not determinative.

12.    Page 20, Paragraph 72 – we object to the "role in the offense" enhancement. First, the application note to section 2B1.4 limits such enhancement to those insider trading cases where the "defendant occupied and abused a position of *special trust*" (emphasis added) and yet this paragraph of the PSR makes no such finding. It is not sufficient to recite formulaically, as the PSR does, that Mr. Naseem "was employed in the Investment Banking Division at Credit Suisse and had access to material, non-public information concerning Credit Suisse transactions. He provided such information to another for personal benefit." For obvious reason, the abuse of a "special trust" enhancement necessarily depends on something above and beyond the duty breach inherent in any insider trading conviction.[1] As the application note suggests, "[e]xamples might include a corporate president or an attorney who misused information regarding a planned but unannounced takeover attempt."

No breach of "special trust," above and beyond the breach of basic trust inherent in Mr. Naseem's conviction, is present in this case. If Mr. Naseem had worked on any of the deals in question, we concede we would not have this argument. But he did not, as the PSR recognizes at paragraph 27. He was a relatively junior investment banker at the firm. To be sure, he owed a duty to Credit Suisse and the jury evidently found that he breached that duty. But there is simply no evidence of abuse of a position of special trust beyond that, such as to justify this two-level enhancement. *Cf. United States v. O'Hagan*, 139 F.3d 641, 656 (8th Cir. 1998) ("We agree with the district court that a secretary or other employee at Dorsey & Whitney could have breached a duty to the firm and violated the securities laws under the misappropriation theory without abusing a

---

[1]    Mr. Naseem's conviction necessarily reflects the jury determination that he breached a duty, since the Court charged the jurors that they had to find that he "had a fiduciary or other relationship of trust and confidence with Credit Suisse and/or certain of its specified clients" and that that duty was breached. Jan. 31, 2008 Trial Transcript at 2354-55 (attached).

position of special trust. O'Hagan was a senior partner at Dorsey & Whitney, it was his status as a senior partner that gave him access to his partner, Mr. Tinkham, and enabled him to broach the subject of the Pillsbury takeover, and we have no doubt that it was his status as a senior partner who specialized in securities law that contributed to Mr. Tinkham's willingness to confide in him that Tinkham was in fact working for a client who was trying to take over Pillsbury and to seek his views as to whether the representation should continue. . . . O'Hagan occupied the position of special trust the application note envisions.").

13. Page 21, Paragraphs 74, 76, 78 – for the reasons set forth in paragraphs 11 and 12 above, we submit that the adjusted offense level and total offense level could be no more than a level 26. This is without prejudice, of course, to our anticipated downward departure arguments and other arguments as to why the gain enhancement should not be applied in this case.

14. Page 21, Paragraph 82 – Mr. Naseem's mother's name is Parveen, not Darveen. His sister's name was Mehnoor, not Mehmoor. She died in December 1995, not September 1995.

15. Page 26, Paragraph 109 – because Mr. Naseem's offenses of conviction are deportable, it is highly unlikely the Government will incur supervised release expenses in this case.

16. Page 26, Paragraph 111 – as indicated in paragraph 3 above, the count two through 29 convictions do not support forfeiture. While the count 1 conviction concededly does, we disagree that the proper figure is "an amount not less than approximately $9 million." The PSR's figure apparently includes *un*charged trade profits. We contend that this is error, and that uncharged conduct cannot figure in the forfeiture analysis. As discussed in paragraph 11 above, the correct figure is $5,738,719 or $5,743,419 (depending on the date of certain Veritas sales). We will endeavor to reach agreement with the government on this issue prior to sentencing.

17. Page 26, Paragraph 112 – we believe that Mr. Naseem's daughter's medical condition, the degree to which he was and would be involved in managing her care for that condition, and the considerable expenses associated with her care going forward, support a downward departure motion based on exceptional family circumstances under U.S.S.G. § 5K2.0(a)(4) and also under U.S.S.G. § 5H1.6, application note 1(B) (discussing departures based on loss of caretaking or financial support). That will be the subject of a separate brief to the Court. We will also be arguing for a downward departure and/or § 3553 variance based on the unfair application in this case of the commentary to U.S.S.G. § 2B1.4.

Mr. Walter J. Quinn
April 29, 2008
Page 7

We thank you very much for your anticipated consideration of these points.

Very truly yours,

Lisa A. Cahill

Enc.

cc:    The Honorable Robert P. Patterson, Jr.
       AUSA Josh Klein
       AUSA Reed M. Brodsky
       Edward J.M. Little, Esq.
       Michael Bachner, Esq.

UNITED STATES OF AMERICA v.
HAFIZ MUHAMMAD ZUBAIR NASEEM

VOLUME 9
January 25, 2008

Page 1525

[1]        (In open court)
[2]        THE COURT: Members of the jury, you just heard
[3]    testimony from Ms. Gaw which related to the period 2005. 2005
[4]    is before the period charged in the indictment. Mr. Naseem has
[5]    not been charged with committing any wrongdoing while he was at
[6]    JP Morgan and you are not to consider it with respect to any
[7]    evidence that he -- any wrongdoing while he was at JP Morgan
[8]    from this testimony.
[9]        But, I am admitting the testimony for a limited
[10]    purpose, and that is that you may consider this testimony if
[11]    you so choose, as evidence, and there is more evidence coming
[12]    in on this, insofar as you find that it will show evidence of a
[13]    relationship between Mr. Naseem and Mr. Rahim. And it is to be
[14]    considered by you, it is admitted as background to the
[15]    conspiracy alleged in the indictment. And it is as to and may
[16]    give you, if you accept it, some evidence of the existence of
[17]    the conspiracy prior to the time charged in the indictment.
[18]        Of course, as with all testimony, you are free to
[19]    accept or reject this testimony. And, I remind you that
[20]    Mr. Naseem has not been charged with any wrongdoing while he
[21]    was at JP Morgan.
[22]        All right. Is that sufficient?
[23]        MR. BACHNER: Yes, your Honor. Thank you.
[24]        MR. KLEIN: The government calls Mark Impellizeri,
[25]    your Honor.

Page 1526

[1]        THE COURT: All right.
[2]    MARK IMPELLIZERI,
[3]        called as a witness by the Government,
[4]        having been duly sworn, testified as follows:
[5]        THE DEPUTY CLERK: Please state your name and spell
[6]    your last name slowly for the record, please.
[7]        THE WITNESS: Mark Impellizeri, I-M-P-E-L-L-I-Z-E-R-I.
[8]        THE COURT: Go ahead, please.
[9]        MR. KLEIN: Thank you, your Honor.
[10]    DIRECT EXAMINATION
[11]    BY MR. KLEIN:
[12]    Q. Mr. Impellizeri, I will just ask you if you would to just
[13]    speak up into the microphone so all the Jurors can hear you as
[14]    you answer the questions I put to you.
[15]        Good afternoon, sir.
[16]    A. Hi.
[17]    Q. What do you do for work?
[18]    A. I'm a paralegal at Merrill Lynch.
[19]    Q. And how long have you -- withdrawn.
[20]        Which office of Merrill Lynch do you work at?
[21]    A. I work at Merrill Lynch's office of general counsel at 222
[22]    Broadway.
[23]    Q. And that's right here in Manhattan?
[24]    A. Yes.
[25]    Q. How long have you worked at Merrill Lynch?

Page 1527

[1]    A. About three and a half years.
[2]    Q. And you indicated you were a paralegal?
[3]    A. Yes.
[4]    Q. What are your responsibilities as a paralegal at Merrill
[5]    Lynch? And I will just again ask you if you would speak up.
[6]    A. I assist in responding to regulatory requests. I assist
[7]    the attorneys in conducting internal investigations. And I
[8]    file forms U-5 and RE-3s for regulatory filings.
[9]    Q. With respect to regulatory requests and internal inquiries,
[10]    what type of assistance do you provide, generally?
[11]    A. Generally, I collect documents responsive to regulatory
[12]    requests.
[13]    Q. Generally, what types of documents do you collect?
[14]    A. I collect account statements, I conduct trade runs, trade
[15]    confirmations, commission runs.
[16]    Q. In approximately how many instances during your time at
[17]    Merrill Lynch have you collected these sorts of documents in
[18]    connection with your work assisting upon regulatory requests
[19]    and internal inquiries?
[20]    A. Hundreds of times.
[21]    Q. Prior to your testimony today, have you reviewed certain
[22]    Merrill Lynch documents relating to brokerage accounts
[23]    maintained by an individual named Ajaz Rahim and another
[24]    individual named Hina Ajaz?
[25]    A. Yes.

Page 1528

[1]        THE COURT: Can you spell those names, please?
[2]        MR. KLEIN: Ajaz Rahim, A-J-A-Z, R-A-H-I-M. And the
[3]    other name is Hina Ajaz, H-I-N-A, and the last name is A-J-A-Z.
[4]    Q. Mr. Impellizeri, before I show you some documents, let me
[5]    just also ask you whether some of the documents that you've
[6]    assisted in gathering, in connection with your work, have
[7]    related to Merrill Lynch branch offices outside the United
[8]    States?
[9]    A. Sometimes, yes.
[10]    Q. Is it fair to say that are you also generally familiar with
[11]    some of Merrill Lynch's electronic systems that are used to
[12]    generate certain trade runs and other account related
[13]    information?
[14]    A. Yes.
[15]        MR. KLEIN: May I approach, your Honor?
[16]        THE COURT: Yes, you may.
[17]    Q. Mr. Impellizeri, I'm going to hand you a stack of documents
[18]    and just ask you to look at the document on top which is
[19]    Government Exhibit 1300 marked for identification. I will ask
[20]    you to look at Government Exhibit 1300 and tell us if you
[21]    recognize it.
[22]    A. Yes.
[23]    Q. Did you review Exhibit 1300 prior to your testimony today?
[24]    A. Yes.
[25]    Q. And did you initial the front page of that document?

Page 457

[1] put the board over there so you don't --
[2]      THE COURT: No, no. Don't do that. It is the jury
[3] that has to make -- I don't mind coming down.
[4]   Q. Mr. Ziskroit, using an orange -- we used green. Using a
[5] brown marker, please identify the desks of Mr. Hamadeh,
[6] Mr. Petrov, Mr. Ryan and Mr. Lima.
[7]      Who's desk did you draw under N46A?
[8]   A. That's Basil, Basil Hamadeh.
[9]   Q. Cliff Ryan is M45A?
[10]   A. And I can't recall -- in 2006 Peter Petrov and Michael Lima
[11] wasn't an employee at the time.
[12]   Q. If we can switch to the other chart, Government Exhibit
[13] 45C, if you can draw circles around those desks?
[14]   A. Cliff Ryan, Peter Petrov, Michael Lima and Basil Hamadeh.
[15]   Q. So, Basil Hamadeh was at P06D, Michael Lima was at S09B,
[16] Cliff Ryan was at M08A and Peter Petrov was at N11B?
[17]   A. That's correct. I don't know the numbers, but that's
[18] where they were.
[19]   Q. And when they were on the 22nd floor, did you make these
[20] observations of Mr. Naseem looking at their desks when they
[21] weren't there?
[22]   A. That's correct.
[23]   Q. With the Court's permission, Mr. Ziskroit, would you return
[24] to the witness stand?
[25]      Was Mr. Naseem working with -- based on your

Page 458

[1] observations, was Mr. Naseem working with Mr. Hamadeh at any
[2] time during 2006 and 2007?
[3]   A. Yes, he was.
[4]   Q. Was Mr. Naseem working with Cliff Ryan?
[5]   A. Yes, he was.
[6]   Q. Was Mr. Naseem working on projects with Michael Lima?
[7]   A. Yes, he was.
[8]   Q. Was he working on projects with Mr. Petrov?
[9]   A. I -- I'm not too sure.
[10]   Q. Now, was it usual or unusual for an associate working with
[11] an analyst on a project, based on your observations, to go to
[12] the analyst's desk and retrieve documents?
[13]   A. Yes, it -- it was common.
[14]   Q. What, if anything, about what Mr. -- you observed about
[15] Mr. Naseem doing with respect to the cubicles of Mr. Hamadeh,
[16] Mr. Petrov, Mr. Ryan and Mr. Lima, were different?
[17]   A. Because, like I said, we were friends, we would flip
[18] through books and see what they're working on, if anything is
[19] interesting or anything can be used for future presentations to
[20] make our lives easier or, basically, make us seem a little
[21] smarter.
[22]   Q. Mr. Ziskroit, you don't know from where your cubicle was
[23] and where you were making these observations what books or
[24] documents Mr. Naseem actually flipped through when he looked at
[25] the desks of Mr. Hamadeh, Mr. Petrov, Mr. Ryan and Mr. Lima

Page 459

[1] when those analysts were not around?
[2]   A. I couldn't tell you.
[3]   Q. You can't identify the documents?
[4]   A. No.
[5]   Q. You don't know what project or deal it related to?
[6]   A. No.
[7]   Q. Mr. Ziskroit, did you ever hear Mr. Naseem talking on the
[8] telephone?
[9]   A. Yes, I did.
[10]   Q. Did you ever hear Mr. Naseem speaking a language other than
[11] English?
[12]   A. Yes, I did.
[13]   Q. Did you understand it?
[14]   A. No.
[15]   Q. Did you know what the other language was?
[16]   A. No.
[17]   Q. Let me direct your attention, Mr. Ziskroit, now to the work
[18] that you did on Babcock & Brown's acquisition or announced
[19] acquisition to acquire Northwestern.
[20]      You mentioned you had worked on that deal?
[21]   A. That's correct.
[22]   Q. In a few sentences for the jury, would you describe that
[23] transaction or deal?
[24]   A. Yes.
[25]      It was a public company --

Page 460

[1]      THE COURT: Which was?
[2]   A. Northwestern was a public regulated and unregulated energy
[3] group with operations in electricity and gas in Montana,
[4] Nebraska and South Dakota, of the United States. They had two
[5] potential suitors put in public bids, public non-binding bids
[6] for Northwestern, one was Montana Public Power in the summer of
[7] '05, the other one was Black Hills Corporation put it in in
[8] November of '05. And, based on those public non-binding bids,
[9] the company then hired Credit Suisse to evaluate strategic
[10] alternatives. And one of those strategic alternatives was an
[11] auction process where they elicited bids from potential suitors
[12] and we thus -- we, thus, and Northwestern -- and Northwestern
[13] agreed that Babcock & Brown was the best suitor in terms of
[14] valuation for stockholders and decided that they should sell
[15] themselves or be acquired by Babcock & Brown.
[16]   Q. Mr. Ziskroit, you just put about six months of your work on
[17] that deal in four sentences so we will try to break that down.
[18]      You said Credit Suisse represented which party?
[19]   A. Northwestern, the board of Northwestern I believe it was,
[20] or the management.
[21]   Q. What kind of company is Northwestern?
[22]   A. It was a public regulated and unregulated energy and gas
[23] company.
[24]   Q. It is a public company?
[25]   A. Yes.

Page 601

[1] taking a moment.
[2] Q. Sir, what I would like you to do is read 3518-A and see if
[3] that refreshes your memory, sir, as to whether or not you had
[4] conversations with law enforcement as to whether or not
[5] Mr. Naseem and you had conversations at your cubicle?
[6]    MR. BRODSKY: Objection, your Honor. It's misleading.
[7]    THE COURT: Objection sustained because that isn't the
[8] question he needs refreshing on. You asked him that question.
[9] Q. Did you have conversations with Mr. Naseem at your cubicle?
[10] A. Yes, I did.
[11] Q. Did you tell that to the FBI during meeting number one?
[12] A. Like I said, I can't recall.
[13] Q. Take a look at 3518-A.
[14]    THE COURT: You can look at that document and refresh
[15] your recollection. But if it doesn't refresh your
[16] recollection --
[17]    MR. BRODSKY: Can we have a side bar?
[18]    THE COURT: First I have to ask whether it can refresh
[19] your recollection.
[20]    MR. BRODSKY: While he is reading that, can we have a
[21] quick side bar?
[22]    My objection is based on the document it is
[23] misleading, the question is misleading. It's not a good faith
[24] question.
[25]    THE COURT: What paragraph?

Page 602

[1]    MR. BACHNER: Sorry, your Honor?
[2]    THE COURT: I think you should show the government
[3] what paragraph you're relying on.
[4]    MR. BACHNER: The third page.
[5]    MR. BRODSKY: Mr. Bachner has pointed to the second
[6] full paragraph on page 3. We continue with our objection.
[7]    THE COURT: Objection sustained.
[8]    MR. BACHNER: I voice my objection. Anything can
[9] refresh a witness's recollection.
[10]    THE COURT: If it relates to the question. Let's not
[11] show him a document that can't refresh his recollection.
[12]    MR. BACHNER: Most respectfully, I just voice my
[13] objection.
[14]    THE COURT: You can voice it.
[15] Q. Mr. Ziskroit, isn't it fair to say that during the first
[16] meeting with the FBI you never once mentioned to them
[17] Mr. Naseem ever flipping through documents?
[18]    MR. BRODSKY: Objection. Asked and answered.
[19]    THE COURT: You have asked that question before and he
[20] has answered it, the way you would want him to answer it.
[21] Q. Isn't it a fact, sir, that you mentioned Mr. Naseem
[22] flipping through documents during -- withdrawn.
[23]    After your first conversation with the FBI, did you
[24] speak to Michael Lima?
[25] A. Yes.

Page 603

[1] Q. Didn't you learn from Michael Lima when you spoke to him
[2] that he told the FBI that Mr. Naseem had flipped through
[3] documents?
[4]    MR. BRODSKY: Can we have a time period as to this
[5] conversation?
[6]    THE COURT: When did you speak to Mr. Lima?
[7]    THE WITNESS: I would speak to him once a week.
[8]    THE COURT: Did you do it between these two meetings?
[9]    THE WITNESS: I might have spoke to him, yes.
[10]    THE COURT: Did you have such a conversation with him
[11] between these two meetings?
[12]    THE WITNESS: No, I did not discuss -- he did not tell
[13] me that Hafiz would flip through books.
[14] Q. It's a fact, sir, is it not, that the first time you
[15] mentioned flipping through documents was during your second
[16] meeting with the FBI after you spoke with Michael Lima?
[17] A. That could be the case if I spoke to him. If I spoke about
[18] it in the phone interview, I can't recall.
[19] Q. Sir, when Mr. Naseem would have conversations with you
[20] regarding -- I think you said he would have a conversation,
[21] What are you working on?, do you recall that?
[22] A. Yes.
[23] Q. He would say things like, Are you working on anything
[24] interesting?, is that correct?
[25] A. It was common amongst bankers.

Page 604

[1] Q. It's fair to say that was not an unusual practice?
[2] A. No. Amongst the people you were friendly with, no, that
[3] was common.
[4] Q. Now, sir, you also told the jury that you had discussions
[5] with Mr. Naseem about his stock picks and his stock portfolio,
[6] things that he invested in, things of that nature?
[7] A. That's correct.
[8] Q. Is it fair to say, just to clarify for the jury, that none
[9] of that had to do with any of the transactions that you worked
[10] on at Credit Suisse?
[11] A. That's correct.
[12] Q. You and he spoke in generalities about other ideas that
[13] both you had and he had?
[14] A. That's correct.
[15] Q. Sir, you told the jury that you saw Mr. Naseem going to
[16] people's cubicles and you mentioned Mr. Lima, correct?
[17] A. Correct.
[18] Q. Cliff Ryan?
[19] A. That's correct.
[20] Q. Basil Hamadeh?
[21] A. That's correct.
[22] Q. And I think you said Peter Petrov?
[23] A. That's correct.
[24] Q. Is it fair to say, sir, that all of those individuals -- do
[25] you know whether all of those individuals actually had a

UNITED STATES OF AMERICA v.
HAFIZ MUHAMMAD ZUBAIR NASEEM

VOLUME 3
January 16, 2008

Page 605

[1] working relationship with Mr. Naseem?
[2]   A. I believe all of them did except for Peter Petrov.
[3]   Q. You're not sure on Petrov?
[4]   A. I'm not sure.
[5]   Q. Sir, in your experience at Credit Suisse, is it fair to say
[6] it's not unusual for somebody -- I want to retract that
[7] question.
[8]       Mr. Ryan's position was what at Credit Suisse?
[9]   A. He was an analyst like myself.
[10]   Q. And Hamadeh?
[11]   A. Analyst.
[12]   Q. Petrov is an analyst?
[13]   A. That's correct.
[14]   Q. And Lima is an analyst?
[15]   A. That's correct.
[16]   Q. Is an associate a higher position than an analyst?
[17]   A. Yes, it is.
[18]   Q. Is it unusual at Credit Suisse for the associate to go to
[19] the people who he works with and who worked under him to check
[20] on their work?
[21]   A. Not at all.
[22]   Q. Sir, going back to this flipping of documents, at the time
[23] that you say you saw this happen, did it strike you as
[24] improper?
[25]   A. No.

Page 606

[1]   Q. Did it strike you as -- it did not strike you as improper?
[2]   A. That's correct.
[3]   Q. At the time, sir, that you said you were working on TXU, I
[4] think you said that 90 percent of your desk was covered with
[5] TXU documents?
[6]   A. I believe I said that, yes.
[7]   Q. Is it fair to say again that the TXU documents that were
[8] seated on your desk, by and large, those documents were coded?
[9]       It said Eagle, it didn't say TXU, for example?
[10]   A. Primarily, yes, but with basic knowledge of the industry --
[11] not basic, but with our knowledge of the industry you could
[12] figure out what.
[13]   Q. What you're saying is that Mr. Naseem would be flipping
[14] through documents and would be able to discern codes as he is
[15] flipping through the documents?
[16]   A. No.
[17]   Q. Is it fair to say, sir, that the documents that you
[18] testified about, I think you referenced them as TXU, they were
[19] referenced as Eagle, isn't that right?
[20]   A. That's correct.
[21]   Q. Now, you got a directive in that e-mail to keep the TXU
[22] transaction really confidential, right?
[23]   A. That's correct.
[24]   Q. Penalties of being thrown off the team, right?
[25]   A. That's correct.

Page 607

[1]   Q. And you told this jury that TXU was really important to you
[2] on a personal level because that's where you were going to make
[3] your bonus?
[4]   A. I did not say that.
[5]   Q. It was a very important transaction for you because it
[6] could lead to a promotion for you?
[7]   A. I never said that.
[8]   Q. Was TXU an important transaction for you?
[9]   A. Yes.
[10]   Q. Why was it an important transaction?
[11]   A. The nature, the size of the transaction, and that I was
[12] hand selected to be on the deal.
[13]   Q. Do you think, sir, the fact that doing a good job in the
[14] transaction could be a good thing for your future?
[15]   A. Yes, but I knew I was leaving Credit Suisse.
[16]   Q. Would it be better to leave Credit Suisse on good terms or
[17] bad terms?
[18]   A. I believe anyplace on better terms.
[19]   Q. Would it be good to have TXU under your belt as a
[20] successful transaction or an unsuccessful transaction?
[21]   A. What do you mean by successful?
[22]   Q. One having done a good job.
[23]   A. Of course you wanted to do the best job on everything.
[24]   Q. Indeed, sir, you told this jury that you used to actually
[25] physically lock up your documents because you didn't want to be

Page 608

[1] the guy ever accused of leaking information, isn't that
[2] correct?
[3]   A. Yes, that was partly, and to protect it.
[4]   Q. Now, sir, when you testified that you saw Mr. Naseem
[5] flipping through documents on your desk, that you say are
[6] covered in 90 percent of TXU documents, you must have reported
[7] that to Mr. Welch.
[8]   A. Could you repeat that?
[9]   Q. When you say you saw Mr. Naseem flipping through documents
[10] on your desk at a time you were working on TXU, you must have
[11] reported that to Mr. Welch?
[12]   A. It was very brief, and I did not.
[13]   Q. The flipping through was very brief?
[14]   A. Very brief, like I said originally this morning.
[15]   Q. Is it fair to say then that that event you say occurred was
[16] not significant to you?
[17]   A. I was quick in stopping it and it was not significant
[18] because it was a trusted friend.
[19]   Q. Just so we are clear, for the six-month period you left
[20] Credit Suisse, you never told anybody until the FBI interviewed
[21] you on the second meeting after you spoke to Mr. Lima about
[22] this event?
[23]       MR. BRODSKY: Objection. It misstates his testimony.
[24]       THE COURT: Objection sustained to the form of the
[25] question.

UNITED STATES OF AMERICA v.
HAFIZ MUHAMMAD ZUBAIR NASEEM

VOLUME 13
January 31, 2008

Page 2354

[1] THE COURT: With respect to the first factor, to find
[2] that the defendant engaged in insider trading, you must find
[3] that the defendant had a fiduciary or other relationship of
[4] trust and confidence with Credit Suisse or certain of its
[5] specified clients. Such a relationship is alleged to arise out
[6] of Naseem's employment relationship with Credit Suisse.
[7] "Fiduciary" means characterized by faith, trust and confidence.
[8] The question for you to consider is whether Credit Suisse
[9] and/or its clients expected Naseem to keep confidential and to
[10] refrain from improperly disclosing the information at issue in
[11] this case.
[12] Whether a relationship giving rise to such a duty
[13] existed is ultimately a question of fact which depends on the
[14] particulars of the interaction between the parties and the
[15] nature of their relationship. That relationship may have been
[16] either formal or informal. In considering whether a duty of
[17] confidentiality existed, you may examine any written policies
[18] or procedures employed by Credit Suisse to inform its employees
[19] of their responsibilities under the federal securities laws.
[20] You may consider any memoranda or other written notifications,
[21] or oral notifications from Credit Suisse or its officers or
[22] employees to Naseem concerning the use or disclosure of
[23] material, confidential, non-public information. However, a
[24] duty of confidentiality need not have been expressed explicitly
[25] or in writing. It may be inferred, for example, from the

Page 2355

[1] nature and circumstances of Naseem's position as a Credit
[2] Suisse investment banker.
[3] If you find that the defendant had a fiduciary or
[4] other relationship of trust and confidentiality with Credit
[5] Suisse and/or certain of its specified clients, then you must
[6] next consider whether the defendant breached that duty of trust
[7] and confidentiality by misappropriating and disclosing
[8] material, non-public information to Ajaz Rahim.
[9] Misappropriation of non-public information --
[10] non-public information a type of property -- by those who owe a
[11] duty to an owner of the property or one who holds the property
[12] for the owner, is a form of fraud. In the eyes of the law, the
[13] theft of non-public, material information is no different in
[14] kind from the theft of money or other valuable property. The
[15] one qualification on this principle is that the information
[16] that is stolen must be material as well as non-public. I will
[17] define those terms for you shortly.
[18] In order to find that Naseem breached his duties of
[19] confidentiality you must be persuaded, beyond a reasonable
[20] doubt, as to each of Counts Two through Twenty-nine, that the
[21] information Naseem allegedly misappropriated or disclosed to
[22] Rahim was non-public at the time it was disclosed. Information
[23] is non-public if it was not available to the public through
[24] such sources as press releases, Securities and Exchange
[25] Commission filings, trade publications, analyst reports,

Page 2356

[1] newspapers, magazines, television, radio, word of mouth,
[2] websites, internet chat rooms and online message boards. It is
[3] important to recognize, however, that the fact that information
[4] has not appeared in a newspaper or other widely available
[5] public medium is not alone dispositive of whether the
[6] information is non-public. Sometimes a corporation is willing
[7] to make information available to securities analysts or
[8] prospective investors who ask for it even though it never may
[9] have appeared in any newspaper or other publication. The key
[10] word is "available." if the information is out there in public
[11] media or in SEC filings open to the public, or if the company
[12] policy was to give it to people who ask for it, it is public.
[13] If, on the other hand, the information is not
[14] generally available and the company would not make it available
[15] in response to a request, then it is not public rather than
[16] public. It follows from what I have said that information is
[17] not necessarily non-public simply because there has been no
[18] public announcement or because only a few people have been made
[19] aware of it.
[20] On the other hand, if information has not been
[21] disclosed and is kept confidential by a company, it is
[22] non-public. Whether information was non-public is an issue of
[23] fact for you to decide.
[24] In order to find that Naseem breached his duty of
[25] trust, you must also be persuaded, beyond a reasonable doubt,

Page 2357

[1] as to the count you are considering, that the information
[2] Naseem disclosed to Rahim was "material" at the time the
[3] information was disclosed.
[4] Information is "material" if it reasonably would be
[5] expected to be important to a reasonable and prudent person in
[6] taking action of relevance to the issues in the case. Within
[7] the particular context of the purchase and sale of stocks,
[8] material information is information which a reasonable investor
[9] would have considered significant in deciding whether to buy,
[10] sell or hold securities, and at what price to buy or sell.
[11] Put another way, there must be a substantial
[12] likelihood that the information would have been viewed by the
[13] reasonable investor as having significantly altered the total
[14] mix of information then available. In considering whether
[15] information about a particular event was material, you may
[16] consider how probable it was that the event would occur at the
[17] time the information was disclosed, as well as the importance
[18] of the event to the company in question.
[19] The government must also prove beyond a reasonable
[20] doubt that Rahim used material, non-public information that had
[21] been given to him by the defendant. A person uses material,
[22] non-public information in connection with a stock sale or a
[23] purchase if that information is a factor in his decision to
[24] purchase or sell the stock.
[25] How do you tell whether a person who receives material