**Mark S. Silver MA, MSW, LCSW, PsyD, JD**
**30 Vesey St., Suite 100 NY NY 10007**
**Marksilver1@cs.com**

LCSW License: 069495-1
**Mitigation & Forensics**
**917-608-1346**

Re: NASEEM, HAFIZ

and his parents openly discussed their family's priorities and lives together and he was also responsible for attending to his siblings' health and safety while his father worked long hours almost every day and his mother seemed endlessly in need of daytime rest.

Hafiz reports that he cared for his grandfather, grandmother, and uncle before their deaths, literally sleeping in their hospital rooms to ensure that they had a family member present to advocate on their behalf when they could no longer speak for themselves.

<u>Summary</u>

Hafiz reports that as an adult son and father in his own right he recognizes the irreplaceable role that he fulfills in his family of origin and for his own children and understands that his presence is essential to their well-being.

## VIII. HAFIZ AND AYESHA'S MARRIAGE

<u>Ayesha's Family Background</u>

Ayesha's father, Chawdhry Waheed Udin Ahmed, was a district magistrate for twenty-six years in Pakistan in the judicial system. Ayesha's mother, Kishwar, who is 63 years old, suffers from Hypertension, High Cholesterol, Thyroid, and related issues.

<u>Arranged Marriage</u>

Hafiz reports that he and Ayesha were married through an arranged engagement. Hafiz says that they did not know each other well before the marriage, but they trusted their parents' judgment without question. He says that their families knew one another, lived in the same area, and had similar life experiences and cultural expectations. Hafiz and Ayesha were married on February 21, 1997 in Pakistan. Ayesha says that they have carved out for themselves a life-long commitment of trust and love and she is greatly distressed at the current situation, as she may be separated from Hafiz for an extended period of time due to incarceration. She has deep conflict because while she may need the support of her extended family in Pakistan in Hafiz's absence, it is in her daughter's best medical interest to remain here where the healthcare benefits have permitted their daughter the gift of ambulation. The loss of her daughter's ability to walk would be devastating to endure. Although Maheem has started to walk, doctors believe that she needs constant and regular help to continue her improvement. If this is stopped or disrupted she will revert back to three years ago. The family of Hafiz Naseem, including himself, has been struck by tragedy. Maheen was born a premature baby; Hafiz and his wife had to put in day in and day out efforts to raise this lovely child as a normal child. But, to the utter shock of Hafiz and his wife, when Maheen was about one year of age it was diagnosed by the doctors in Pakistan that Maheen suffered from cerebral palsy. It

**Mark S. Silver MA, MSW, LCSW, PsyD, JD**
30 Vesey St., Suite 100 NY NY 10007
Marksilver1@cs.com

LCSW License: 069495-1
**Mitigation & Forensics**
**917-608-1346**

Re: NASEEM, HAFIZ

was further informed that there is no treatment in Pakistan for this disease and this lovely child would never be able to stand on her two legs and she would remain on the wheelchair for the rest of her life. Both Hafiz and his wife used to weep for days, weeks, and months praying to God to have their daughter recover. This was the main reason why Hafiz made the decision to come to the United States. Maheen's treatment in the United States was started and she underwent a very sensitive selective dorsal rhizotomy procedure and she also needs another surgery in her lower extremities. Her second surgery had been postponed twice due to the present situation of her father and it can be assumed that her treatment is being disturbed due to this unfortunate incident.

Strong Bonds

Hafiz reports that he and Ayesha have a very fulfilling and loving marriage based on the common values of family integrity, religious worship, hard work, and education. Hafiz and Ayesha report that they completely trust each other and are fortunate to have a strong sense of security and safe intimacy in their relationship. Hafiz and Ayesha have been extremely supportive to each other throughout this frightening period and when Ayesha is anxious and restless Hafiz calms her by reassuring her that their family will be safe and that he will always care for her and the children no matter the circumstances. She says that Hafiz is also essential to her because her English is less proficient and without her husband she would be lost in many facets of the family's daily lives.

Hafiz's Positive Qualities

Ayesha says that Hafiz is an understanding and generous person. She says that Hafiz is an excellent father and husband, but also a devoted son and brother. Ayesha says Hafiz's personality is "sweet" and his values reflect the caring and kind individual that he is. She describes Hafiz as a person who "always loves to help" and can be trusted to assist anyone.

Ayesha says that her marriage has provided her with trusting companionship. Ayesha emphasized that she feels blessed that she is married to a wonderful person whose devotion to family values has made her life joyful and fulfilling. Ayesha reports that Hafiz has influenced her life in just about every respect.

Common Values

Ayesha says that she and Hafiz have many similar values, which she had cherished since her childhood. Ayesha reports that like herself Hafiz is a Muslim and this commonality of religious belief is extremely important to her and her family. She feels her faith brought her solace throughout her development, and she wanted to marry someone who

**Mark S. Silver MA, MSW, LCSW, PsyD, JD**
30 Vesey St., Suite 100 NY NY 10007
Marksilver1@cs.com

LCSW License: 069495-1
**Mitigation & Forensics**
917-608-1346

Re: NASEEM, HAFIZ

was willing to invest time and energy in a similar belief system and to partake in religious ritual practice in a modern yet respectful manner.

Ayesha reports that when she met Hafiz she understood from their conversations that he was quite close with his father and mother and loved his siblings. Ayesha says that she had always been extremely close with her large family and she wanted to marry a man who deferred to his parents' wishes and maintained a strong and caring relationship with his siblings. Ayesha saw this as a reflection of Hafiz's good character and values.

<u>Hopes and Expectations</u>

Ayesha says that she and Hafiz had hopes and expectations about their future. They spoke about having several children and one day buying their own home and having a family to be proud of.

<u>Dependent Relationship</u>

Ayesha says she has difficulty making everyday decisions without an excessive amount of advice and reassurance from Hafiz. She says that she needs to speak to him many times during the day for his feedback, love, and input regarding every day simple matters about the family and home and in his absence she feels lost and frightened. She says that when she speaks with him she finds that it brings her psychological peace and comfort and permits the children to feel reassured and helps them remain better focused on school. For example, Ayesha reports that she literally cannot write a check because Hafiz has always managed their financial issues. Similarly, she is worried about how she will get from place to place as Hafiz has always driven her wherever she has needed to go.

Ayesha says that she typically attended to the children's daily needs and the home, which has been very time consuming given their daughter's CP while Hafiz has adopted almost all other roles to balance out their respective contributions to their home. Moreover, Ayesha noted that women in her culture leave school at a young age, often before even completing high school, to enter an arranged marriage, and this too has meant that she has been very limited in her exposure to the world making her dependence on Hafiz also the more urgent.

Ayesha says that she needs Hafiz to assume responsibility for major areas of her life and deeply fears the loss of his support and approval. She confesses that she has difficulty initiating projects on her own due to a lack self-confidence and it is only through his constant emotional presence that she has committed herself to their family needs. Ayesha says she feels uncomfortable when alone and has realistic fears of being unable to care for herself and the children.

**Mark S. Silver MA, MSW, LCSW, PsyD, JD**
**30 Vesey St., Suite 100 NY NY 10007**
**Marksilver1@cs.com**

LCSW License: 069495-1
Mitigation & Forensics
917-608-1346

Re: NASEEM, HAFIZ

Medical Issues

Ayesha reports that in the last year she has been diagnosed with possible diabetes for which she has been prescribed Metaform. Ayesha fears that if she is not well there would be no one to care for her children and she is concerned that even their basic daily needs would not be fulfilled.

## IX. HAFIZ'S CHILDREN

Background

Hafiz and Ayesha have two children: Maheen and Danish.

Danish

Danish was born on December 16, 1997 in Lahore, Pakistan with no pre- or neo-natal problems and has achieved normal developmental milestones. Danish attends fifth grade at an excellent public high school and he is simply a brilliant young boy who loves basketball, baseball, and reading endlessly. His potential is almost unlimited given his acumen and wisdom, and as reflected in the numerous awards he has received. Hafiz's incarceration would undoubtedly force Danish to become a parentified child as his mother cannot cope without help and this would likely serve to redirect Hafiz's focus from his scholastic achievements. Such duties can be extremely difficult for an adolescent and Ayesha and Hafiz fear that Danish's amazing achievements would be lost because such responsibilities would become a daily part of his life in the long-term absence of his father.

Danish's behavior and presentation is consistent with childhood depression. While depressed adults often feel deep despair, hopelessness, low-energy, and neurovegetative signs of depression (such as erratic sleep and appetite), children's depression most often manifests itself through erratic behavior, inattention to detail in school, contrary or antisocial conduct, attention seeking behaviors, and puerile behavior that masks an underlining anger or disappointment. Danish has already shown various signs of depression, including social withdrawal, sad affect, anxiousness, clinginess, fear of separation from home, and related symptoms. He is extremely scared, constantly asks about his father, and the family fears that he will soon begin to undermine his fantastic scholastic achievements. While depression is an appropriate way to understand Danish's current presentation it is also consistent with Separation Anxiety Disorder (SAD). SAD is a developmentally inappropriate and excessive anxiety concerning separation from home or from those to whom the individual is attached, as evidenced by three (or more) of the following:
(1) recurrent excessive distress when separation from home or major attachment figures

**Mark S. Silver MA, MSW, LCSW, PsyD, JD**
**30 Vesey St., Suite 100 NY NY 10007**
**Marksilver1@cs.com**

LCSW License: 069495-1
Mitigation & Forensics
917-608-1346

Re: NASEEM, HAFIZ

occurs or is anticipated
(2) persistent and excessive worry about losing, or about possible harm befalling, major attachment figures
(3) persistent and excessive worry that an untoward event will lead to separation from a major attachment figure (e.g., getting lost or being kidnapped)
(4) persistent reluctance or refusal to go to school or elsewhere because of fear of separation
(5) persistently and excessively fearful or reluctant to be alone or without major attachment figures at home or without significant adults in other settings
(6) persistent reluctance or refusal to go to sleep without being near a major attachment figure or to sleep away from home
(7) repeated nightmares involving the theme of separation
(8) repeated complaints of physical symptoms (such as headaches, stomachaches, nausea, or vomiting) when separation from major attachment figures occurs or is anticipated.

<u>Maheen</u>

Maheen was born on August 21, 2000 in Lahore, Pakistan about three months prematurely at a low birth weight of about 3 lbs. Maheen suffered developmental delays, including not being able to crawl even at age 18 months. Maheen was misdiagnosed for about two years until a correct diagnosis of Spastic Diplegic Cerebral Palsy (CP) was made. Chawdhry, Hafiz's father-in-law, stated that Maheen's birth was greeted with great joy and with a son and daughter Hafiz felt that somehow his luck had improved. Chawdhry says that when it became evident that Maheen was in fact quite ill Hafiz was greatly distressed. Chawdhry says he can still recall the anxiety that Hafiz faced watching his newborn daughter in an incubator and running back and forth between the hospital and home to attend to his son and also work responsibilities.

CP is a neurological-muscular disorder that appears in infancy or early childhood and permanently affects body movement and muscle coordination. After about a year of evaluations, Hafiz was informed that the best medical care in the world was in New York at New York University Hospital and the Hospital for Joint Diseases. The doctor in Pakistan who made the correct diagnosis was a graduate and PhD from NYU. Her name was Zara Habib and she recommended the hospital and the doctors. Hafiz reports that he also wished to advance his educational horizons with a graduate degree in business and he was accepted to the New York University's Stern School of Business at the same time. He was also accepted in many other higher ranked schools but he chose to come to NYU for the treatment. Hafiz says that Maheen underwent a selective dorsal rhizotomy surgery in order to modulate the abnormal tone in her lower extremities such that she is now able to walk where before she could not crawl or otherwise move freely. He says that now she does not even use supports. Hafiz believes that at heart Maheen is a human of tremendous will power and he recognizes that in this sense she is stronger than him.

**Mark S. Silver MA, MSW, LCSW, PsyD, JD**
**30 Vesey St., Suite 100 NY NY 10007**
**Marksilver1@cs.com**

**LCSW License: 069495-1**
**Mitigation & Forensics**
**917-608-1346**

Re: NASEEM, HAFIZ

Maheen's physician has stated that Maheen is still in need of extensive lower extremity surgery and possibly boney intervention and that it would be imperative for her continuity of care that her surgery and postoperative rehabilitation will occur at New York University School of Medicine. Maheen is extremely limited in her activities of daily living and even requires assistance with toileting and related bathroom and personal hygiene needs. It was noted that in the absence of proper care Maheen may suffer from long-term pathologies, including arthritis, osteoporrhosis, and complications from abnormal movement patterns. Intervention, with appropriate physical therapy, surgery, and related assistance, is essential for a life that minimizes the devastation of this disease process. Finally, Maheen has been scheduled for hip surgery, however Ayesha has repeatedly delayed the surgery because she has been overwhelmed from being alone due to Hafiz's incarceration, even though Maheen's hips could significantly worsen without the surgery. It was also noted that Maheen has missed physical therapy appointments due to the present legal matter. Maheen's physician is Dr. Joan T Gold located at 400 East 34th St, New York NY 10016-4998 (212)-263-6519. Maheen's physical therapist is Janet Weidinger, MS, PT located at 162 Duxbury Rd Purchase, NY 10577.

Maheen is in second grade at the Bruno M. Ponterio Ridge Street School where she is a very good student. Her principal, Kevin A. Fittinghoff, wrote a letter on her behalf stating that Maheen is among the most determined children that he has ever seen. Through a Section 504 accommodation plan, Maheen receives a fulltime one on one aide as well as adapted physical education, occupational therapy and physical therapy. All of these services are delivered on site in a special room.

<u>Hafiz as a Great Father</u>

Ayesha reports that Hafiz is simply an outstanding father who attends to his children's every need and concern and is as devoted as her father was to her family when she was growing up. Despite Hafiz's extremely busy investment banking schedule he never missed a doctor's appointment for the children and attended most games and plays. She can remember that he would even drop the children at school even after only a few hours of sleep. Ayesha says that her children are very fortunate to have a father who is caring and places his children's needs above his own well-being and he is very involved in his children's school programs, sports, music, friends, hobbies, games, and other interests both in and outside of the home. She says that her daughter and son are very attached to Hafiz and she believes that Hafiz's incarceration would crush them and they would suffer severe emotional hardship. Ayesha does not want the children to suffer living without the protection and guidance their father provides. Hafiz says that he is heart-broken knowing that his children are suffering in his absence. He says that he recalls sleeping on a chair for nights on end outside of his daughter's hospital room to be there in case she became frightened while he should have been studying for his final exams while attending the business program at New York University. He says that while most of his

**Mark S. Silver MA, MSW, LCSW, PsyD, JD**
30 Vesey St., Suite 100 NY NY 10007
Marksilver1@cs.com

LCSW License: 069495-1
**Mitigation & Forensics**
**917-608-1346**

Re: NASEEM, HAFIZ

friends attended parties before graduation, he celebrated by his daughter's bedside (who had her surgery at the same time) so that the family could enjoy the day together. He says that he would sacrifice anything for his children and knowing that he is absent from their lives and helpless to assist them in their time of need has been the most painful experience of his life.

<u>Emotional Hardship for Danish and Maheen</u>

The children's lives would be permanently altered should Hafiz be incarcerated for an extended period. Children construct their world through the emotional, physical, instrumental, and informational supports that they perceive their primary caregivers offer them during critical stages of development. Danish and Maheen are at stages when their needs are both complex and fundamental and the sudden and perhaps permanent disruption of these needs can have quite far reaching effects on their healthy growth. The loss of their family structure or the systems that support them would be devastating at this stage of the children's development. Children who lose a parent face serious challenges in maintaining their developmental stride. The absence of a parent at a time when the children are trying to develop mastery and competence in the extra familial world can derail their achievements. This may in turn sabotage other developmental milestones during adolescence that the children must master. The children live in a healthy and safe home and the sudden absence of their beloved father or the community in which they have close ties would be very difficult to absorb and process.

Danish and Maheen care for and depend on both of their parents in a healthy and loving way and the continued absence of one or both parents would be emotionally devastating to the children. The emotional well-being of the children is at stake and their ability to navigate their world and develop in a healthy manner may be permanently destroyed. Danish and Maheen will feel less confident and their sense of self worth will be compromised if the family is divided. Such children often blame themselves for the losses they suffer.

Danish and Maheen love both of their parents very much and they wish to remain with their family intact in their home in New York. The children benefit greatly from living with loving and giving parents from whom they learn and gain their strength and confidence. They have developed in an emotionally and psychologically healthy manner because of the healthy structure of their home environment, which would be shattered if Hafiz is removed from their lives for any length of time.

Additionally, when only one parent is left to take care of the children that parent may become overwhelmed by the increased dependence and responsibility. This is particularly true when the second parent becomes saddled with unbearable financial and other responsibilities. Ayesha has been forthright in stating that she would be unable to

**Mark S. Silver MA, MSW, LCSW, PsyD, JD**
**30 Vesey St., Suite 100 NY NY 10007**
**Marksilver1@cs.com**

LCSW License: 069495-1
**Mitigation & Forensics**
**917-608-1346**

Re: NASEEM, HAFIZ

care for herself and the children, while also maintaining the home. Ayesha married straight out of high school, has never worked, has no professional skills, and has no idea how she will support her children without Hafiz.

Children who lose a parent risk a host of serious mental health problems, including sadness, depression, anxiety, loneliness, erratic behaviors, unstable moods, and interpersonal issues. Such mental health problems can cause irreparable harm to a child's emotional and psychological well-being and also prohibit the child from participating fully in his or her school programs and non-scholastic endeavors due to poor concentration and great personal distraction. Such mental health problems also tend to carry over into the child's adolescence and adulthood at which point repairing the deficits can be difficult if not impossible without significant interventions.

Education Issues

For Hafiz and Ayesha education is a crucial element in their lives. They understand the privileged opportunity their children possess to improve their lives, attain their goals, and achieve their employment choices through world-class education. If Ayesha took the children to Pakistan, the children would experience major educational losses. The children cannot read or write Urdu like their peers and their spoken language is not fluent and would cause them to be behind other children of the same age. This would further complicate the children's integration into the school system. Danish and Maheen are simply amazing students, and have the opportunity to make extremely important contributions to the United States. The children, and Danish in particular, are on the road to making important advances in their school work that will provide for them increased self-esteem and a direction that can lead toward professional careers after the completion of their secondary and post-secondary educations.

## X. EDUCATION, EMPLOYMENT, HOBBIES, & VOLUNTEER WORK

Education

In 1993, Hafiz graduated with distinction from the Engineering University of Lahore, a college that his father and brother also attended. From 1995 to 1997, Hafiz undertook a Masters of Business Administration in Management and Finance. On August 2, 2002 Hafiz began a graduate degree with a Masters of Business Administration at the Stern School of Business at New York University, which he completed in two years of full time studies. Hafiz notes that he was studious throughout his years at high school and college and he has achieved recognition through the Dean's List and National Scholarship awards.

**Mark S. Silver MA, MSW, LCSW, PsyD, JD**
**30 Vesey St., Suite 100 NY NY 10007**
**Marksilver1@cs.com**

**LCSW License: 069495-1**
**Mitigation & Forensics**
**917-608-1346**

Re: NASEEM, HAFIZ

<u>Employment</u>

From 1997 to 2002 Hafiz was employed at the American Express Bank for about five years where he specialized in heading a team for corporate investing banking clients and for commercial financial services. Hafiz also worked for an engineering consulting firm for the World Bank undertaking research projects to help understand and alleviate water condensation, water shortages, and other life savings matters particularly in agricultural regions of the Third World. In 2003, Hafiz was accepted to an internship for bond insurers at XLCA. From July 2004 until March 2006 Hafiz was employed at JP Morgan in a leveraged finance group. He then moved to Credit Swisse in oil and gas investment banking until his arrest in May 2007.

<u>Volunteer / Charity Work</u>

Hafiz reports that he has followed in his father's footsteps of giving back to the community through volunteer work and charity, the most salient are listed:

- In 1992 Pakistan experienced flooding on a far large scale than Katrina. Hafiz helped through disaster relief and establishing blood banks for emergency care.
- Hafiz reports that while blood drives are common in the United States they remain rare in Pakistan. While in college Hafiz established a very successful blood drive and awareness campaign after a friend was diagnosed with cancer and in time hospitals approached his group directly for supplementary blood supplies when running low. He says that he also organized symposiums to raise awareness.
- Hafiz reports that he tutored fellow students throughout high school and college without charge out of respect for his teachers and also to assist his peers who required scholastic assistance.
- Hafiz was directly involved in Third World Solutions, which focuses on micro financing projects.
- Hafiz greatly assisted the needy after the 2005 Pakistani earthquake through clothing drives, food shelters, housing, concert promotions for charity, free schooling, free medical care projects, and numerous other causes.
- There have been many other such instances, including assisting children at the hospital where Maheen was cared for.
- Hafiz has even served in arbitration for community matters.

**Mark S. Silver MA, MSW, LCSW, PsyD, JD**
30 Vesey St., Suite 100 NY NY 10007
Marksilver1@cs.com

LCSW License: 069495-1
Mitigation & Forensics
917-608-1346

Re: NASEEM, HAFIZ

## XI. PSYCHIATRIC & MEDICAL ISSUES

### Medical Issues

Hafiz has a history of high cholesterol which he believes has been exacerbated since incarceration. The physician at MCC has informed Hafiz that his cholesterol level is now dangerously high, and Hafiz has been prescribed medication to try to control it. Hafiz recognizes that he has often neglected his own health as he worked very long hours to support his wife and children in their needs.

### Drug Use

Hafiz did not have any history of any drug use. He did smoke about half a pack of cigarettes per day since age 16, but gave up smoking cold turkey in March 2007.

### Criminal History / Antisocial Behavior / Violence

Hafiz has no criminal history whatsoever, has no instances of antisocial behavior, and no history of violence, or other impulsive or dangerous actions to himself or others.

### Trauma: Depression & Anxiety

Hafiz denies chronic depression or anxiety, though recognizes that there have been discrete periods when he has felt rather helpless. Hafiz identified his mother's head injury accident, the death of his sister, the day his daughter was diagnosed with her neuromuscular disease, and his arrest in the present matter, as the times when he has felt most vulnerable and frightened, however says that he never felt truly alone given the mutual support between himself and his family members.

Chawdhry, Hafiz's father-in-law, describes Hafiz as a man who suffers from deep inner anxiety due to the illness of his mother and the death of his sister, both of which he took personally, perhaps because he was both the oldest child and son in the family. Chawdhry says that from the first moment he met Hafiz he felt Hafiz's deep sense of pain, grief, and agony, though Hafiz refused to burden others with his internal anguish. He believes that Hafiz experiences a kind of intense constant trauma that he carefully strains to balance as a way of living up to the personal values that he inherited from his father and mother. He says that in all the years that he has known Hafiz he has never encountered Hafiz to act in mean-hearted manner or otherwise harm anyone for any reason, but has been considerate and thoughtfully selfless towards family members and strangers. Chawdhry concluded that Hafiz is no less human than himself and can only conclude that these burdens have cost a huge personal toll on his health stability and inner mental strength.

**Mark S. Silver MA, MSW, LCSW, PsyD, JD**
30 Vesey St., Suite 100 NY NY 10007
Marksilver1@cs.com

LCSW License: 069495-1
Mitigation & Forensics
917-608-1346

Re: NASEEM, HAFIZ

Posttraumatic Stress Disorder

Posttraumatic Stress Disorder encompasses persons who have experienced, witnessed, or confronted events that involve actual or threatened harm to oneself or a loved one or when one's family members' safety or physical integrity are threatened. At such times, persons respond with fear, shock, and helplessness. Hafiz has indeed experienced several traumatic life events and at such moments he has redirected his focus towards long hours of study and / or work. The traumatic and unwanted memories remain indelibly branded such that the person is unable to forget or dismiss the memories which essentially become part of the person's life and greatly informs how he thinks and behaves. Hafiz reports efforts to avoid thoughts, feelings, and conversations associated with his life traumas and generally avoids the subjects at all costs, except when forced to revisit these very painful memories. While after trauma some persons act or feel as if the traumatic event were recurring, for Hafiz these traumas were not single event issues, but rather on-going realities that have greatly altered his life and well-being. He has been unable to avoid the realities of these traumas because every time he looks at his mother's vacant eyes, accepts that his family will forever miss his sister, or holds his crippled daughter the concrete trauma is literally in his hands and arms. While most persons who suffer trauma would generally attempt to persistently avoid stimuli associated with the trauma, Hafiz has no such option or choice and the places, people, and activities of his daily life in fact comprise the very trauma that he would wish never occurred. Hafiz has not had the luxury of being able to escape, deny, or otherwise re-direct his focus, but in fact has defined his life behaviors to cope with these tragedies.

Mental Status Exam

Hafiz Naseem is a 37-year-old man who appears his chronological age. He is alert, fully oriented, fully cooperative, and a good historian. He required considerable time to collect his thoughts and compose himself. He was appropriately dressed in prison garb, made good eye contact, and had no inappropriate movements. Hafiz was pleasant to speak with during the interviews and could clearly convey the depression and anxiety that he experienced both during his life and presently. Hafiz wishes to better understand the hardships in his life and its effects on his behaviors, thoughts, feelings, and decision-making ability.

Hafiz's speech is clear and coherent, though in a low tone. He says that his mood is generally fair with moderate anxiety, though admits that the criminal case has caused him great distress, as he fears for the future well-being of his children, wife, and elderly parents. Hafiz's affect was appropriate to context and he noted that he bites his fingernails when he is anxious. He says that he often prays for his and his family's future health and safety. His thoughts are clear and coherent. He denies suicidal or psychotic ideation. His insight and judgment are good.

**Mark S. Silver MA, MSW, LCSW, PsyD, JD**
**30 Vesey St., Suite 100 NY NY 10007**
**Marksilver1@cs.com**

**LCSW License: 069495-1**
**Mitigation & Forensics**
**917-608-1346**

---

Re: NASEEM, HAFIZ

Based on the foregoing interview, Hafiz's presentation is consistent with:
Axis I: R/O Depressive Disorder, NOS
         R/O Posttraumatic Stress Disorder
Axis II: Deferred
Axis III: See above
Axis IV: Psychosocial Issues: Family's Health, Criminal Matter


Mark S. Silver, MA, MSW, LCSW, PsyD, JD

Date: May 23, 2008

24

# EXHIBIT D



RESEARCH SERIES ON THE RECIDIVISM OF
FEDERAL GUIDELINE OFFENDERS

RELEASE 1

# MEASURING RECIDIVISM:
# THE CRIMINAL HISTORY COMPUTATION
# OF THE FEDERAL SENTENCING GUIDELINES

A COMPONENT OF THE
FIFTEEN YEAR REPORT
ON THE U.S. SENTENCING COMMISSION'S
LEGISLATIVE MANDATE



May 2004

**RUBEN CASTILLO**
*Vice Chair*

**WILLIAM K. SESSIONS, III**
*Vice Chair*

**JOHN R. STEER**
*Vice Chair*

**RICARDO H. HINOJOSA**
*Commissioner*

**MICHAEL E. HOROWITZ**
*Commissioner*

**MICHAEL E. O'NEILL**
*Commissioner*

**EDWARD F. REILLY, JR.**
*(Ex officio)*

**DEBORAH J. RHODES**
*(Ex officio)*

**Commission Staff**

Linda Drazga Maxfield
Miles Harer*
Timothy Drisko
Christine Kitchens
Sara Meacham

*while serving at the U.S. Sentencing Commission



When sentencing offenders under the guidelines, federal judges reference two axes of a sentencing table to determine the appropriate sentencing range (prior to consideration of a warranted departure). The vertical axis of the sentencing table contains 43 "offense levels" designed to quantify the seriousness of the instant offense. Along the horizontal axis lie six "criminal history categories" (CHCs) designed to quantify the extent and recency of an offender's past criminal behavior. The table cell in which the offense level and the criminal history level intersect displays the minimum and maximum number of months for an offender's recommended sentence.

Inherent in using the horizontal axis of the sentencing table is the notion that prior criminal behavior warrants incremental punishments: the more extensive an offender's criminal history, the harsher the sentence should be. This notion is formally justified in terms of culpability (just punishment), deterrence, incapacitation, and limited rehabilitation potential.[1] The Commission recognizes the importance of measuring accurately such prior criminal behavior and future recidivism risk, thus improving the goals of crime control.[2]

In developing the guidelines' Chapter Four criminal history component, the first U.S. Sentencing Commissioners evaluated several preexisting prediction tools. Due to pressing congressional deadlines, the guidelines' criminal history measure did not emanate from its own direct empirical evidence. Instead, the chosen criminal history instrument combined elements from the already validated U.S. Parole Commission's "Salient Factor Score" and the "Proposed Inslaw Scale."[3] It was reasoned that the Salient Factor Score's high predictive power would transfer, at least in part, to the nascent guidelines' criminal history measure. While the new guidelines' criminal history measure combined elements of the preexisting Salient Factor Score and the Proposed Inslaw Scale, it also added elements aimed at achieving philosophical and practical concerns specific to sentencing federal defendants. The Sentencing Commission currently uses the criminal history measure as a tool to measure offender culpability, to deter criminal conduct, and to protect the public from further crimes of the defendant.[4]

Since the time the sentencing Guidelines Manual was first released, the introductory section

---

[1]USSG Ch. 4, Pt. A, intro. comment. The U.S. Sentencing Commission, 1987, 4, cites the U.S. Supreme Court ruling in *Graham v. West Virginia*, 224 U.S. 616,623 (1912) that states "the repetition of criminal conduct aggravates the guilt and justifies heavier penalties when they are again convicted."

[2]U.S. Sentencing Commission, 1987, 41.

[3]U.S. Sentencing Commission, 1987, 43; Hoffman and Beck 1997, 1.

[4]USSG Ch. 4, Pt. A, intro. comment

of Chapter Four has always stated that in order to protect society from known criminals, the criminal history measure should take into account *culpability* (i.e., harsher punishments for offenders with aggravated prior criminal backgrounds) and *recidivism* (i.e., the likelihood of re-offending). Furthermore, the way in which the sentencing guidelines account for culpability and recidivism should be "consistent with the extant empirical research" and should incorporate "additional data insofar as they become available in the future."[5]  The Commission's intention to follow these directions is reflected in its early research agenda, as well as in staff resources spent on preliminary recidivism projects conducted in the early years of the Sentencing Commission.[6]

In fact, however, a delay in beginning a vigorous validity test of the criminal history measure was unavoidable.  Such a project had to await the simple passage of time.  In order to conduct a recidivism study, enough federal offenders would have to be convicted and then released to the community.  Once released, a research design requires that offenders sentenced under the guidelines be in the community and at risk of recidivating for a follow-up period of several years.

As such, a fair assessment of the guidelines' new criminal history measure would require time: time for the guidelines to adjust to its early constitutional/legal challenges, time for judges to become familiar with the guideline process, time for the stabilization of a system of data collection from district courts, and time for adequate observation periods to elapse so that offenders with prison sentences as long as five years would have been released into the community for at least two years. Nonetheless, even given these necessary time requirements, the delayed validation of the criminal history measure generated concern among judicial personnel and sentencing practitioners that the criminal history measure might not accurately reflect recidivism risk, may be too complex to apply correctly, fail to reflect differences in past criminal behavior among federal offenders, and sustain disparate sentencing practices the Sentencing Reform Act aimed to diminish.[7]

This report serves as a "performance review" of criminal history's predictive ability.  Much like performance reviews for employees, the performance review of the criminal history measure includes a discussion of areas where performance is in need of improvement, is satisfactory, or is exceeding expectations.  As such, it assesses the predictive power of the criminal history measure, determining whether it predicts better than random chance, and, if so, by *how much*.  Emanating from this performance analysis, the reports in the recidivism project series examine the recidivism contributions of current criminal history components and suggest modifications or changes to improve predictive accuracy.

Using data collected from guideline federal offenders sentenced in fiscal year 1992, the current study examines in detail the predictive statistical power of the criminal history measure, responds to the Sentencing Commission's initial intentions, fills the void of empirical evidence about the criminal history measure, and addresses current criticisms of the CHC.

---

[5]Ibid.

[6]Betsey, 1989; Swenson, 1990; Wilkins, 1990; Schmidt and Garner, 1991.

[7]Hoffman and Beck 1997, 192.

## A. The Recidivism Project

The recidivism study data are composed of a stratified, random sample of 6,062 U.S. citizens[8] who were sentenced under the federal sentencing guidelines in fiscal year 1992.[9] Data on criminal behavior prior to the federal instant offense, as well as demographic and offender characteristics, were collected from the federal pre-sentence reports (PSRs) and other court documents submitted to the Sentencing Commission by U.S. district courts. Prison release date information was extracted from the SENTRY datafile of the Federal Bureau of Prisons in the U.S. Department of Justice. Recidivism information was obtained from the "RAP" sheet data of the Federal Bureau of Investigation's Criminal Justice Information Services Division office.

The sample of offenders in the recidivism analysis represents the total 28,519 sentenced federal citizen offenders in the Commission's fiscal year 1992 datafile where the following "two year window inclusion" conditions were met:

- a pre-sentence report (PSR) from a fiscal year 1992 sentencing was submitted to the Sentencing Commission;

- a "RAP" sheet was located on the FBI datafile; and

- for offenders receiving prison sentences, the release from prison occurred at least two years prior to June 1, 2001.

Given the project schedule for "RAP" sheet data collection in October 2001, an offender had to have been released from prison by June 1, 1999. Because the sampled offenders were sentenced in fiscal year 1992 (i.e., between October 1, 1991 and September 30, 1992), prison sentences as long as seven years are available for study.[10] The selection of these specific dates reflects the Commission's specific interest in recidivism impacts of mandatory minimum sentences. The effect of five year mandatory minimum sentences can be analyzed using the project's sampling strategy.

With the recidivism study's prison release deadline established as June 1, 2001, there were

---

[8] Due to alien deportation following conviction for criminal behavior, it is difficult to measure recidivism of noncitizens convicted of federal crimes. A companion report in this recidivism project series, "Recidivism of Fiscal Year 1995 Noncitizen Federal Offenders," addresses citizenship issues in recidivism research.

[9] Details on the structure, methodology, and statistical techniques of the analysis are documented in the project's companion report, "Background and Methodology of the U.S. Sentencing Commission's 2003 Recidivism Study."

[10] While the two year recidivism follow-up period limit was set at June 1, 2001, the actual collection of FBI "RAP" sheet data did not occur until October 2001. The four month delay between June and October assured that "RAP" sheet data would reflect all events prior to June 1. The intervening months accounted for administrative processing time to update fingerprint card information on the FBI datafile, thus minimizing any potential bias due to the states' differential schedules for reporting data to the FBI.

offenders in the sample who either were still in prison on this date, or had at this time been released from prison for less than two years. Exhibit 1 illustrates the impact of the study definition on offender inclusion in the study. For the entire recidivism sample, 9.3 percent of sample offenders are not in the analysis because they had not finished serving their prison time.[11] In addition, for the entire recidivism sample, an additional 5.4 percent were released from their prison terms but did not have a two year "at risk" window of recidivism opportunity by June 1, 2001. Even with these limitations, however, 85.3 percent of the total recidivism sample is included in the analysis reported here. Not included in the analysis are those offenders with sentences roughly longer than seven years who are disproportionately found in the higher CHCs, particularly CHC VI.[12]

## B. Recidivism Definitions

Recidivism results are presented using two substantive definitions. The first, or "primary," definition includes the first occurring of any one of the following three types of events during the offender's initial two years back in the community:

- a re-conviction for a new offense;

- a re-arrest with no conviction disposition information available on the post-release criminal history record;[13] or

- a supervision revocation (probation or post prison supervision).

The second "re-conviction only" recidivism definition limits the recidivism definition to re-conviction events during the two year follow-up period. As such, under this secondary definition, recidivism is measured as the first occurring re-conviction for a new offense during the initial two years back in the community.

The use of two different recidivism definitions addresses the state of post-release criminal behavior records. The recidivism literature recognizes that the FBI offender "RAP" sheets are the most accurate and readily available data source for repeat criminal behavior. However, "RAP" sheets can contain errors or partial information. For example, "RAP" sheets only contain information on offenses for which offender fingerprints were obtained. Additionally, depending on the reporting policies and practices of local jurisdictions, arrest dispositions may not always be transferred to the FBI for inclusion on "RAP" sheets. "RAP" sheets will under report actual criminal

---

[11]This figure represents the sum of the sample offenders who by June 1, 2001, were still in prison (8.9%) or who had died (0.4%).

[12]The percentage of offenders in each CHC who were released from prison and met the two year window inclusion conditions are: CHC I–91.3 percent; CHC II–85.6 percent; CHC III–83.7 percent; CHC IV–80.9 percent; CHC V–73.8 percent; and CHC VI–49.6 percent.

[13]Disposition information was obtained from the FBI's criminal history record ("RAP sheet").

behavior, and will under report convictions resulting from arrests. For this reason, recidivism studies (including all of the Commission's previous recidivism study reports) commonly cite recidivism rates separately for what is termed here the "primary" and "re-conviction" definitions. However, these same studies also argue that, compared to the "re-conviction" definition, the "primary" recidivism definition is a more reliable and valid measure for the probability of actual re-offending because of its inclusiveness and its high association with actual re-offending.[14] Also, because these two definitions are strongly correlated, the research findings resulting from analyses using the two definitions are similar and lead to nearly identical conclusions, although the magnitude of their comparative findings differs.

## C. Methodology

In this study, three techniques are used to analyze recidivism rates of federal offenders. The three techniques are tabular analysis, area measurement under the receiver operating characteristic curve, and survival analysis with hazard modeling. All three are accepted methods for evaluating recidivism. By using all three methods, the Commission is able to show the degree to which the criminal history components predict recidivism.[15]

Tabular analyses provide "yes" or "no" rates of recidivism for offender characteristics. For example, exhibits in this report compare recidivism rates across many characteristics, such as gender (male rates versus female rates) or educational level (those without high school diplomas, those graduating high school, or those with college). Tabular analyses permit straightforward comparison between characteristics, but can be misleading. They do not provide information about intervening influences that may in fact mitigate or enhance an association. For example, if offenders of one race are more likely to finish high school than are offenders of another race, the confounding effects of race and level of education cannot be separated from a tabular analysis. In essence, tabular analyses cannot claim that race determines or causes the educational achievement. Tabular analyses simply show whether offenders of a particular race are more likely to finish high school. In other words, tabular analyses do not explain *why* some people of a particular race are more likely to finish high school.

Measuring the area under the curve (AUC)[16] is an established technique associated with receiver operating characteristic curve analysis. It provides the probability that the offender's prior criminal history is able to predict who does recidivate and who does not. The AUC statistic ranges from a value of 0.5 (indicating no predictive power for recidivism) to a value of 1.0 (indicating 100

---

[14]Spohn and Holleran, 2002. The methodological arguments supporting various empirical definitions of recidivism are contained in the companion project report, "Background and Methodology of the U.S. Sentencing Commission's 2003 Recidivism Study."

[15]Quinsey, Harris, Rice, and Cormier, 1998; Swets, Dawes, and Monahan, 2000.

[16]The AUC methodology is summarized in Appendix A, with a detailed explanation in the project's companion report, "Background and Methodology of the U.S. Sentencing Commission's 2003 Recidivism Study."

percent accuracy in predicting recidivism). The greater the AUC statistics, the better is the predictive power of the prior criminal history model.

The third method used to evaluate recidivism in this study, survival analysis,[17] makes a further important contribution. Survival analysis measures the ability of criminal history to predict how rapidly offenders recidivate during a follow-up period. An important strength of survival analysis is its ability to incorporate explanatory variables into the prediction model, thus measuring the statistical significance of their independent effects on recidivism.

The analysis below uses all three of these methodological techniques to present and evaluate the current predictive power of the guidelines' current Criminal History Category (CHC) and criminal history point measures.

## D. Recidivism Prediction Results

The sections below present the recidivism prediction statistics for the guideline criminal history measures. The analysis uses recidivism data tabulations, survival analysis, and AUC outcomes for both the CHC and criminal history point measures. Exhibits 2 through 8 cited in this section appear at the end of the report.

### 1. Criminal History Category

Exhibit 2 (located at the end of the report) presents the guidelines' recidivism rates by CHC for both the primary and re-conviction recidivism definitions. The sidebar graphic to the right displays the numerical data of Exhibit 2 for the primary recidivism definition. Recidivism risk increases with each CHC: guideline offenders in higher CHCs are more likely to re-offend within two years of release from prison or upon entering probation status. Under the primary recidivism measure, offenders in CHC I have a substantially lower risk of recidivating within two years (13.8%) than do offenders in CHC VI (55.2%).



**Percent Recidivating Within Two-Years (Primary Definition), by Criminal History Category**

Recidivism Sample 2003

SOURCE: U.S. Sentencing Commission, FY1992 Recidivism Sample (U.S. citizens), 2003, weighted data.

---

[17]The survival (or hazard modeling) methodology is summarized in Appendix B, with a detailed explanation in the project's companion report, "Background and Methodology of the U.S. Sentencing Commission's 2003 Recidivism Study."