

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*
*New York, New York 10007*

May 29, 2008

By Hand Delivery and ECF

The Honorable Robert P. Patterson
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

      Re:  <u>United States v. Hafiz Naseem</u>,
            S1 07 Cr. 610 (RMB)

Dear Judge Patterson:

      The Government respectfully submits this letter in opposition to defendant Hafiz Naseem's sentencing memorandum, dated, May 23, 2008. The defendant is scheduled to be sentenced on May 30, 2008, at 2:00 p.m.

      Naseem challenges the computation of his Guidelines range of 97 to 121 months' imprisonment, as calculated by the Probation Department (Presentence Investigation Report ("PSR") ¶¶ 69-78), on grounds that the Probation Department improperly attributed a two-level enhancement for abuse of trust. (Br. 3). Naseem also moves for a downward departure from the applicable Guidelines Range both on grounds that he did not reap any financial benefit and based on his claim of extraordinary family circumstances. (Br. 2). Finally, Naseem argues that the factors set forth under Title 18, United States Code, Section 3553(a) militate in favor of a more lenient sentence than one falling within the advisory Guidelines range. (Br. 2).

      For the reasons set forth below, the Court should adopt the Guidelines calculations set forth in the PSR and reject Naseem's motions for a downward departure and non-Guidelines sentence.

**PROCEDURAL BACKGROUND**

On or about November 20, 2007, Indictment S1 07 Cr. 610 (RPP) was filed in twenty-nine counts, charging the defendant and a co-conspirator, Ajaz Rahim, with: (i) conspiracy to commit securities fraud, in violation of Title 18, United States Code, § 371 (Count One), and (ii) twenty eight counts of substantive securities fraud, in violation of Title 15, United States Code, § 78j(b) and 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2.  (PSR ¶¶ 1-3).  Trial commenced on January 14, 2008. On February 4, 2008, the defendant was convicted, by a jury, of all counts in the Indictment.  (PSR ¶ 6).

**THE OFFENSE CONDUCT**

**A.    The J.P. Morgan/Chase Conduct**

From approximately September 2005 through March 2006, the defendant stole confidential information from J.P. Morgan Chase ("JP Morgan") and its clients regarding potential transactions in at least eight publicly traded companies at the time: Northwestern Corporation;[1] Huntsman Corporation; Aramark Corporation; Education Management Corporation; Alliance Data Systems; K2 Inc.; Computer Science Systems; and Engineered Support Systems.  Naseem then passed that information to Rahim, who traded on this information in an offshore account in Bahrain. (PSR ¶ 20).  The JP Morgan conspiracy formed the backdrop to the charged conspiracy, which occurred during 2006 and 2007 while the defendant worked at Credit Suisse Securities, and serves to explain the circumstances under which Naseem began to engage in insider trading almost immediately upon commencing employment at Credit Suisse.

While at JP Morgan, Naseem began to conspire with Rahim around the time Naseem received a poor review in late July 2005.[2]

---

[1]    As discussed further below, Naseem and Rahim continued to engage in insider trading in the securities of Northwestern Corporation after Naseem began working at Credit Suisse in connection with a potential acquisition of Northwestern Corporation by another company.

[2]    The Government learned of Naseem's poor 2005 mid-year review from a witness during its preparation for trial.  The

Indeed, in late July 2005, Anis Uddin Sheikh, a mutual friend of both Naseem and Rahim, provided Rahim's telephone numbers to Naseem via e-mail.[3]  (GX 14).  Shortly after receiving this e-mail from Sheikh, Naseem began calling Rahim (GX 1202) and Rahim began trading on inside information during the fall of 2005.  (As explained below, the evidence reflects that Sheikh later became involved in funneling insider trading profits from Rahim to Naseem.)

The evidence demonstrated at trial that, starting in or about September 2005, JP Morgan was engaged to advise and finance a potential acquisition of Northwestern Corporation by AES corp. (Tr. 1683).  Naseem was *assigned to work on this transaction* and accordingly came into possession of material, nonpublic information relating to this transaction.  (Tr. 1488-93, 1499). Starting in early October 2005, minutes after speaking with Naseem over the telephone, Rahim traded in the securities of Northwestern Corporation, over and over again—starting a pattern of telephone calls between Naseem and Rahim, and subsequent trading by Rahim in multiple different securities over an eighteen month period.

During the course of his employment at JP Morgan, Naseem had access to inside information relating to the following additional transactions by virtue of his position as an investment banker in the Syndicated and Leveraged Finance Group: Aramark Corporation; Education Management Corporation; Alliance Data Systems; K2 Inc.; Computer Science Systems; and Engineered Support Systems.  All of these companies were involved in transactions for which JP Morgan had been engaged as an advisor. (GXs 1900, 1904, 1905, 1906, 1907, 1908, 1909, 1911).  As demonstrated through evidence introduced at trial, from in or

---

Government never called this witness to testify.  However, Government Exhibit 1912, which indicates that Naseem's year end 2005 review reflected that he "needs improvement" corroborates what the Government learned about his mid-year review.

[3]    The evidence at trial demonstrated that Naseem and Rahim had a longstanding relationship dating back to when they worked together at American Express Bank in Pakistan, where, incidentally, Sheikh worked as well.  The evidence further showed that during 2004 and early 2005, prior to when Sheikh provided Naseem with Rahim's telephone numbers, Naseem and Rahim communicated by e-mail periodically.

about October 2005 through in or about February 2006, Rahim
traded in the securities of each of the aforementioned target
companies, often within minutes or hours of speaking to Naseem by
telephone.[4]

## B.    The Charged Conspiracy

In or about March 2006, Naseem left JP Morgan and began
working at Credit Suisse Securities.  Almost immediately upon
joining Credit Suisse, Naseem began to pass inside information
about Credit Suisse merger and acquisition deals, to Rahim, who,
in turn, traded in the securities of the respective target
companies.  The scheme followed a similar pattern to the one
Naseem and Rahim established while Naseem worked at JP Morgan.
According to the evidence adduced at trial, Naseem and Rahim
conspired to trade, based on material non-public information, in
the securities of the following nine publicly traded companies
while Naseem was employed at Credit Suisse: Northwestern
Corporation; Energy Partners, Ltd; Veritas DGC Inc.; Jacuzzi
Brands, Inc.; Trammell Crow Co.; Hydril Company; Caremark RX;
John Harland Co.; and TXU Corp.  (PSR ¶ 25).

Credit Suisse advised either the target company or the
potential acquiror on transactions involving each one of these
companies.  Moreover, the evidence at trial demonstrated that
Naseem accessed scores of confidential documents relating to
these transactions despite the fact that he was not assigned to
work on a single one of these transactions.[5]  (PSR ¶ 27).  Naseem
accessed these documents principally through the "Docs Open"
system, and, on occasion, through the "shared drive." (PSR ¶ 27).
In addition, as Harris Ziskroit testified, Naseem was observed
rummaging through papers on the desks of Credit Suisse analysts.
(Tr. 450; PSR ¶ 27).

---

[4]     Should the Court wish it to do so, the Government can
provide the Court with summary charts it had prepared and
submitted to the Court in support of a motion it had filed
seeking to offer the JP Morgan evidence during trial.

[5]     In connection with the TXU transaction, Credit Suisse
implemented additional security measures which precluded access
to various deal documents.  Naseem not only successfully accessed
certain TXU documents, but repeatedly attempted to access
documents to which he was denied access.

Rahim traded in the securities of each of the target companies, often, just minutes after speaking to Naseem over the telephone.  Rahim executed trades through offshore accounts, located in Bahrain (the Merrill Lynch account) and Guernsey (the numbered Bank Julius Baer accounts of Rahim and his wife).  (Gxs 1392, 1412, 1439).

Rahim and Naseem worked in tandem to monitor the progress of these deals.  Thus, Rahim typically acquired substantial long positions in these securities just weeks or even days prior to their public announcements.  Also, Naseem repeatedly accessed documents relating to these transactions, often until just before their public announcement, obviously for the purpose of keeping Rahim apprized about recent developments. Then, upon the public announcement of these deals, Rahim would dump his entire position at huge profits.

Ultimately, the defendants' illicit profits from the charged scheme totaled nearly $8 million.

## C.   The Unraveling Of The Scheme

On or about Friday, February 23, 2007, Rahim purchased approximately $1 million of TXU options, which he sold on Monday, February 26, 2007, for over $6 million.  (PSR ¶ 69).  Following this transaction, Naseem stopped talking to Rahim on his Credit Suisse phone.  Instead, Naseem continued to speak to Rahim, but did so through an international calling service called Click-2-Dial instead of on his Credit Suisse phone.  (PSR ¶ 60). Furthermore, this options trade prompted regulators to obtain a "freeze order" pursuant to which Bank Julius Baer froze Rahim's assets in the Guernsey accounts belonging to Rahim and his wife. Shortly thereafter, in March 2007, Rahim wired illicit trading proceeds amounting to approximately $2.7 from his Merrill Lynch account to Pakistan.[6]  (PSR ¶ 61).

In April 2007, Naseem suddenly and without much forewarning, informed his co-workers and supervisors that he needed to travel immediately to Pakistan.  Naseem told his colleagues that he needed to attend to his mother who was about

---

[6]     Unlike the circumstances surrounding the Guernsey accounts, regulators had not identified and frozen Rahim's Merrill Lynch account in time to prevent him from wiring illicit proceeds out of that account.

to have surgery, and that his father was incapable of doing
certain things without him.  Before departing alone, Naseem spoke
with Rahim through the Click-2-Dial service, and Naseem made an
inquiry "on behalf of a friend" to move a family from Rye, New
York (where Naseem was living) to Naseem's hometown in Pakistan.
Notably, Naseem's wife and children departed after Naseem had
already left for Pakistan, and they traveled on a long,
international overseas flight without the assistance of Naseem.
(During the trial, the Government provided the Court with a copy
of Naseem's e-mail exchange with the company that provides
assistance for moving household goods overseas.  Should Naseem
contest the authenticity of the business documents, the
Government respectfully requests the opportunity to call the
company representative who spoke with Naseem about transporting a
family's household items from Rye, New York, to Lahore,
Pakistan.)  When Naseem returned to the United States, on or
about May 3, 2007, he was arrested.  (PSR ¶ 63).

## D.    The Defendant's Profits From The Scheme

Based on Naseem's account statements from JP Morgan
Chase Bank and wire transfer documents from American Express
Bank, it is undisputed that Naseem received nearly $200,000 in
wire transfers from four individuals during a several month
period starting on or about August 24, 2006 and ending on or
about January 12, 2007.[7]  Based on these documents, it is further
undisputed that the individuals who transferred this money to
Naseem were Ateeq Ahmed a/k/a Arjumand Ateeq a/k/a Haris Ahmed,
Anis Uddin Sheikh a/k/a Anis Ud-Din Shiekh a/k/a Sheikh Anis,
Melissa Ikram, and Syed Irshad Shah.  It is undisputed that these
individuals were in Pakistan at the time of the wire transfers at
the same time that Naseem's co-defendant Rahim was in Pakistan.
It is also undisputed that none of these individuals are members
of Naseem's family in Pakistan.

_____

[7]    These documents were not introduced at trial but were
produced to the Honorable Richard M. Berman and the defendant
prior to trial.  Although Naseem objected to their admission at
trial on multiple grounds, including relevance, Judge Berman
ruled that they were admissible.  During trial, the Government
decided that Naseem's culpability in the insider trading scheme
was sufficiently demonstrated such that it was unnecessary to
introduce the wire transfers into evidence.

6

Given that between $5,000,000 and $6,000,000 of the illegal profits from the scheme were earned by Rahim and Naseem after January 12, 2007, the nearly $200,000 in wire transfers constituted at least 10% of the profits that were made from Naseem's and Rahim's illegal insider trading scheme during the time period when Naseem received this money. Moreover, over $100,000 in wire transfers – more than half of the total – was provided by Anis Uddin Sheikh, the same individual who provided Naseem with Rahim's telephone numbers in July 2005, while Naseem was still at JP Morgan.

There is a strong inference that the wire transfers Naseem received during the latter part of 2006 constituted payment for illegal tips he had provided to Rahim. These wire transfers not only occurred during the period of the conspiracy, and were sent by four individuals who were not part of Naseem's family, but the bulk of the money was provided by Anis Uddin Sheikh, the very individual who e-mailed Rahim's telephone numbers to Naseem at or about the time Rahim and Naseem first began to conspire together at JP Morgan.

In addition to the nearly $200,000 in wire transfer payments, the evidence indicates that Naseem would have received substantial additional payments had the conspiracy not been foiled. In fact, most of the illicit profits from the scheme resulted from Rahim's trading in January and February 2007. These funds, which were maintained in the Guernsey accounts that belonged to Rahim and his wife were frozen by the authorities in March 2007. Obviously, neither Rahim nor Naseem were able to share in these profits, which were seized shortly after they were generated.[8] It stands to reason that, had these funds not been seized, Naseem would have received additional payments for enabling Rahim to earn these extraordinary profits. Indeed, it is utterly implausible to believe that Naseem repeatedly accessed scores of confidential deal documents, risked his career by stealing inside information, and tipped Rahim over a period of a

---

[8]    In addition, in or about March 2007, Rahim managed to wire approximately $2.7 million of proceeds from the crime to Pakistan before authorities could restrain those funds. Shortly thereafter, Naseem traveled to Pakistan, where he met with Rahim. Based on their relationship, the insider trading scheme, and other evidence, the Government believes that there is a fair inference to be drawn that Naseem met Rahim in Pakistan, and Naseem received part of the illegal trading proceeds.

year and a half, only to benefit Rahim alone and not himself.

**ARGUMENT**

**A.    The Probation Department Correctly
       Calculated The Applicable Guidelines Range**

      The PSR provides for a two-level enhancement based on the defendant's role in the offense, pursuant to which the defendant abused a position of special trust under U.S.S.G. § 3B1.3. (PSR ¶ 72). Naseem objects to the application of this enhancement on grounds that the enhancement applies only to defendants who abuse a position of "special" trust, which excludes himself. Naseem claims that this enhancement necessarily depends on something beyond the duty breach inherent in any insider trading conviction. (Br. 16). The defendant then distinguishes himself from the examples set forth in the application note to U.S.S.G. § 2B1.4 of a corporate president or an attorney who misused information regarding a planned but announced takeover. (Br. 16). Instead, Naseem claims that as a junior investment banker, his position was more akin to that of a secretary or other employee who could have breached a duty to the firm without abusing a position of special trust. (Br. 16). For the reasons set forth below, these claims are unavailing.

**1.    Applicable Legal Principles**

      U.S.S.G. § 3B1.3 provides, in relevant part, that:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.

U.S.S.G. § 3B1.3. Section 3B1.3 further provides, in relevant part, as follows:

> "Private trust" refers to a position of . . . private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are

8

primarily non-discretionary in nature."

U.S.S.G. § 3B1.3, cmt. n. 1.  Examples of when this adjustment applies include "an embezzlement of a client's funds by an attorney serving as a guardian" and "a bank executive's fraudulent loan scheme."  *Id.*

The term "special skill" refers "to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing.  Examples would include pilots, lawyers, doctors, accountants, chemists and demolition experts."  U.S.S.G. § 3B1.3, cmt. n.4.

U.S.S.G. § 2B1.4 provides, in relevant part, as follows:

> Section 3B1.3 (Abuse of Position of Trust or Use of Special Skill) should be applied only if the defendant occupied and abused a position of special trust.  Examples might include a corporate president or an attorney who misused information regarding a planned but unannounced takeover attempt.  It typically would not apply to an ordinary "tippee."

U.S.S.G. § 2B1.4, cmt. n.1.

## 2.  Discussion

The abuse of trust enhancement applies squarely to Naseem's role in the charged offenses.  Naseem's conduct was analogous to "an attorney who misused information regarding a planned but unannounced takeover attempt."  Indeed, as an investment banker, Naseem operated as a financial adviser on highly sensitive transactions.  Like other investment bankers, Naseem received extensive compliance training and was required to certify that he had received such training and that he understood the sensitive and confidential nature of the inside information he received.  Naseem's obligation to maintain the confidentiality of Credit Suisse inside information extended to *all* confidential information Naseem obtained during the course of his employment at Credit Suisse.  Moreover, Naseem specifically acknowledged the position of special trust he occupied as a Credit Suisse investment banker.

The defendant concedes that had he worked on any of the deals in question, the abuse of trust enhancement would apply. (Br. 16). However, the defendant claims that because he was not assigned to these deals, his position was more akin to that of a secretary or other employee as opposed to an employee invested with a "special trust."

This argument is specious. The very nature of the defendant's position as an investment banker caused Credit Suisse to invest him with a special trust. Investment bankers, unlike Credit Suisse employees who worked in other departments such as sales/trading and research, were located in a separate area, apart from other employees, specifically because investment bankers came into contact with inside information – in other words, because they, unlike other employees, were invested with the special trust of keeping inside information confidential, *including inside information relating to deals on which they did not work.*

Furthermore, as an investment banker, Naseem had access to Credit Suisse's "docs open" management system, as well as various shared drives, including the Energy Group shared drive, the M&A shared drive, and the Financial Sponsors shared drive. Indeed, Naseem made special requests to access certain shared drives. As reflected by the testimony during the trial, many bankers at Credit Suisse did not have access to the share drives that Naseem was able to view even though they worked in the same division. Also, as an investment banker, Naseem, unlike non-investment banking employees, shared printers and fax machines with, and worked in very close proximity to, other bankers, which inevitably exposed him to, or at least risked exposing him to, inside information pertaining to deals on which he was not working. Accordingly, Naseem's position as an investment banker was clearly one that endowed him with a special trust that he abused in a most egregious fashion.[9]

---

[9]    Not only did Naseem occupy a position of special trust but, like an accountant, he employed a special skill. Naseem was a financial adviser, who performed financial spreadsheet analyses of potential mergers and acquisitions transactions. This skill enabled Naseem to not only pilfer confidential information, but to monitor the progress of the deals in question, and to comprehend the significance of the documents he accessed more completely than would have otherwise been possible. Consequently, the abuse of trust enhancement should apply in this

In addition, the Eighth Circuit's opinion in *United States* v. *O'Hagan*, 139 F.3d 641, 656 (8th Cir. 1998), which the defendant cites in support of his claim, more aptly buttresses the Government's position, as opposed to that of the defense. O'Hagan was an attorney who worked at the law firm of Dorsey & Whitney. One of O'Hagan's partners at the firm – an attorney named Thomas Tinkham – was representing a company, Grand Met, that was considering making a tender offer for another company, Pillsbury. O'Hagan initiated a conversation with his partner, Tinkham, and asked whether the firm was doing work on a takeover of Pillsbury. Tinkham acknowledged that the firm was, indeed, working on such a takeover and then sought input from O'Hagan regarding whether the firm should represent a client interested in making a tender offer for a local company. *O'Hagan*, 139 F.3d at 648.

In holding that the abuse of trust enhancement, the Eighth Circuit noted that O'Hagan was a senior partner at Dorsey & Whitney and that it was his status as a senior partner that gave him access to his partner, Mr. Tinkham, and enabled him to broach the subject of the Pillsbury takeover. The Eighth Circuit further noted that O'Hagan's position as a partner at the firm that contributed to Mr. Tinkham's willingness to confide in him that Tinkham was, in fact, working for a client who was trying to take over Pillsbury. Here, it was Naseem's position as an investment banker that enabled him to obtain access to the docs open system and the shared drives for the Mergers and Acquisitions, Global Energy, and Financial Sponsors groups. Concededly, the mechanism by which Naseem accessed the inside information in question – via the firm's computer network – differed from the manner by which O'Hagan accessed inside information. However, in this case, as in *O'Hagan*, it was Naseem's position in Credit Suisse's Investment Banking Division that enabled him to access the inside information. Thus, Naseem, like O'Hagan, abused a position of special trust.

Certainly Naseem's circumstances were distinguishable from those of his co-conspirator Rahim, who did not work at Credit Suisse, did not purloin inside information, and, arguably, did not abuse a position of special trust. In fact, U.S.S.G. §

---

case not only on grounds that Naseem abused a position of special trust, but also on the independent basis that Naseem "used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3.

2B1.4 specifically distinguishes the circumstances of a tippee from those of a tipper, stating that the abuse of trust enhancement under Section 3B1.3 "typically would not apply to an ordinary 'tippee.'"  U.S.S.G. § 2B1.4, cmt. n.1.  This very distinction between Naseem's circumstances and those of his co-conspirator further supports the application of this enhancement to Naseem.

Finally, Naseem *did*, in fact, work on a transaction involving Northwestern Corporation while employed at JP Morgan with respect to which he provided inside information to Rahim, who traded, based on that information in October 2005.  Although Naseem was not assigned to work on the Northwestern Corporation transaction in which Credit Suisse was involved during 2006, Naseem's abuse of JP Morgan's trust further militates in favor of applying the two-level abuse of trust enhancement.  Naseem's JP Morgan conduct was part of the same course of conduct as the charged offenses and therefore constitutes relevant conduct which should be considered in determining Naseem's specific offense characteristics.  *See* U.S.S.G. § 1B1.3(a).

For the reasons set forth above, the Court should adopt the Guidelines calculation set forth in the PSR, which includes a two-level enhancement for abuse of trust pursuant to U.S.S.G. § 3B1.3.

## B.  Naseem's Motion For A Downward Departure Based On His Claim Of Not Profiting From The Scheme Should Be Denied

Naseem also moves for a downward departure, under U.S.S.G. § 5K2.0(a), based on his claim that "there is no evidence of any gain by the defendant."  (Br. 17-18).  Naseem argues that his failure to profit from the crime constitutes a mitigating circumstance and that the 20 level enhancement resulting from Rahim's gain constitutes an aggravating circumstance, both of which were not adequately considered by the Sentencing Commission.  (Br. 18).  For the reasons set forth below, this claim is both factually and legally baseless.  Consequently, the Court should deny Naseem's motion for a downward departure under Section 5K2.0(a).

1.      **Naseem Engaged In Scheme For Gain,**
        **And Naseem Received Illegal Proceeds**

        As an initial matter, as discussed above, Naseem's
claim is factually baseless because there is substantial evidence
of gain by the defendant as a result of the insider trading
scheme.  The defendant received nearly $200,000 in wire transfer
payments during the course of the conspiracy.  These funds
constituted approximately 10% of the profits earned from the
scheme as of the approximate date on which the last wire transfer
payment was made.  In addition, over half of the $200,000 was
wired to Naseem by Anis Uddin Sheikh, the individual who provided
Naseem with Rahim's telephone numbers just before the JP Morgan
conspiracy was implemented.  Furthermore, the individuals who
wired these payments to Naseem, including Sheikh, are not his
family members, and were all located in Pakistan, as was Rahim,
at the time the payments were made.

        Prior to the initial trial in this matter before Judge
Berman, Naseem moved, *in limine*, to preclude the Government from
introducing evidence of the wire transfers.  In support of his
motion to preclude, Naseem filed an affidavit with the Court in
which Naseem's father attested that the wire transfers were
transferred to Naseem from his father and were raised through
legitimate sources.[10]  (Naseem claimed that his father and family
were wealthy in Pakistan, as he repeatedly bragged to co-workers
and colleagues at Credit Suisse in an attempt to explain how he
was able to purchase and collect multiple (over 10) highly
expensive watches, engage in high-stakes gambling, and spend
money freely, even by comparison with standard practices of
highly compensated investment bankers.)

        The Government submits that Naseem's prior claim that
these funds originated with his father begs credulity.  It is
simply incongruous that Naseem's father would transfer to him
$200,000 via four different individuals, none of whom are related

---

        [10]     Judge Berman denied the defendant's motion to preclude
the Government from introducing evidence of the wire transfers
and ruled that there existed a sufficient nexus between the wire
transfers and the charged scheme to permit the Government to
introduce this evidence at trial.  Nevertheless, the Government
ultimately decided not to seek to introduce this evidence at
trial.

to Naseem, particularly in light of Naseem's well paying job as
an investment banker.  Moreover, Naseem now claims, in support of
his motion for a downward departure based on his family
circumstances, that his family lacks financial means and are
dependent upon him for financial support.  This claim squarely
contradicts Naseem's prior contention that his father supported
*him* by providing him with nearly $200,000 during a several month
period in 2006.  The incongruity between these two opposing
claims further belies Naseem's claims with respect to both his
alleged lack of gain as well as his family circumstances.

        Moreover, as discussed above, much of the gain from the
offense – totaling millions of dollars – was frozen before the
conspirators could access the funds.  Ample evidence indicates
that Naseem and Rahim planned to share in these frozen profits.
E-mails introduced at trial demonstrated that at the outset of
the charged scheme, in May 2006, Naseem and Rahim discussed
opening a brokerage account at Arif Habib bank in Pakistan that
Rahim would manage.  In one of the e-mails between Naseem and the
Arif Habib broker, Naseem stated: "You will note that I have
authorized Ajaz to manage [the account].  Also talked to him and
he knows that he can do whatever he wants.  Let the fun start."[11]
(GX 2).

        The e-mail correspondence between Naseem and the Arif
Habib broker signifies that Rahim and Naseem were communicating
about a brokerage account that Rahim agreed to manage for Naseem
at the very same time they were engaged in the charged
conspiracy.  Common sense compels the conclusion that Naseem and
Rahim intended for Naseem to share in the profits from the
scheme.  A contrary conclusion requires the Court to accept the
unlikely notion that the confluence between the Arif Habib-
related communications and the conspirators' participation in the
charged scheme was mere happenstance.

        Similarly, Naseem's statements, made in various e-
mails, evidence his ambition for wealth, which further supports
the conclusion that Naseem engaged in the insider trading scheme
for financial gain.  Thus, for example, on or about December 21,
2004, Naseem stated, in an e-mail to a "Nadeem Karamat" that "I
have stopped looking into market, because I have so much inside

_____

        [11]    Notably, the very date of this e-mail, May 24, 2006,
was the same date on which Naseem requested and obtained access
to the Credit Suisse Mergers and Acquisitions shared drive.

info that it can become very tempting." (GX 71). In another e-mail dated July 8, 2005, sent by Naseem to a "Ali Malik" while Naseem was employed at JP Morgan, Naseem states, in relevant part:

> I have been working for JPMorgan for now almost an year and a half. [sic] It is a typical Wall Street shop where dog eats dog and *money is the biggest and only motivator*. Where small fish like me work all hours they can stay awake and big fish divide their time between playing golf at Augusta, their beach houses in Hamptons and their ski lodges in Aspen and their mansions in Connecticut.

(GX 74) (emphasis added). Also, the sheer length of time during which Naseem and Rahim conspired together, both at JP Morgan and at Credit Suisse, further supports the inference that Naseem engaged in the scheme for financial gain.

### 2. Naseem's Motion For A Downward Departure Under U.S.S.G. § 5K2.0 Is Legally Baseless

As a legal matter, Naseem does not, and cannot, dispute that Section 2B1.4(b) increases the offense level based on "the gain resulting from the offense" and that "the gain resulting from the offense" in this case is nearly $8,000,000. Furthermore, the official commentary to Section 2B1.4 demonstrates that the Sentencing Commission carefully considered how "the gain resulting from the offense" should be calculated, and determined that gain should be based on the profits of the defendant *and his co-conspirators*, *or the profits of the tippee* to whom the defendant provided the information.

The commentary to Section 2B1.4 states, in relevant part:

> This guideline applies to certain violations of Rule 10b-5 that are commonly referred to as "insider trading." Insider trading is treated essentially as a sophisticated fraud. Because the victims and their losses are difficult if not impossible to identify, *the gain, i.e., the total increase in value realized through trading in securities by the defendant and persons acting in concert with*

> *the defendant or to whom the defendant*
> *provided inside information,* is employed
> instead of the victims' losses.

U.S.S.G. § 2B.14, cmt. background (2007) (emphasis added).  In
defining gain, "the commentary uses common words with widely
understood meanings." *United States v. Mooney*, 425 F.3d 1093,
1100 (8th Cir. 2005) (en banc).  The words appearing in the
above-quoted commentary demonstrate that the Commission
contemplated a situation (unlike the instant case) where there
was no evidence that the tipper profited from the insider trading
scheme.  The Commission expressly stated that, in such
situations, the gain should be calculated by determining the
increase in value realized through trading by the individuals "to
whom the defendant provided inside information." *Id*.  Thus, a
failure to hold the tipper accountable for "the gain" to the
tippee would not only flout Section 2B1.4's clear admonition to
the contrary, but would also undermine the deterrent effect of
insider trading prosecutions.  Such a result would be
particularly unfortunate in light of the fact that it is the
first-tier tippers who actually steal the material non-public
information in an insider trading scheme and are thus, at least
in this respect, more culpable than tippees.

        Moreover, as the Second Circuit has held in the context
of defining "intended loss," "one is presumed to intend the
natural and 'probable' consequences of one's acts." *United
States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000).  Here, it
should be presumed that Naseem intended the natural and probable
consequences of his act of tipping Rahim repeatedly with
material, nonpublic information — substantial illegal trading
gains.  Accordingly, even assuming, *arguendo,* that there were no
evidence that Naseem realized any profits from the insider
trading scheme, Naseem's offense level should be increased by the
gain of the person to whom Naseem provided inside information,
and the Commission's plain language demonstrates that Naseem
should be held responsible for the full extent of the tippee's
gain.

        In addition, Naseem's suggestion that "the gain" here
results in an "unfair" or "harsh" application of the Guidelines
(*see* Br. 18) misses the mark.  The Commission specifically
designed the insider trading Guideline so that virtually the
entire increase beyond the base offense level would be driven
entirely by "the gain." *See* U.S.S.G. 2B1.4(b).  Given that the
principal motive in any insider trading scheme is greed, it seems

perfectly reasonable for the Commission to design the insider trading Guideline in this manner.  The Commission could have, but did not, include various other factors in determining the offense level.  Indeed, Naseem's conduct would have implicated several additional enhancements under the general fraud Guideline, U.S.S.G. § 2B1.1, including an enhancement for committing "a substantial part of a fraudulent scheme . . . from outside the United States" (U.S.S.G. § 2B1.1(b)(9)(B)), and while being "a person associated with a broker or dealer" (U.S.S.G. § 2B1.1(b)(15)(A)(ii)).  If Naseem's argument were correct, that is, if a defendant's offense level should not be driven by "the gain," then the entire structure and purpose of Section 2B1.4 would be rendered meaningless.

## C.    The Court Should Deny Naseem's Motion For A Downward Departure Based On His Family Circumstances

         Naseem also seeks a downward departure based on extraordinary family circumstances, pursuant to U.S.S.G. § 5H1.6.  For the reasons set forth below, Naseem's family circumstances are not extraordinary and his request for a downward departure should be denied.

### 1.    Applicable Legal Principles

         Section 5H1.6 of the Guidelines provides that "[f]amily ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."  Because family circumstances are a "discouraged" basis for departure under the Guidelines, a court may depart downward based on such circumstances "only 'in exceptional cases,'"  *Koon* v. *United States*, 518 U.S. 81, 95 (1996)(quoting U.S.S.G. ch. 5, part H, intro. comment.), and "only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present."  *Id.* at 96; *see also United States* v. *Faria*, 161 F.3d 761, 762 (2d Cir. 1998)("a court may depart on the basis of family circumstances only in exceptional circumstances"); *United States* v. *Walker*, 191 F.3d 326, 338 (2d Cir. 1999)(family circumstances departures "must be reserved for situations that are truly extraordinary").

         As the Second Circuit has repeatedly emphasized, "[d]isruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration."  *United States* v. *Johnson*,

964 F.2d 124, 128 (2d Cir. 1992); *accord United States* v. *Galante*, 111 F.3d 1029, 1034 (2d Cir. 1997); *see also United States* v. *Londono*, 76 F.3d 33, 36 (2d Cir. 1996) ("[i]ncarceration inevitably impacts on family life and family members.").

Thus, the Second Circuit has limited family circumstances departures to cases in which a sentence within the Guidelines range would impose hardships on a defendant's family beyond the contemplation of the Sentencing Commission and more severe than those commonly afflicting families of incarcerated felons. Such departures are limited to situations "'where the family was uniquely dependent on the defendant's ability to maintain existing financial and emotional commitments.'" *United States* v. *Faria*, 161 F.3d 761, 762 (2d Cir. 1998) (quoting *United States* v. *Sprei*, 145 F.3d 528, 535 (2d Cir. 1998)). The departure is impermissible where other relatives could meet the family's needs. *United States* v. *Selioutsky*, 409 F.3d 114, 119 (2d Cir. 2005).

District Courts in this Circuit and other Courts of Appeals have regularly held that, in the absence of extreme hardships that could not have been contemplated by the Sentencing Commission, even compelling relationships between the defendant and her family do not warrant a departure. *See, e.g., United States* v. *Madrigal*, 331 F.3d 258, 260 (2d Cir. 2003) (reversing departure where older children were available to care for younger siblings); *United States* v. *Rybicki*, 96 F.3d 754, 759 (4th Cir. 1996) (reversing departure where defendant's wife suffered from fragile mental health and son suffered from neurological problems requiring supervision); *United States* v. *Allen*, 87 F.3d 1224, 1225-26 (11th Cir. 1996) (reversing departure for defendant who was primary caretaker for 70-year-old father suffering from both Alzheimer's and Parkinson's diseases); *United States* v. *Goff*, 20 F.3d 918, 921 (8th Cir. 1994) (reversing departure where defendant was sole source of family income for wife -- who suffered from depression disorder and panic attacks -- and three sons); *United States* v. *Rushby*, 936 F.2d 41, 42-43 (1st Cir. 1991) (departure could not be based on fact that defendant had "strong family ties," was a "good father," had "two sons, aged seven and nine," and was "the main breadwinner of the family [who] function[ed] as a caretaker . . . when his wife [was] working," and did chores such as grocery shopping and snow shoveling for his wife's grandmother who lived across the street); *United States* v. *Malpeso*, 943 F. Supp. 254, 257 (E.D.N.Y. 1996) (denying departure even though one of defendant's

young children showed signs of emotional distress, the family was
encountering financial difficulties, and defendant's wife could
not find day care for the children and hence could not work),
*aff'd*, 126 F.3d 92 (2d Cir. 1997).

### 2.   Discussion

        Naseem emphasizes the significant emotional and
psychological pain that members of his family have endured as a
result of his conviction.  (Br. 20-28).  The consequences to
Naseem's family are, to be sure, extremely unfortunate.  However,
as indicated above, "difficulties for those who depend on the
defendant, are inherent in the punishment of incarceration."
*United States* v. *Johnson*, 964 F.2d at 128.  The sort of
psychological and emotional distress described by Naseem in his
submission, and described by the various letters provided to the
Court on behalf of Naseem, as painful as it may be, does not
"substantially exceed the harm ordinarily incident to
incarceration for a similarly situated defendant."  *See* U.S.S.G.
§ 5H1.8, cmt. n.1(b)(ii) (requiring, among other things, harm
beyond that ordinarily incident to incarceration as a basis for
even considering a family circumstances departure; *see also,*
*United States* v. *Rybicki*, 96 F.3d at 759 (reversing departure
where defendant's wife suffered from fragile mental health and
son suffered from neurological problems requiring supervision).

        Naseem also claims that his family depends upon him for
"some or all of their emotional" well being (Br. 4) and that he
is instrumental in the care of his ill daughter and that his
incarceration would hamper her medical treatment.  (Br. 20-28).
Naseem's claim, however, is belied by the fact that he admittedly
worked in excess of 100 hours per week as an investment banker at
JP Morgan and Credit Suisse.  In fact, in describing his hours at
JP Morgan, Naseem stated the "work is unbelievably overwhelming"
and that he "regularly put in 100-120 hours work weeks." [sic]
(GX 8).  Naseem went on to state that "on a normal day I go back
home at 1 in the night.  Good day, 10 pm.  Bad day, 5 in the
morning.  *I don't remember the last day when I had dinner with*
*ayesha and kids.*  I work weekends (all of them)." (GX 8)
(emphasis added).  The evidence at trial demonstrated that life
as a Credit Suisse investment banker was not much different.
Naseem's claim that his caretaking role is so extraordinary that
it takes this case out of the heartland is substantially
undermined by the evidence that he spent virtually all of his
time at work.  Moreover, as the Probation Office notes, "the

defendant was obviously fully aware of his daughter's condition and his family responsibilities when committing the fraud and surely must have known that he was placing not only himself, but his family at risk if his conduct was discovered."  (PSR at 28).

In addition, Naseem claims the financial support he provides to his family is irreplaceable and notes that "both his parents and his in-laws rely on Mr. Naseem for financial and emotional support." (Br. 28).  This claim, however, is contradicted by Naseem's statement to the Probation Officer that "his family had wealth and there were no money problems."  (PSR ¶ 83).  Furthermore, as discussed above, this argument is precisely the opposite of what Naseem argued at trial in support of his motion to preclude the Government from introducing evidence of wire transfer payments to Naseem of nearly $200,000 during the course of the conspiracy.  Specifically, Naseem represented to Judge Berman that it was his father who assisted him financially and that it was his father who sent him the nearly $200,000 between August 2006 and January 2007.  These contrasting claims mean that either (i) Naseem is currently lying and his father did, in fact, provide him with financial support, which strongly suggests his father possesses the financial means to assist Naseem's family, or (ii) Naseem lied to Judge Berman and, in fact, the $200,000 in wire transfers came, not from his father, but from the insider trading scheme.  In any event, the fact that Naseem is either misrepresenting facts to this Court or did so before Judge Berman, calls into serious question any claims he makes concerning his family's ability to subsist financially while he remains incarcerated.

Moreover, the Government is in possession of e-mails, which were produced to the defense in discovery, that indicate that Naseem was exploring job opportunities outside the United States, including in Pakistan, during April 2007.  The fact that Naseem was investigating possible job opportunities in Pakistan wholly undermines his claim that his daughter's health gains would be lost should his family be forced to live outside the "United States or in a country with comparable resources." (Br. 14).  Naseem's claim that his children's suffering would be compounded should they have to move outside of their school district for financial reasons (Br. 26) is similarly undermined by the fact that he actively sought employment in Pakistan during April 2007.

Also, importantly, the volume of letters submitted on Naseem's behalf demonstrates that he has a large and supportive

network of family and friends, which include, among others, his parents, his wife's parents, his brother, and many others. Although Naseem asserts that his wife, her family, and his family are incapable of caring for their two children, the Probation Department report strongly suggests otherwise. (PSR, Justification). At the outset, the Probation Department spoke with Naseem's wife, and she answered the Probation Officer's questions without apparent difficulty, reported that she has not told her children that their father is incarcerated but rather that Naseem is "busy with work and will be back soon," and stated that "she relies on the support of her family and her husband's family as well." (PSR ¶ 86). Indeed, Naseem's wife told Probation that "her parents and the defendant's father have come from Pakistan and are residing with her to assist her." (PSR ¶ 86).

Moreover, Naseem himself described his family as "very close-knit and reported that as is customary in Pakistan, they often lived with extended family members in the same home." (PSR ¶ 83). Based on its considerable experience with respect to the sentencing of defendants, the Probation Department found that Naseem's children had sufficient and reasonable support from his wife, his wife's parents, his parents, and their respective extended families in Pakistan such that a departure for family circumstances was not warranted. (PSR at 28). As the Probation Officer further notes, it would appear that Naseem and his family are subject to deportation and that upon their return to Pakistan, Naseem's wife will have access to extended family to assist her with their daughter's care. (PSR at 28). Naseem's conclusory and unsupported claims that his family unit will be destroyed if he receives a term of imprisonment simply do not withstand scrutiny, particularly in light of the Probation Department's findings.

Naseem relies upon *United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991), *United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992), and *United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997) in support of his family circumstances departure motion. However, Naseem's circumstances are distinguishable from those of the defendants in these case. For example, in *Alba*, before remanding for resentencing, the Second Circuit found that the defendant had an "extremely limited" involvement in the cocaine transaction that led to his guilty plea, that the defendant was a hard working day-laborer who juggled two jobs to take care of his wife, two daughters (4 and 11 years old), disabled father who relied on the defendant to get in and out of his wheelchair, and

paternal grandmother.  933 F.2d at 1121-22.  As an initial
matter, Naseem's extensive involvement in the criminal insider
trading scheme for which he continues to refuse to accept
responsibility provide a marked contrast with the *Alba* case.
More importantly, the Probation Department's findings that the
defendant's children are and will continue to be cared for by
Naseem's wife, his wife's family, and Naseem's family render
Naseem's family circumstances wholly different from those of the
defendant in *Alba*.

        Similarly, in *Johnson*, Your Honor was dealing with a
much different situation.  There, Your Honor found that the
defendant's crime "more closely resembl[ed] theft than bribery,"
and that the defendant was not only a mother but the sole
provider and care giver for four young children (ages five months
old, 5, 6, and 6).  964 F.2d at 125-26.  Although Naseem compares
himself with this mother, neither his crime nor his family
circumstances (given the substantial support that he has received
and will continue to receive from his extended family, his wife,
and  his wife's extended family) come close to resembling the
burdens that the defendant in *Johnson* faced.

        Finally, in *Galante*, the Second Circuit affirmed a
family circumstances departure for a pizza shop worker who had
pleaded guilty and received home detention of twenty-four months,
because the defendant had limited earnings, two children (ages 8
and 9), had a family that was on the brink of being evicted from
their home and forced to apply for public housing and assistance,
and the defendant helped his mother wash and feed his disabled
father who lived with him.  111 F.2d at 1032.  Unlike this case,
in *Galante* "[t]here was proof that neither Galante's parents nor
his siblings could provide financial assistance for his family."
*Id*.

        In seeking a departure or variance for family
circumstances, Naseem not only relies on cases that are entirely
distinguishable, but he overlooks the Second Circuit's most
recent pronouncements in this area, which emphasize the limited
application of these departures or variances.  In *United States
v. Cutler*, 520 F.3d 136 (2d Cir. 2008), and *United States v.
Trupin*, 475 F.3d 71 (2d Cir. 2007), the Second Circuit vacated
the sentences and remanded for new sentencing proceedings based,
in part, on findings that the defendants warranted downward
departures or variances based on their family circumstances.  In
*Cutler*, the Second Circuit found that the fact that the
defendant's incarceration was likely to cause hardship to his ex-

wife, his three children (ages 11, 14, and 20), and cause the children to leave their school system and move into the home of their mother's sister in another state "do not take this case sufficiently out of the mainstream o family hardships to warrant a downward departure." 520 F.3d at 164-65. As to the second defendant, while "sympathetic" to this defendant's circumstances of having a mentally retarded brother who suffers from cerebral palsy and to whom the defendant provided substantial support, and an elderly mother-in-law who lived in an assisted living facility, the Court reversed the district court's finding and held that "[t]hese circumstances fall far short of a basis for departure." *Id*. at 171-72. Similarly, in *Trupin*, the Second Circuit found that the defendant had not demonstrated, contrary to the district court's findings, that his "presence was essential to his wife's well-being." 475 F.2d at 75. The Court concluded that "the separation of [the defendant] from his wife caused by incarceration is not sufficiently unique to [the defendant], but rather is true of every married defendant who runs afoul of the law and is then separated from his family. While tragic, it is a tragedy of [the defendant's] making." *Id*.

Finally, it is hardly "self evident" as Naseem claims, that a family circumstances departure would address the various harms he chronicles in his sentencing submission. First, it appears that Naseem and his family will be deported to Pakistan upon his release from prison. Given this circumstance, the harms that would attend the family's departure from this country are inevitable regardless of whether or not the Court grants the defendant's departure motion. Second, Naseem's ability to provide financial support for his family has been compromised. He is now a convicted felon who will almost certainly be barred from working in the securities industry. Consequently, it is far from "self evident" that a downward departure would "effectively . . . address the loss of caretaking or financial support." *See* U.S.S.G. § 5H1.6, cmt. n. 1(B)(iv).

For the foregoing reasons, the Government respectfully submits that the Court should deny Naseem's motion for a family circumstances departure. Undoubtedly, Naseem's incarceration will be extremely difficult for his family, which is not uncommon when husbands and fathers are incarcerated. Naseem's predicament, however, does not fall within the realm of those extraordinary circumstances that warrant a downward departure.

**D.    The Factors Under 18 U.S.C. § 3553**
**Require A Sentence Of Incarceration**

The factors set forth under Title 18, United States Code, Section 3553(a) militate in favor of a sentence that includes a substantial period of imprisonment.  For example, the offense at issue here was an extensive, sophisticated, and elaborate scheme that Naseem and his conspirator carried out for a year and a half.  Naseem assured his employer of his trustworthiness, certified his understanding of Credit Suisse's compliance policies, and then repeatedly breached the trust he owed to his employer, his colleagues, his co-workers, and his employer's clients by stealing confidential information.  Naseem violated the trust that so many individuals and companies gave him with utter abandon, accessing and attempting to access numerous deal documents that related to at least 17 deals involving public companies, over a period of 18 months, while employed at two different financial institutions.  This sort of calculated and persistent criminal behavior, calls for a stiff sentence which should recognize "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  *See* 18 U.S.C. § 3553(a)(2)(A).

Similarly, a sentence of substantial incarceration is necessary to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).  Should Naseem, who worked for two major financial institutions, and provided tips with respect to numerous confidential deals, over a period of a year and a half, netting nearly $8 million in profits, be spared incarceration it would send a woefully inadequate message to others contemplating similar behavior.

In considering the history and characteristics of the defendant, the Government would ask the Court to consider not only the hardships and good deeds outlined by the defendant's submission, but also the following.  As evidenced by the numerous letters provided to the Court in support of Naseem, he was reared in a loving and caring family.  His father is an educated professional.  By all accounts, Naseem is a very bright and capable individual.  Moreover, although he endured his share of difficulties – including some profound hardships – he was blessed with tremendous opportunities.  Naseem himself described his upbringing to the Probation Officer as "privileged."  (PSR ¶ 83). He completed his college education in Pakistan, after which he attained a good job working at a bank.  Subsequently, he was

accepted to and graduated from a prestigious business school in the United States. And he attained employment at two of most prestigious employers on Wall Street.

Further, as an employee at JP Morgan and Credit Suisse, as reflected by the impressive testimony of the diligent, intelligent, and hard-working investment bankers at Credit Suisse, Naseem was indoctrinated in the number one bright-line governing principle that bankers are required by law, by practice and by clients to keep their client confidences entirely confidential and never, ever use them for selfish purposes, whatever those purposes might be.

Despite all the advantages that he received during his upbringing, education at the finest institutions in the United States, and privilege of working at premier places on Wall Street, Naseem demonstrated complete and utter disdain for JP Morgan, Credit Suisse, their clients, and the federal securities laws. Naseem's crimes can only be understood as the product of his greed and recklessness. Naseem is not an individual who lacked the ability to support his family through legitimate means. Rather, Naseem is someone who purposefully and willfully committed serious crimes notwithstanding the significant educational, familial, and other advantages he enjoyed. The fact that Naseem endured hardship and sorrow in his life neither justifies the commission of his crimes, nor militates in favor of leniency, particularly in light of the significant advantages and opportunities he had.

A substantial sentence is necessary to send a message to Naseem, others on Wall Street and in similar positions where client confidences are absolutely necessary and required for the security of our capital markets, and the public that trading on the basis of inside information in violation of duties of trust and confidence in such an extensive, arrogant manner for reasons of pure greed, despite the pernicious consequences to one's family, co-workers, colleagues, and employer, cannot and should not be tolerated or treated lightly.

**CONCLUSION**

For the reasons stated above, the Government respectfully requests that the Court adopt the Guidelines calculations set forth in the PSR, deny the defendant's motions for downward departures and/or a variance, and impose a sentence that includes a substantial period of incarceration.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By:  //s// Josh Klein/Reed Brodsky
Joshua Klein
Reed Michael Brodsky
Assistant United States Attorneys
Telephone:  (212) 637-2397/2492

cc:  Walter J. Quinn, U.S.P.O.
     Michael Bachner, Esq.
     Edward J.M. Little, Esq.
     Lisa A. Cahill, Esq.
     (By E-mail and Facsimile)